Kelly J. Shindell DeLacey
DeLacey, Riebel & Shindell, LLP
180 Montgomery Street, Suite 1900
San Francisco, CA 94104
Telephone: 415-528-7000
Fax: (415) 528-7001
Email: kelly@drsfamilylaw.com

Richard Min (admitted *pro hac vice*)
Green Kaminer Min & Rockmore LLP
420 Lexington Avenue, Suite 2821
New York, NY 10170
Telephone: (212) 681-6400
Facsimile: (212) 681-6999

*Attorneys for Petitioner CASIMIRO JOSE CANHA CAVACO DIAS*

GIBSON, DUNN & CRUTCHER LLP
THAD A. DAVIS, SBN 220503
 tdavis@gibsondunn.com
DANIELLE HESSE, SBN 318321
 dhesse@gibsondunn.com
ROMMY FLORES C., SBN 298770
 rfloresconklin@gibsondunn.com
WILLIAM FELDMAN, SBN 339008
 wfeldman@gibsondunn.com
AARON J. CHEUNG, SBN 346307
 acheung@gibsondunn.com
NICOLE WADDICK, SBN 352997
 nwaddick@gibsondunn.com

One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone:   415.393.8200
Facsimile:   415.393.8306

333 South Grand Avenue, Suite 4600
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

*Attorneys for Respondent RULA NABIL KHOURY CAVACO DIAS*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In the Matter of I.D., N.D., and C.D.: <br><br> CASIMIRO JOSE CANHA CAVACO DIAS <br><br> Petitioner, <br><br> and <br><br> RULA NABIL KHOURY CAVACO DIAS <br> Respondent. | Case No.  3:24-cv-04471-EMC <br><br> **JOINT PRETRIAL CONFERENCE STATEMENT** |

**I.     The Action**
      a.   <u>Substance of the Action</u>

This case concerns the children of Petitioner Casimiro Jose Canha Cavaco Dias ("Petitioner" or "Mr. Dias") and Respondent Rula Nabil Khoury Cavaco Dias ("Respondent" or "Ms. Dias"). This is an action brought pursuant to the Hague Convention on the Civil Aspects of Child Abduction, Oct. 25, 1980, art. 13(b), T.I.A.S. No 11670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg., 10, 494 (Mar. 26, 1986) ("Hague Convention"), implemented in the United States through the International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq. (formerly codified at 42 U.S.C. § 11601 et seq.) ("ICARA") seeking the return of three children to Armenia. Petitioner argues that Armenia is the Children's habitual residence, and therefore, they ought to be returned to Armenia forthwith; Respondent takes the contrary position.

Respondent disputes that the Children should be forced to return to Armenia. First, Respondent argues that Armenia is not the Children's place of habitual residence, and therefore, removal of the children from Armenia was not wrongful. Second, Respondent contends that the Children would face grave risk if returned to Armenia in the form of physical and/or psychological harm from Petitioner.

      b.   <u>Relief Prayed</u>

Petitioner respectfully requests that this Court grant Petitioner's Hague petition and order the return of the Children to their habitual residence in Armenia. Should the Court determine that a grave risk of harm exists in returning the children, the Petitioner respectfully requests that the Court exercise its discretion to order their return with appropriate ameliorative measures in place.

Respondent respectfully requests that the Court deny Petitioner's Hague petition in full. Armenia is not the Children's place of habitual residence. Even if it were, and it is not, the Children would face grave risk if returned to Armenia in the form of physical or psychological harm from Petitioner, and there are no ameliorative measures sufficient to protect them.

Respondent further requests that she be awarded her attorneys' fees as provided by law or this Court.

## II. Factual Basis of the Action

a. <u>Undisputed Facts.</u>

1. The parties were married on August 17, 2013, in Lisbon, Portugal. Petitioner is a citizen of Portugal, and Respondent was born in Palestine and is a citizen of the United States.

2. The parties have three children: I.D. is nine years old and a United States and Portuguese citizen; N.D. is eight years old and a United States and Portuguese citizen; and C.D. (nickname A.D.) is six years old and a United States, Portuguese, and Bajan (Barbados) citizen.

3. The parties are both currently employees of the World Health Organization (WHO).

4. The family has relocated every few years to different countries. Ms. Dias is a consultant who is able to work remotely.

5. The family lived in Denmark from January 1, 2009, to December 31, 2014. Then they lived in Angola from January 1, 2015, to June 15, 2016. They then lived in Barbados from June 16, 2016, to December 31, 2018. Subsequently, they lived in Jamaica from January 1, 2019, to December 2023.

6. Mr. Dias was offered a position in Armenia in the fall of 2023, and the family moved there on December 27, 2023.

7. Petitioner received a fixed-term contract for his position in Armenia on November 20, 2023, set to run from November 22, 2023, to November 21, 2024, with the possibility

of renewal.[1]  To date, Petitioner's contract in Armenia has not been renewed, nor terminated.

8. The Children were issued "International Organization Employee/Expert ID" cards by the Ministry of Foreign Affairs of the Republic of Armenia on March 1, 2024, which expire on July 8, 2026 and grant the Children "the immunities and privileges as provided for the employee/expert of the international organization by the International Agreements of the Republic of Armenia."

9. The parties signed a one-year lease for a home in Yerevan, Armenia on February 2, 2024, which renews automatically upon the termination of the year.

10. The parties enrolled the Children in the International School of Quality in Yerevan, Armenia, an English-speaking school, which they attended while living in Armenia. The Children are covered with health insurance by the WHO, which provides international coverage.  This coverage includes Armenia and the United States, among other locations worldwide.  The Children received medical and dental care in Armenia.  The Children have also received medical and dental care in Jamaica and the United States.

11. The police responded to the hospital and took a report from Respondent as a victim of domestic violence on April 21, 2024. The next day, on April 22, 2024 she obtained an emergency restraining order against Petitioner.

---

[1] **Respondent's Note**: In relation to Petitioner's admittedly false claims that his contract/assignment ran until 2028 and/or for "5 years" Petitioner agreed to amend and refile these false pleadings.  Additionally the parties are working to resolve certain discovery issues, including extensive spoliation by Petitioner of key evidence and yet-to-be-satisfied discovery obligations.  Petitioner has agreed that Respondent may supplement her exhibit list prior to trial to include any such developments.
**Petitioner's Note:** Petitioner disagrees with Respondent's representations above, especially concerning allegations of extensive spoliation of key evidence and that there are outstanding discovery obligations.  Respondent has recently requested some additional documentation and despite disagreement about its relevance to these proceedings, Petitioner is working with Respondent to provide that information in good faith and to permit supplementation of the exhibit list of the recently requested documents.

12. On or about April 23, 2024 Respondent's brother and sister arrived in Armenia, and they accompanied Respondent to the police station.

13. The Children remained with the Petitioner from April 21, 2024 to April 25, 2024. On April 25, 2024, after dropping the children off at school, Petitioner was notified by the school that Respondent had picked them up early.

14. The U.S. Embassy issued emergency passports to Respondent for the Children, and Respondent moved with the Children from Armenia to the United States on April 25, 2024.

15. Petitioner challenged the restraining order in Armenian court. Respondent did not participate in the proceeding. On July 8, 2024, the Administrative Court of Appeals invalidated the decision of the police department dated April 23, 2024, "on the application of emergency intervention against a person who committed domestic violence." Respondent, upon learning of this decision from an appeal in which she did not participate, has appealed it. That appeal remains pending.

16. On June 24, 2024, Petitioner filed a petition in this Court under the Hague Convention, seeking return of the Children to Armenia. [ECF No .1]. This Hague Convention case before this Court follows.

   b. Disputed Factual Issues.

17. Whether Respondent's removal of the Children from Armenia was wrongful.

18. Whether Armenia was the Children's place of habitual residence at the time of removal.

19. Whether the parties, and even Petitioner, intended to stay in Armenia long term, and if so, how long they alleged intended to remain in Armenia.

20. Whether other facts involving the circumstances of the move, the family, and their lives in Armenia related to the issue of habitual residence collectively indicate whether

Armenia was or was not the place of habitual residence of the Children. Such facts in dispute include among others: degree of local contacts in Armenia, location of extended family, location of the parties' real estate and financial assets, duration of time the family was in Armenia, degree to which the family settled in Armenia, Petitioner's conduct towards Respondent and the Children, Petitioner's employment in Armenia and intentions therewith.

21. Where the parties' belongings were located at the time of the removal and whether the parties' belongings had been shipped from Jamaica to Armenia around the time of the move in December 2023 and to what extent the parties' belongings were shipped and collected.

22. Whether Petitioner physically abused Respondent, including the degree, severity, and history of that abuse.

23. Whether Petitioner psychologically abused Respondent, including the degree, severity, and history of that abuse.

24. Whether Petitioner physically abused the Children, including the degree, severity, and history of that abuse.

25. Whether Petitioner psychologically abused the Children, including the degree, severity, and history of that abuse.

26. Whether the Children would be exposed to a grave risk of harm should they be forced to return to Armenia with Petitioner.

27. Whether Petitioner specifically physically abused Respondent on or around April 19, 20, and 21, 2024, causing injuries requiring her to seek medical treatment at a hospital.

28. Whether Petitioner's alleged threats of violence and actual violence, including in front of and directed towards the Children, would expose the Children to grave risk if returned to Armenia.

29. Whether the Children were exposed to any of the alleged abuse against Respondent.

30. Whether Petitioner has threatened harm to Respondent and members of Respondent's family on multiple occasions.

31. Whether on April 21, 2024, Petitioner threw Respondent out of the house and warned her not to be there when he returned.

32. Whether there are ameliorative measures in Armenia that would adequately protect the Children from a grave risk of harm if forced to return to Armenia with Petitioner.

33. Whether Petitioner spoliated evidence in anticipation of and during this litigation.

### III. Disputed Legal Issues.

The two issues in this case are: (1) determining whether Petitioner can establish by a preponderance of the evidence that the children's habitual residence was Armenia at the time they were wrongfully removed, which is a threshold issue; and (2) if Petitioner succeeds in establishing by a preponderance of the evidence Armenia is the habitual residence, whether Respondent can prove by clear and convincing evidence that returning the Children to Armenia would pose a grave risk of harm pursuant to Article 13(b) of the Hague Convention. The Court may, but is not required to, and once grave risk has been established by Respondent such that return to Armenia would expose the Children to grave risk of harm, whether sufficient ameliorative measures are available to mitigate against the grave risk of harm.

#### Habitual Residence

1. **Petitioner's Position**: Armenia is the Children's habitual residence. *Monasky v. Taglieri*, 589 U.S. 68, 77 (2020) (The Supreme Court has held that "the place where a child is at home at the time of removal or retention, ranks as the child's habitual residence."). The Ninth Circuit has held post-*Monasky* that a child's "habitual residence" may be where the facts indicate that the parents "made their home." See, e.g., *Kenny v. Davis*, 2022 WL 501625, at *1 (9th Cir. Feb. 18, 2022). In the instant case, the parents shared an intention to move to Armenia, establish a home there, and remain there for some indeterminate length of time. It is the only place in the world that could be the Children's habitual residence and in fact is there habitual residence. The Children were removed from their habitual residence on April 25, 2024. Therefore, the Children should be returned to Armenia forthwith, as the Hague Convention "requires the prompt return of a child

wrongfully removed or retained away from the country in which she habitually resides." *Monasky*, 589 U.S. at 72.

2. **Respondent's Position**: Armenia is not the Children's place of habitual residence, and no court has ever found a country to be a Children's place of habitual residence with as few and as tenuous connections as those here. In fact, the intention of both parents was that Armenia was but a temporary stopover before Petitioner was able to get a better position elsewhere. Habitual residence is determined by "the totality of the circumstances specific to the case." *Monasky*, 589 U.S. at 71. The "totality of circumstances" rubric includes: (1) a "change in geography combined with the passage of an appreciable period of time"; (2) where the children have lived throughout their lives; (3) the length of time that Children have lived in a country; (4) whether the parties viewed their time in a country as temporary; (5) the citizenship and immigration status of the Children and parents; (6) whether the Children speak the language of the country; (7) whether the children have acclimated; and (8) the purposes and intentions of the parents. *See, e.g., Farr v. Kendrick*, 824 F. App'x 480, 482 (9th Cir. 2020). Every single factor cuts against finding Armenia as a place of habitual residence here. Additionally, there is no requirement that the Court find (nor that Respondent establish) that there be any habitual residence at all. *See Watts v. Watts*, 935 F.3d 1138, 1147-48 (10th Cir. 2019) ("[t]he Convention does not require a district court to determine where a child habitually resides [ ] [i]nstead, the Convention requires a district court to determine whether the child habitually resides in the location that the petitioner claims"); *see also Nisbet v. Bridger*, 2023 WL 6998081, at *6 (D. Or. Oct. 24, 2023) (holding that children who moved repeatedly between two countries "lacked a habitual residence altogether"); *Alzu v. Huff*, 2024 WL 3165485 (W.D. Mi. June 24, 2024) (holding that the Hague Convention does not require every child to have a habitual residence). To summarize a few key facts: (1) the children spent less than four months in Armenia, which was the latest in a long line of countries they had lived in; (2) *both* parties demonstrably viewed their time in Armenia and indeed intended the time there to be only temporary: Petitioner applied to four different jobs in other countries and interviewed for two even after accepting his short-term post in Armenia, and Petitioner's job there—his only connection to the country—is set to expire less than three weeks after the close of trial; (3) none of the parties nor any Children are Armenian citizens, nor did either party ever intend to seek (nor do they have any basis to seek) Armenian citizenship or long-term immigration status for themselves or the Children; (4) none of the Children

speak Armenian, nor were they learning the language; (5) the children had not acclimated to Armenia—they had made no close friends at school, did not speak the language, lived in four different locations (a hotel, an AirBnB, a house, and briefly an apartment), and had not yet even received their belongings from the shipping company by the time they left; and (6) as stated, both parties intended to leave Armenia as soon as possible so much so that Respondent suggested adding language to the February 2024 lease to avoid liability should the family be relocated during the 12-month lease term as they clearly planned. To reiterate, the Convention does not require that a respondent prove that the Children may have some other habitual residence, nor does it assume that children necessarily have a habitual residence at all. *Watts*, 935 F.3d at 1147-48 ("[t]he Convention does not require a district court to determine where a child habitually resides [ ] [i]nstead, the Convention requires a district court to determine whether the child habitually resides in the location that the petitioner claims"); *Nisbet,* 2023 WL 6998081 at *6; *Alzu*, 2024 WL 3165485, at *5.

Grave Risk of Harm

1. **Petitioner's Position:** Even if this Court were to accept the Respondent's account of events as credible, the abuse allegations still do not satisfy the established standards for "grave risk" as defined by case law and the Hague Convention. The Ninth Circuit has emphasized that the grave-risk exception must be "drawn very narrowly" and "is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Gaudin v. Remis*, 415 F.3d 1028, 1035-36 (9th Cir. 2005) (citations and internal quotation marks omitted). "Rather, the question is whether the child would suffer 'serious abuse' that is 'a great deal more than minimal.'" *Id*. at 1035 (citations omitted). Moreover, even if a removing parent establishes the grave risk exception, the Court may still order the children's return if the court finds "ameliorative measures" can be undertaken that sufficiently mitigate the risk. *Golan v. Saada*, 142 S. Ct. 1880, 1887 (2022).

2. **Respondent's Position:**  Even if Armenia were the place of habitual residence, the shocking facts and extensive evidence in this case easily meet the grave risk exception. "Th[e] 'grave risk' defense [] reflects the proposition that the remedy of return is inappropriate when the abductor is a primary caretaker who is seeking to protect herself and the children from the other parent's violence." *Colchester v. Lazaro*, 16 F.4th 712, 717 (9th Cir. 2021) (internal quotation marks omitted); *see also Golan*, 596 U.S. at 680 ("[D]omestic violence in the home may also constitute an obvious grave risk to the child's

safety that could not readily be ameliorated."). Petitioner's documented, extensive, and long history of physical and psychological abuse of Respondent and the Children, and his threats of violence (including murder and dismemberment of Respondent's family), are more than enough to satisfy the grave risk exception here. *See, e.g.*, *Acosta v. Acosta*, 725 F.3d 868, 875-76 (8th Cir. 2013) (finding grave risk when petitioner had a "violent temper and inability to cope with the prospect of losing custody of [his] children" and had "made multiple threats to kill [respondent] and her family"); *Delgado v. Marquez*, 2024 WL 517874, at *10 (N.D. Cal. Feb. 9, 2024) (finding grave risk established where petitioner had committed domestic violence against respondent, violently threatened her family, had assaulted her in front of the child, and physically restrained her and the child). Even if the Court were to draw the grave risk exception "very narrowly", Petitioner can establish grave risk by clear and convincing evidence. *See Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001) ("[A]t one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation.") (*abrogated on different grounds by Golan v. Saada*, 596 U.S. 666 (2022)). And this Court need not consider ameliorative measures at all. *Golan*, 596 U.S. at 682. But even if it did, Petitioner has put forth no evidence to demonstrate how three children under the age of ten, none of whom speak Armenian, could be protected from the near-certain physical and psychological harm that will continue at the hands of Petitioner if they are returned to Armenia.

Dated: October 9, 2024

                Respectfully submitted,

                */s/ Kelly J. Shindell DeLacey*

                Kelly J. Shindell DeLacey
                DeLacey, Riebel & Shindell, LLP
                180 Montgomery Street, Suite 1900
                San Francisco, CA 94104
                Telephone: 415-528-7000
                Fax: (415) 528-7001
                Email: kelly@drsfamilylaw.com

|   |   |
|---|---|
| 1 | /s/Richard Min |
| 2 | Richard Min (*pro hac vice*) |
|   | Green Kaminer Min & Rockmore LLP |
| 3 | 420 Lexington Avenue, Suite 2821 |
|   | New York, New York 10170 |
| 4 | Telephone: (212) 681-6400 |
|   | Fax: (212) 681-6999 |
| 5 | rmin@gkmrlaw.com |

*Attorneys for Petitioner*
*Casimiro Jose Canha Cavaco Dias*

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

 /s/ Thad A. Davis
Thad A. Davis, Bar No. 220503

Attorneys for Respondent
RULA NABIL KHOURY CAVACO DIAS