

I, Tamar Shirinian, Ph.D., submit the following in the case of Rula Nabil Khoury Cavaco Dias in response to the report submitted by Ashkhen Dashyan.

1. My qualifications, background, and relevant professional experiences are summarized in my Opening Report, dated September 23, 2024 ("Opening Report"). Further, my complete CV is attached to the Opening Report as **Exhibit A**.

2. I write this rebuttal report and testify in any future hearings related to this case, *pro bono publico*, and am not being compensated for my time spent on this matter.

3. I have been asked to provide a responsive opinion regarding my thoughts and conclusions from reading the report submitted by Ashkhen Dashyan on September 23, 2024.

## I. Ms. Dashyan Ignores Cultural Realities of Gender Power in Armenia

4. As an initial matter, Ms. Dashyan's report disregards highly relevant facts regarding gender roles in Armenia, the cultural focus on independence and unity of the family unit, and how those ethos affect attitudes towards domestic violence in Armenia, and policing thereof.

5. As detailed fully in my Opening Report, most women in Armenia do not call the police in cases of domestic violence until their life, or that of their children, are already in severe danger. Further, the cultural focus on family unity means that police in Armenia often do not consider the safety of the children or adequately record evidence of physical violence. *See* Opening Report ¶¶ 9–13.

6. As the United States Department of State has recognized, "[l]aw enforcement bodies [in Armenia] did not effectively investigate or prosecute allegations of domestic violence," because "law enforcement agencies often failed to provide sufficient support and protection to survivors; many survivors felt unsafe at police stations; legal assistance often was lacking for women; courts rarely applied protective measures for survivors and often did not prevent the recurrence of violence; perpetrators often received lenient punishments not involving imprisonment, such as fines; and the heavy judicial caseload often delayed or prevented trials from occurring."[1] Further, "harmful gender stereotyping, secondary victimization, victim-blaming, and disbelief in survivors' testimonies were serious problems in the investigation and prosecution of cases."[2]

7. Ms. Dashyan's report does not appear to consider any of these important cultural issues, nor their impact on the actual, boots-on-the-ground effects on women in Armenia and the effectiveness of Armenian domestic violence laws and procedures.

## II. Ms. Dashyan Ignores Armenia's Recently Passed April 2024 Domestic Violence Law, and Misstates the Effectiveness of Armenia's Prior Domestic Violence Law

---

[1] United States Department of State, *Country Reports on Human Rights Practices for 2023, Armenia*, 41-42 (2023).
[2] *Id*. at 42-43.

**Department of Anthropology**
**College of Arts & Sciences**
430, 1621 Cumberland Avenue  Knoxville. TN 37996-1525
865 -974-6369

**BIG ORANGE. BIG IDEAS.®**



8. Interestingly, Ms. Dashyan's report appears to ignore the April 2024 amendments to Armenia's domestic violence law. *See* Opening Report ¶ 25.

9. This omission is noteworthy. As detailed in my Opening Report, Armenia's 2017 domestic violence law was met with extreme backlash, underscoring the cultural barriers to protection of women in Armenia. *See* Opening Report ¶ 22. Further, the 2017 domestic violence law was focused on "family harmony," rather than on protection of, and justice for, victims of domestic violence. *See id.* Ms. Dashyan's report appears to ignore the April 2024 amendment and the shortcomings of the 2017 law.

10. And as I noted in my Opening Report, the amendments to the 2017 law are a step in the right direction, but do not resolve the cultural barriers that are still present in Armenia today. Additionally, it is impossible to know how, if at all, a law so recently enacted will actually change the status quo from the 2017 law, which, as noted, is significantly lacking in protections for women and all victims of domestic violence.

11. While the 2024 amendments to the law seek to improve significantly the efficacy of the law, the need for these revisions to a state-sponsored drafting of the original law lay bare the cultural and social understandings of domestic violence in Armenia: that the resolution to domestic violence is the return of the victim(s) and perpetrator(s) into a harmonious family rather than the safety of the victim(s). It is my understanding as an expert of gender in Armenia that these sensibilities are still in full operation (including among police) and that it will take much more than the passing of a law and many more years before these social meanings and understandings change in the country. *See* Opening Report ¶¶ 9–16.

### III. Ms. Dashyan Overlooks Critical Facts of Respondent's Experiences as Domestic Violence Victim in Armenia

12. Ms. Dashyan's report also ignores certain key facts about Respondent's experience as a victim of domestic violence in Armenia.

13. For example, Ms. Dashyan ignores that Ms. Dias was abused by Petitioner for months in Armenia, and only received any intervention when she was hospitalized for injuries caused by the abuse. This fact pattern alone points to how difficult it was for Ms. Dias to get help in Armenia for her or the children, particularly as a temporary immigrant with no meaningful social ties and who does not speak the language. This is in contrast to Petitioner, who I understand works away from the home, building social bonds that can be used to undermine reports of his abuse. *See* Opening Report ¶ 35 (discussing concept of close Armenian social networks through which Armenians depend, and Ms. Dias's status in Armenia as an "other").

    a. For example, the police report shows that Ms. Dias "was admitted to 'Nairi' medical center with the diagnosis of 'contusion of the soft tissues of the right part of the chest' as a result of being beaten by her husband." Ex. [1] at 4. Further, "it was found that on the same day, around 1:00 pm, Cazimiro [sic] Jose Canha Cavaco Dias, the husband of R. Cavaco Dias punched different parts of body of Cavaco Dias's during an argument

**Department of Anthropology**
**College of Arts & Sciences**
430, 1621 Cumberland Avenue  Knoxville. TN 37996-1525
865 -974-6369

**BIG ORANGE. BIG IDEAS.**®



**THE UNIVERSITY OF TENNESSEE**
KNOXVILLE

      over domestic injury, causing bodily injury.  A report from Cavaco Dias was not accepted because of the lack of an interpreter." *Id.*

    b. This excerpt alone points to the dangers women, and particularly Ms. Dias, face in Armenia.  Police only became involved once Petitioner's violence had escalated to such a point that Ms. Dias required hospitalization, underscoring the unavailability of preventative measures.

    c. It is also worth noting that even in the midst of an immediate crisis, "[a] report from [Rula] Cavaco Dias was not accepted because of the lack of an interpreter." *Id.*  This again underscores the challenges to effective law enforcement she in particular faces in Armenia, where she cannot speak or understand the language.

14. Ms. Dashyan also observes that even after the report of domestic violence was made by Ms. Dias to the police, the children remained with Petitioner.  Dashyan Report ¶ 54.  First, I understand from counsel that Petitioner had, in the course of assaulting Ms. Dias, kicked her out of the house.  Thus, Ms. Dashyan's observation that "the children had been living with their father" may be inaccurate.  And this fact underscores the insufficiency of Armenia's domestic violence response to protect children, and the inability of that system to protect the children in this case specifically.  Even if Ms. Dias only reported the violence against herself, given the severity of the violence and of Ms. Dias's injuries, it is remarkable that the Armenian police made no efforts to ensure the wellness of the children at issue.

15. Finally, I note that in the case relating to the Armenian domestic violence order against Petitioner, it appears that Petitioner raised a defense of diplomatic immunity.  I am not an Armenian (or U.S.) lawyer and cannot speak to the merits of this defense, but it is another complication that it appears Petitioner has and will use to prevent protection of Ms. Dias and her children and/or proceedings against Mr. Dias in Armenia.

I declare, under penalty of perjury, that the foregoing is true and accurate to the best of my knowledge, information, and belief.

_____       10/3/2024
Tamar Shirinian, Ph.D.                                            _____
                                                                                                                         Date

**Department of Anthropology**
**College of Arts** & **Sciences**
430, 1621 Cumberland Avenue  Knoxville. TN 37996-1525
865 -974-6369

**BIG ORANGE. BIG IDEAS.**®