HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*Dias v. Dias,* 3:24-CV-04471-EMC (N.D. Cal.)

**REBUTTAL EXPERT REPORT OF DR. PETER FAVARO**

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Peter J. Favaro, Ph.D.**
**Child and Forensic Psychologist**
The Center for Improved Human Relationships, LLC
617 Port Washington Blvd
Port Washington NY 11050 516.883.5747

Expert Psychological Report

Identifying Information:

Dias v. Dias, 3:24-CV-04471-EMC (N.D. Cal.)


**Expert Qualifications:**


I am a psychologist licensed in the state of New York (License No. 8168). I have been in private practice since 1986. My area of expertise is psychology within court-related matters. Since 1986, I have been appointed to thousands of cases to evaluate parties in matters involving domestic violence, custody disputes and child abuse. I have also been appointed to provide court-related services such as supervised visitation, family mediation, anger management, family therapy, civility training and parenting coordination and testimony in Hague related matters.

I am the author of more than a dozen books, including but not limited to a textbook on child development and numerous consumer titles on parenting, co-parenting, civility and anger management.

As Founder and Executive Director of The Center for Improved Human Relationships, LLC., I create and administer programs that teach civility training to high-conflict parents. I also run programs which seek to reconcile parents and children who become estranged through the process of divorce.

I have been qualified as a psychology expert in the Eastern and Southern District Federal courts in New York and in jurisdictions outside the State of New York in Hague convention matters in California, Vermont and in Connecticut, both as a court appointed neutral and as an independent

1

CD001718

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

expert. On three different occasions I have been qualified as an expert in Article 13B of the Hague Convention.

A list of matters I have testified in and have been qualified as an expert in are as follows (2019 to 2024):

| Case Name | County |
|---|---|
| Agulnick v Agulnick | Nassau County New York |
| Bardwil v Bardwil | New York County |
| Beckett v Seijo | Nassau County New York |
| Bedoya v Brown | Kings County New York |
| Bensen v Armor | New York County New York |
| Blumenthal v Blumenthal | Kings County New York |
| Brochman v Brochman | Nassau County New York |
| Celec v Mastanduno | Nassau County New York |
| Chios v Chios | Nassau County New York |
| Clarke v Clarke | Kings County New York |
| Cruvinel v Cruvinel | Eastern District New York |
| Dacres v McGowan | US District Court District of Connecticut |
| DeSantis v DeSantis | Nassau County New York |
| Dutta v Srivastava | Nassau County New York |
| ElShanawany v Zetoune | Queens Supreme Court |
| Fapohunda v Fapohunda | Westchester County New York |
| Handakis v Bardatsos | Nassau County New York |
| Hegarty v Steinert | Nassau County New York |
| Hernandez v Martin | Southern District New York |
| Hulsch v Hulsch | Northern District of Illinois, Eastern Division |
| Jacquety v Tena Baptista | Eastern District New York |
| Katz v Katz | Nassau County New York |
| Keen v Bowley | Central District California |

2

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| Lenae v Rogers | Kings County New York |
| Meraj v Meraj | Nassau County New York |
| Malekan v Malekan | Nassau County New York |
| Maney v Maney | Nassau County New York |
| Moran v Moran | Suffolk County New York |
| O'Connell v O'Connell | Nassau County New York |
| Poretti v Baez | Eastern District New York |
| Rahim v Braden | Kings County New York |
| Roe v D'Aguanno | Nassau County New York |
| Ruff v Oweis | Nassau County New York |
| Saada v Golan | Eastern District New York |
| Scicutella v Osorio | Nassau County New York |
| Shah v Federbush | Eastern District New York |
| Smythe v Blatt | Eastern District New York |
| Sultan v Alhadad | Suffolk County New York |
| Vittorio v Vittorio | Nassau County New York |
| Swett v Bowley | Southern District New York |

I have been appointed as a custody evaluator in divorce cases in the following jurisdictions, Nassau, Suffolk, New York, Brooklyn, Queens, Bronx, Richmond, Westchester and Rockland on thousands of occasions. I have been qualified as an expert in child psychology, divorce and custody, sex abuse, substance abuse and also as an expert in the methodology underlying court related mental health evaluations. As recently as (July 2024) in the County of Westchester at The Judicial Training Institute. I lectured on aspects of methodology underlying ethical testimony as an invited faculty member at The Judicial Training Institute which provides mandatory continuing education for judges presiding over matrimonial and family court litigation across the state of New York.

I evaluate domestic violence as a routine task for my court assigned custody cases. In December of 2023, I sat for a 40-hour domestic violence training as part of my ongoing responsibility to the 18B Mental Health Panel in the First and Second Appellate Department in New York State.

3

CD001720

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Orienting Principles

Ethics surrounding psychology in court settings require caveats which help the reader (especially the lay reader) understand strengths and weaknesses of data interpretation. Paramount to this understanding is the expert's due diligence in offering opinion after showing that they have considered all sides of the issues examined. This is an important component to maintaining neutrality even if hired as a partisan expert.

The practice of psychology in legal settings is influenced by the imperfect nature of data gathering as well as imperfections in the data itself. So as not to mislead either the fact finder or lay reader and in acknowledgment of the ethical principle for the practice of forensic psychology I utilize caveats whenever possible so as not to overstate or purvey influence. As such the reader will observe caveats in various portions of this report to appropriately frame the opinions contained herein. I will also present information to show I have considered both sides of any hypothesis I consider.

I reserve the right to submit supplemental information and/or errata post submission.

## Notes and Caveats About The Methodology Used in this Evaluation

Psychological data gathering is subject to what scientists commonly call "confounds." Confounds are imperfections in the data that introduce error into the conclusions drawn about the data. The American Psychological Association in its discussion of ethical principles surrounding custody evaluation, contained within the December 2010 issue of American Psychologist (pp 863-867) and its subsequent revisions points up the importance of multiple methods of data gathering, as a means of addressing the imperfections of psychological data gathering. Consistent with this concern is an explanation of how data is imperfect and might interfere with conclusion formation, especially if all methods of data collection are on some level fundamentally flawed. The following caveats describe the advantages and disadvantages in the type of data collected in this study and are emphasized in various portions of this report:

4

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Self-Report**

Alla Altubaiti in <u>The journal of Interdisciplinary Healthcare</u> (May 4th 2016) the the authors summarize the advantages and disadvantages of the use of self-report to assess personality. Self-report is often the most frequently utilized measure in custody evaluation. This type of data gathering is often divided into "asking questions and talking to people," or data gathering through responses to written questions or structured questionnaires. Both methods suffer from confounds related to the person's motivation to report information accurately. In legal settings, where litigants have a competitive motivation to acquire custody, the tendency is to present in a favorable and virtuous light. I point out this tendency in the testing interpretation of Mr. Caminos. The hypotheses I make and test throughout the data collection is that parties will emphasize their strengths and minimize their weaknesses and in addition, will often emphasize their adversary's weaknesses and minimize their strengths.

When choosing between collecting self-report orally through face-to-face interview or in written form I utilize both, but will often emphasize written responding. In the current matter, I used both techniques equivalently.

Written data gives individuals a greater chance to think about the information they provide without the pressure of responding extemporaneously. Questionnaire data also memorializes a record of exactly what was asked and how the examined party answered.

Written data is less subject to inaccuracies in data description. Transcribing notes gathered through face-to-face oral interview is tedious, error prone and does not make for good practical review if it is to be used as evidence at trial. The questionnaire items are available for the other professionals involved in the case to examine and make inferences from, and to compare to issues of fact in the case.

**Objective Personality Testing:**

5

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Specifically, the MMPI-3, The Millon Inventory (MCMI IV) and the SCL-90-R were used to compile an objective assessment of personality. "Objective" refers the fact that this test is scored according to the normative data developed from the standardization sample.

These measures should be and were interpreted cautiously in high family conflict cases. I use these tests as a gross measure of mental health. I follow caveats in the empirical literature for this population. These tests are scored by computer, but I do not utilize the interpretive summaries provided by the scoring software, because they are speculative and more suited to hypothesis testing in a clinical setting. Instead, I rely on my training and experience in interpreting these tests. I am also guided by the research literature which examines how family conflict litigants perform on these tests. It is important to note that these tests should be used cautiously in forensic settings. This is advises and clearly articulated in Guideline 10.02 of the Specialty Guidelines for Forensic Psychology promulgated by The American Psychological Association:

*Guideline 10.02: Selection and Use of Assessment Procedures Forensic practitioners use assessment procedures in the manner and for the purposes that are appropriate in light o the research on or evidence of their usefulness and proper application (EPPCC Standard 9.02; AERA, APA, & NCME, in press). This includes assessment techniques, interviews, tests, instruments, and other procedures and their administration, adaptation, scoring, and interpretation, including computerized scoring and interpretation systems. Forensic practitioners use assessment instruments whose validity and reliability have been established for use with members of the population assessed. When such validity and reliability have not been established, forensic practitioners consider and describe the strengths and limitations of their findings. Forensic practitioners use assessment methods that are appropriate to an examinee's language preference and competence, unless the use of an alternative language is relevant to the assessment issues (EPPCC Standard 9.02). Assessment in forensic contexts differs from assessment in therapeutic contexts in important ways that forensic practitioners strive to take into account when conducting forensic examinations. Forensic practitioners seek to consider the strengths and limitations of employing traditional assessment procedures in forensic examinations (AERA, APA, & NCME, in press). Given the stakes involved in forensic contexts, forensic practitioners strive to ensure the integrity and security of test materials and results (AERA, APA, & NCME, in press). When the validity of an assessment technique has not been established in the forensic context or setting in which it is being used, the forensic practitioner seeks to describe the strengths and limitations of any test results and explain the extrapolation of these data to the forensic context. Because of the many differences between forensic and therapeutic contexts, forensic practitioners consider and seek to make known that some examination results may warrant substantially different interpretation when administered in forensic contexts (AERA, APA, & NCME, in press). Forensic practitioners consider and seek to make known that forensic examination results can be affected by factors unique to, or*

6

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*differentially present in, forensic contexts including response style, voluntariness of*
*participation, and situational stress associated with involvement in forensic or legal matters*
*(AERA, APA, & NCME, in press). Guideline 10f*

The key concept here is transparency about the strengths and weaknesses of the data presented.
This guards against test data being misused.

## Collateral Documents and Credibility Assessments

 I do not review collateral documents for the truth of their contents. Collateral information is not
always relevant, may suffer from chain of custody issues, or might not reflect information that is
as psychologically relevant as the providing party might believe it is. Evidence adduced at trial is
ultimately determined relevant by the finder of fact and it is beyond the scope of my role to
assign weight or meaning to documents provided by the parties. I provide analyses of collateral
documents for descriptive purposes (for instance in this case photographs and recordings) and
avoid making comparative judgements about the parties based on the documents. I avoid relying
on motion papers as sources of information. The reasons for this are that motion papers are self
serving, not the work product of the parties studied and not sources of information that might no
accurately reflect mental health or parenting capacity. I rely on past findings of fact as important
and might factor in certain exhibits if they reflect mental health history such as treatment or
hospitalization.

I do not offer credibility opinions for two reasons: First, credibility is the sole purview of the trier
of fact. Second, mental health experts are not trained in the assessment of credibility and the
research on credibility assessment shows that mental health experts are not very good at it even
when trained. (i.e, Eckman and O'Sullivan) That is likely because much of the factual data in
cases is "he said/she said" data and almost always outside the purview of an evaluator.

Opinions about parties not directly evaluated (especially third-party sources) is considered a
breach of professional ethical across all of the mental health professions (psychologists,
psychiatrists, social workers, counselors) and if a professional does offer opinions, those

7

CD001724

opinions must come with caveats about how the opinions might be colored by bas.

## **INFERENCES, OBSERVATIONS AND CONCLUSIONS:**

The APA guidelines for forensic practice (2013) emphasize the importance of distinguishing inferences, observations and conclusions:

Guideline 11.02: Differentiating Observations, Inferences, and Conclusions In their communications, forensic practitioners strive to distinguish observations, inferences, and conclusions. Forensic practitioners are encouraged to explain the relationship between their expert opinions and the legal issues and facts of the case at hand.

For clarity to the lay reader "inference" is an interpretation. An interpretation uses psychological knowledge to ascribe meaning to a data point. Inferences can be connected to norms, empirical literature and speculation, the latter of which must be done cautiously and with caveats which acknowledge potential ambiguity and alternative hypotheses. An "observation" is behavior that is directly observed and recorded. A "conclusion" is a statement made on the basis of more than one type of data or method.

## **Additional Caveats:**

I do not take the self-report of litigants for the truth of their contents. The content matter of the narratives of the parties is examined for credibility at the time of trial by the trier of facts.  My use of the narratives and the representations contained therein is to gain understanding of how their recollections would affect their psychology and family dynamics (such as how elements of their reported histories impacts the children if they are found to be credible at trial.)

In this report the reader will see "if/thens" regarding allegations made against the client whose position I am examining. I do not blindly accept this or any client's representations.

## **Present Study:**

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

In the present study I was hired to review the work product of Dr. Laura Petracek and to provide opinion on the grave risk defense. I was paid 25,000 to date and there will be a trial retainer request as well.

**Casmiro Dias Interview and Self-Report  Data:**

Mr. Dias is 45 years of age. He works as a diplomate for the World Health Organization. His children are █ D█ nine almost 10 (daughter), N█ who is 8 (daughter), and A█ (son) who is 6.

He presented as polite and deferential throughout my Zoom contact with him.
These zoom sessions were 45 minutes to an hour in length and were held on the following dates:
September 28th 2024, Saturday, 9 AM (NY Time)
September 20th 2024, Sunday 9 AM (NY Time)
October 2 2024, Wednesday, 9.30 AM (NY Time)

 I found him to be non-defensive as well as aware of his shortcomings and eager for suggestions on how to address them. His affect was normal and varied appropriately with the topic matter There was no evidence of thought disorder or cognitive defect and no evidence of any desire to think about or engage in self or other harm.

Mr. Dias provided consistent information in his three face-to-face interviews (on zoom) and also in his self-report questionnaire interviews.

His narrative asserts that he has known his wife, Rula for fifteen years. He has done everything he could to protect her. He reports that he loves her. He reported that there was a buildup of tension between him and his in-laws (in particular between him and his father-in-law and brother-in-law) who he allegedly tolerated until his relationship with them became heated when his brother-in-law referred to his children "as cockroaches" who should be smashed. He avers that if the insult was directed at him would have let it slide. He perceived the statement about his children being "cockroaches who needed to be smashed," as an implicit threat that required his protection. In the conflict with his in-laws he did not feel his wife was supportive. He asked his wife to facilitate a de-escalation of conflict and allegedly he felt he took more their side than

9

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

hers. During one tense interaction he told his father-in-law to "shut up." This escalated the circumstance further.

This ultimately led to his wife Rula taking the children out of school and abducting them to California where he has been kept away and estranged from his children for five months.

Mr. Dias reported that his frustration over his in-laws insulting behavior toward him and the children was the underlying cause of him saying angry, hurtful things in text messages to his wife. He reported that this was not who he was as a person. He reported that he was ashamed and humiliated by what he communicated. His opinion of himself, in my opinion was that he regretted his communications. He avers that his relationship with his wife was loving and supportive for 15 years.

He reports that he is being accused of abusing his wife and children and that he has never done anything physical to anyone in his family, although his wife claims he has. And his children, allegedly also report this. He understands that writing hateful messages and screaming the way he did in recordings that have been presented in exhibits is abusive and he acknowledges that he did that. He believes that allegations of him being abusive to his children and his wife are exaggerated, opportunistic and in the service of supporting her alleged abduction. There has never been an adjudicated child abuse claim, he says. He asserts that mother filed for a TOP that was heard by an appellate Court and dismissed. He worries that not seeing his children for five months will cause a permanent estrangement.

<u>Mr. Dias reported that mother's allegations are changing:</u>

*"First story was I beat her and children did not see beating. When she went to California she said kids saw me beat her, Then she said I beat her and slapped the children. She said I let the kids starve. I put the in dark rooms. The story is escalating."*

I questioned him about the allegations. He reports that the primary form of discipline he used was time outs. He reported that he never locked them in any closets but that the children would

CONFIDENTIAL                                                  CD001727

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

play in the closets. He always fed his children, he reported. He reported that like most children sometimes they would eat and sometimes they were not hungry. He does not believe in forcing the children to eat.

I questioned him about the photographs his wife submitted, which I also reviewed. He denies ever putting his hands on her. He doesn't know what the photographs are from or when they were submitted. He vehemently denies putting his hands on his wife or children and returns to that narrative that he thought he and his wife had an excellent marriage with good communication where the only point of conflict they had was over her family.

Mr. Dias reports that during the period of time that it is alleged that he beat his children his wife did leave them alone with him, and this included leaving them with him exclusively from April 21, 2024, to April 25 2024, then coming back and allegedly abducted them on April 25. His exact response to this question was as follows:

*She left our house on 21 April 2024, while I was on a birthday party with my three minor children. I took care of my three minor children alone, from 21 April until 25 April 2024, when my wife abduct them from school.*

*She went to see her father in the Atlanta Hospital with covid19 from 1 December to 12 December 2022.*

*I take care of my three minor children alone, from 1 December to 12 December 2022.*

*In other times, we took care for the children together since they were born.*

*My wife has never let our children alone with her parents and brother, due to their threats against them.*

Mr. Dias believes that stress on his children in particular his daughter, ██, escalated to the point that she developed obsessive compulsive disorder characterized by obsessive hand washing. He reported that characterizations about her being a "cockroach," exacerbated this.

He asked if he could speak to me about the medical reports related to mothers alleged assault. He claims that the medical reports showed no injuries or bruising. He also wanted to inform me that

CONFIDENTIAL                                        CD001728

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

in want he alleges was an attempt to humiliate him police reports were leaked to the media. He believes this was done by his wife and/or family.

While the medical reports might be important at trial and given weight one way or the other by the fact finder they were not given weight in this study because without the ability to speak with both parties about them it is difficult to use them as collaterals in a forensic setting. If they are shown to me with accompanying hypotheticals I will opine.

## Results of the Psychological Testing

Psychological testing can be useful in assessing personality traits that are associated with violence and aggression. Problematic profiles reveal character disorders, antisocial personality concerns and other "cluster B" indications. Cluster B personality disorders are a group of personality disorders that are characterized by dramatic, emotional, and erratic behaviors. These disorders can significantly impact a person's relationships, well-being, and overall functioning.

The four main cluster B disorders are: Antisocial Personality Disorder (ASPD), Borderline personality disorder (BPD), Histrionic personality disorder (HPD), and Narcissistic personality disorder (NPD).  Cluster B manifestations include difficulty regulating emotions. Have extreme sensitivity to criticisms and require more attention and validation than others. Certain Cluster B personality types are likely to be associated with physical aggression, others are not. I have performed a review of the literature on this and will present this after the test results.

On the MMPI 3 there were concerns about symptom under reporting. This happens when a person tries to present themselves in an overly virtuous light. Correcting for this the elevations support a histrionic style most probably related to Histrionic Personality Disorder. This was discussed with Mr. Dias and he acknowledged that he could be "hysterical" at times.

The MCMI IV was given as a measure to compare to MMPI 3 scores. This gives insight as to how reliable both measures are. In addition, the MCMI IV is a measure that is more sensitive to personality disorders (or character disorders) even when there is under reporting. As with the

CD001729

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

MMPI 3 he showed a resistance to admitting personal shortcomings. This tendency, by the way, is present in a large portion of test takers who do so in a court setting. This notwithstanding this test did identify characteristics that could be associated with personality disorder, in particular the scores might be related to Histrionic Personality Disorder and/or Compulsive Personality Disorder. The test does not portend either as a "disorder," but classifies his responses as a "style." The difference being a disorder identifies a greater degree of dysfunction. The "style designation identifies a personality tendency or trait.

The Symptom Checklist is a measure designed to identify clinical syndromes such as anxiety and/or depression. No responses or response sets indicate concerns in these areas.

The test data supports (but does not "prove", because psychological testing assists clinical interventions but do not prove diagnoses) Histrionic Personality disorder as a potential diagnosis. This is a useful competing hypothesis to Borderline Personality, Narcissistic Personality or Antisocial Personality. A caveat that should be applied that while Kystrionic Personality Disorder is a "rule in," this description does not completely "rule out," any other cluster B disorder. There is a research literature on whether Histrionic Personality is prone to violence:

The relationship between Histrionic Personality Disorder (HPD) and violence is complex and less direct compared to other personality disorders like antisocial or borderline personality disorders. Individuals with HPD are generally characterized by attention-seeking behavior, excessive emotionality, and a desire for approval, which can contribute to relational instability and conflict rather than direct physical violence (Hopwood et al., 2018; Schulte Holthausen & Habel, 2018).

HPD's association with violence tends to manifest more within the context of interpersonal relationships, especially when individuals feel they are not receiving the attention or validation they desire. This frustration can lead to psychological aggression or manipulation, rather than overt physical violence. For instance, individuals with HPD may use emotional manipulation, threats, or other tactics to regain control or attention in their relationships.

13

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Furthermore, research on intimate partner violence (IPV) indicates that HPD, unlike other Cluster B disorders (e.g., borderline or antisocial), does not show a significant direct relationship with IPV perpetration. This suggests that while HPD may contribute to relational difficulties, it is less likely to be associated with violent aggression compared to disorders like antisocial personality disorder, which involves more overt aggressive behaviors (Collison & Lynam, 2021).

Thus, while individuals with HPD can engage in behaviors that disrupt relationships and cause emotional harm, the manifestation of violence is typically more indirect and associated with emotional manipulation rather than physical aggression. This distinction is important when considering the therapeutic approach and management of HPD in both clinical and relational settings.

This hypothesis is supported by the personality test data but it does not rule out the personality disorders that might be more related to violent acting out. This caveat is in the service of providing a balanced appraisal of Mr. Dias.

As always, it is important to utilize caveats to instruct the reader that these distinctions are not black and white, They must be taken in conjunction with the totality of the data.

From here I turn to Mr. Dias's treating therapist who I asked to give me a treatment report. Here is her verbatim response:

*Dear Dr Favaro,*

*Here is the summary of my work with Casimiro.*

*I have first met Casimiro in June when he contacted me in my capacity as staff counselor asking for psychological support. I have been since meeting with him online on a weekly basis (with the exception of summer holidays). When he first met, I would say that his symptoms were most consistent with acute traumatic stress. They included: sleeplessness, severe anxiety, loss of appetite, grief, self-blame, disbelief, hopelessness, self-neglect and social withdrawal (he found it difficult to be around others as he felt their comments about his situation were making things harder for him). He occasionally also had physical symptoms like shaking and dizziness (not during sessions, but according to his account). He told me that he continued going to work every day, but found it hard to leave his house in the free time. The severity of his symptoms gradually*

14

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*improved over a few weeks with anxiety now being the main symptom. However, all of his reactions, including current anxiety, appeared and continue to appear proportionate to the difficult life circumstances he finds himself in (that is the circumstances he is describing to me). Overall, he seems to be showing a lot of psychological resilience in the face of the adversity, good emotional regulation, and ability to cope in adaptive ways. My interventions were primarily focused on providing emotional support, normalizing his traumatic stress reactions, improving self-care and mental health hygiene, problem-solving, and helping him deal with worries.*

*During our conversation and in all email communications, Casimiro has always been extremely polite, respectful, and considerate. Despite being overwhelmed with difficult emotions, he has always been able to give me a coherent account of what happened from week to week, and the actions he said he took seemed appropriate. He seems a rather quiet, self-reflected person, who is more likely to blame himself for what happened than others. He spoke a lot about sadness and extreme guilt for not being able to prevent what happened, and very little about feeling angry. In three months working together, he did not have any sign of impulsive behavior during sessions or an outburst of anger/frustration and no sign of hostility towards anybody. All of this makes it very difficult for me to imagine him being violent, especially towards his children. The way he spoke about the situation revealed a father who loves and cares for his children and is devastated by the prospect of never seeing them again.*

*I would be happy to elaborate on any of the above if necessary. Tomorrow (Wednesday) I could be available at 8am or 4pm NY time and on Thursday I am available all of your morning.*

*Kind regards,*

*Nadya*

The coincidental application of "traumatic stress" to Mr. Dias's diagnosistic profile is not surprising to me, despite the fact that the criteria for PTSD was not described as part of his diagnosis, just like it was not described in detail for the children or Ms. Dias by Ms. Petracek. The term "traumatic stress" was used by this therapist as a descriptor of his symptoms not as a diagnosis.

I believe it is unlikely that Mr, Dias suffers from post-traumatic stress. An alternate hypothesis would be that  he experiences severe anxiety and depression and a grief reaction to the loss of contact with his children. The comments I made on having a histrionic "style" certainly would exacerbate feelings of loss, grief and depression.

Report of Laura Petracek Psychologist

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Dr. Petracek provides a well-rounded review of the research literature on Intimate Partner Violence. I certainly agree that the literature she sets forth is highly relevant when Intimate Partner Violence is suspected, adjudicated and found. Dr. Petracek "backs in" to her opinion by declaring mother and children suffer from the aftermath of domestic violence without evaluating both sides of the case and assuming that the test results only support that hypothesis. This is often referred to as "affirmation bias," "self-confirming bias," or "confirmation bias."

I have some major ethical concerns about the foundation of her opinion. Dr. Petracek acknowledges that she treated the children while at the same time offering expert testimony. This is, by her own admission, a dual role. Ethical guidelines followed by mental health professionals caution against dual roles. In lay terms practitioners should not treat and testify. You cannot act as a forensic and a therapist in the same case,

Second, it does not appear as though Dr. Petracek reached out to Mr. Dias to attempt to gather "his side of the story."  In the absence of doing that ethical practice requires she provides caveats about the limitations of failing to do that.

Third, Dr. Petracek appears to accept at face value the allegations made against Mr. Dias and assumes that IPV and related abuses have absolutely occurred. This is a biased approach and conflates both roles that she put herself in with the role of fact finder.

Here is an example:
*Presenting issues included living in a household where there was domestic*
*violence, a recent move from Armenia, recent marital separation, a new home, and a new school.*
*(P. 24)*

Clinicians in a treating role, provide language which shows that they operate in a neutral role and speak of <u>allegations</u>, not <u>determinations.</u>

Dr. Petracek reports that I.D. witnessed fighting that made her "scared" and "sad" but has no way of knowing the degree to which each parent participated in the bickering or how.

16

CD001733

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Certainly, if the child witnessed and is found credible,, that her father slam her mother's head to the ground, that is evidence of domestic violence perpetrated by the father.  However, it is unclear how that information was elicited  or what the potential alternate hypothesis of child influence might be. Since Dr. Petracek did not record her interviews, it is hard to know how or if leading or suggestive questioning was used. This points to the potential difficulties of using "clinical summaries" and not detailed notes. It also points to difficulties of interviewing children in forensic settings versus clinical settings. In clinical settings disclosures of children are consumed by the task of treatment planning. In forensic settings disclosures are used in the service of assisting fact finding.

In N.D.'s clinical summary, Dr. Petracek fashions evidence of domestic violence using the research literature as permission to speculate (P 27-28):

*"When asked about her social interactions, N.D. reveals a sense of isolation, stating that she has no friends at the camp. Instead, she plays exclusively with her siblings, I.D. and C.D.. This reliance on her siblings or social interaction is common in families affected by domestic violence."*

While it might be common in families with domestic violence, it is also common for a host of reasons that are not related to domestic violence. For instance, it could be common in children who are shy. Dr. Petracek relies on pure speculation and the least she could have done was examine this hypothesis from more than one side. In the absence of a caveat this statement shows bias. The fact is that anything which causes discomfort in a child can be used (through speculation) to determine that domestic violence as occurred.

While the father denies ever striking any of his children. Dr. Petracek's observations are important, but once again they are only important if they are true and if they were not influenced by the mother. There are no indications by Dr. Petracek of how she ruled this out.

Recollections of the youngest child C.D. are also subject to similar concerns about speculation as well as impact confidence about credibility of the reports.

17

CD001734

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Apropos of this, if Dr. Petracek limited her role to clinical intervention there would be no criticism here. However, she didn't. In a clinical environment practitioners can form opinions, change them over time and not worry about credibility. Once those opinions are brought into a court room the rights of the parent not spoken to, evaluated or listed to can leave these children essentially fatherless.

In Dr. Petracek's evaluation of Ms. Dias, she once again repeats the allegations of the party she works with without including even the possibility that the other side might not result in the certainty she portrays. The American Psychological Associations Guidelines (2013) section 1.01 states:

*When conducting forensic examinations, forensic practitioners strive to be unbiased and impartial, and avoid partisan presentation of unrepresentative, incomplete, or inaccurate evidence that might mislead finders of fact. This guideline does not preclude forceful presentation of the data and reasoning upon which a conclusion or professional product is based. When providing educational services, forensic practitioners seek to represent alternative perspectives, including data, studies, or evidence on both sides of the question, in an accurate, fair and professional manner, and strive to weigh and present all views, facts, or opinions impartially.*

This is the section of the code that applies to Dr. Petracek not providing any caveats about her perceptions of credibility, test limitations as they are cited in the research literature or alternate hypotheses.

Once again, and so I do not fall into that same pitfall Dr. Petracek repeatedly transgresses, she might have come to the right conclusion for the wrong reasons. A coin toss could predict any binary outcome (i.e., there was/was not domestic violence. But looking at the data from all sides and pointing out strengths and weaknesses of data such as psychological testing represents a scientifically rigorous approach to the data collected.

Dr. Petracek's administers a self-report measure to Ms. Dias:

*"To assess the frequency and severity of conflict in Mr. and Ms. Dias's relationship and assess the impacts on the children. I administered the Conflict Tactics Scale to Ms. Dias. The Conflict Tactics Scale (Straus 1979, 1990) measures the extent to which partners in a*

18

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*relationship engage in concrete acts and events of psychological, physical, or sexual attacks on each other; the consequences of the attacks; and partners' use of reasoning or negotiation to deal with conflicts. (P30)."*

This is wildly overstated. The Conflict tactics Scale does not "measure" the extent to which partners engage in concrete acts and events of psychological, physical or sexual attacks on one another. What it measures is the extent to which these behaviors are alleged or reported. This measure has been very severely criticized in the research literature which does not even identify it as a tool to determine whether IPV has occured (see Richard T. Jones, Kevin Browne, Shihning Chou, A critique of the revised Conflict Tactics Scales-2 (CTS-2), Aggression and Violent Behavior,Volume 37,2017, Pages 83-90). In this article the authors review the improved and revised version of this measure and conclude much more work needs to be done.

Now in a clinical or experimental setting this is a tool that can inform treatment planning. In a forensic setting where there is an obligation to educate laypeople her statements about this measure are deceptive. Again, conflating clinical and forensic roles are liable to lead to inaccuracy, confusion to the lay reader of the report, speculation, and misrepresentation.

Dr. Petracek's use of the MMPI - 3 is not her work product. She utilizes the software interpretation (most likely from Pearson Global Assessments) which means she did not interpret the test herself. Nor did she reveal that she used interpretation software, which is another important caveat she refused to follow (see the front matter of this report with excerpts from the specialty guidelines. She relied on the software scoring the test. She had an obligation to indicate that it is not her work product. Despite this the results of the testing indicate that mother's protocol, like father's indicates that she tried to present virtuously. The mother's protocol also shows indications of personality disorder. However dr. Petracek did no due diligence to cross reference this test with another similar personality test. Father's testing shows the same response tendency of presenting overly virtuously. However, curiously absent from her comments about the MMPI 3 testing are what these indications mean. In my opinion this could have been done in the service of avoiding presenting mother in a negative light.

CONFIDENTIAL

CD001736

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Dr. Petracek reports on the scoring of checklists pertaining to the children (the BASC). This measure has also been criticized in the literature (Gladden and Lancaster, 2003).  In a clinical environment this can be an adequate treatment planning tool. However, in a forensic environment the strengths and weaknesses of measures like this must be provided to lay readers who could be potentially swayed by jargon and information which does not meet the burdens of providing empirically sound opinion in a court of law.

The BASC test is suitable for a clinical environment but is not suitable in a forensic environment because of issues with its validity and reliability and because it is subject to misreporting and manipulation.

### **Interviews With the Children**

I interviewed the children on Sunday October 6th, 2024. Total interview time was 73 minutes for all three children. The interviews presented challenges and confounds that must be noted in giving a balanced appraisal. All three children showed indications of being either shy or unwilling to participate. The observer, who was extremely helpful, would clarify what the children said, much of which was inaudible. The eldest child (█████) did not want to participate and did not last past 13 minutes. She was visibly frightened, would not even say hello and paused at great length. I do not interview children when they are showing signs of stress. I believe it is unfair to subject them to this.

The youngest child, Alfonse was more willing to answer questions. When I asked him if he would visit with his father he said "Maybe." That was the clearest answer he gave.  Hearing him at all was difficult because he was sitting in an office chair that swiveled. I have found that when kids are sitting in that kind of chair they will swivel through the entire interview — and Alfonse definitely took that opportunity. His interview lasted a little bit more than 30 minutes. He reported that his father yelled at his mother and hit her. He could not answer about frequency, where or when.

N████ was shy and spoke with her head tilted down to her shoulder. She was sweet and polite and smiled though the entire interview. I ask kids to tell me if they know the difference between the

20

truth and a lie at the beginning of my interviews. I ask the question: "If I told you that I was a green monster with three heads would that be the truth or a lie." All three children smiled, N███ smiled the most.

Any disclosure that the children witnessed either aggression to them or to the mother could not be followed up on with reference to time, place or circumstances. This doesn't mean it did or didn't happen (in the interests of fair appraisal. It is important because an important forensic question related to grave risk hinges on whether there was a hostile environment over a period of time or whether there were isolated instances of abuse. Neither of these questions could be addressed by either my or Dr. Petracek's data gathering.

Normally I would record interviews with children unobtrusively. This was forbidden but it does provide the best record. Instead, I did structured interviews where I create the questions beforehand and try my best to type their answers. This is not ideal, but it is far better than providing summaries either contemporaneously or in summary as Dr. Petracek did.

## Children's Drawings

Dr. Petracek submitted several children's drawings with her file. They have zero value in determining child abuse for multiple reasons. If you look at the answers to questions the children were asked it is apparent to me that the questions are most likely leading. This is not acceptable practice in forensic settings and without the exact dialogue around the questions (to determine how leading the questions were or the full context of the questions) the drawings offer nothing probative. The number of "I don't know" responses," also lessen the quality of the exercise. The children do not remember context. There is also no telling whether any "slapping" incidents occurred more than once. Frequency can be an important metric in determining whether child abuse occurred in a pattern. This is not to say that a one-time occurrence of violence should be ignored, but it should be considered in terms of the totality of events and whether the frequency justifies that the father produces an environment that is a grave risk to the children which could not be mitigated by psychological interventions in their home country. This should also be taken within a framework of what the totality of the evidence is that is related to domestic violence;

21

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and this should include the fact that the mother left the children solely in the father's care for four days prior to mother taking the children out of the home.

There is research literature about the interpretation of children's figure drawings which is important to consider in forensic contexts. This literature provides valuable information as to how they can be misused, especially because the lay reader of technical documents by people who claim to be experts can be easily swayed by what "experts" say about them. While children's drawings might offer a look into their experiential worlds, they are not a litmus test. In a clinical setting they might be helpful in developing hypotheses. However, the empirical literature is useful in looking at hypotheses from both sides which Dr, Petracek did not do even in a single instance in her report which did not even include any data, self-report or otherwise from the father.

Empirical research on the use of children's drawings in forensic evaluations is inconclusive at best. Studies have repeatedly demonstrated that the interpretation of children's drawings is highly subjective, with low inter-rater reliability among practitioners (Machover, 1949; Tharinger & Stark, 1990). This lack of consistency is problematic in forensic settings, where decisions must be based on reliable and objective evidence. Furthermore, there is no standardized methodology for interpreting children's drawings that can be consistently applied across different evaluators (Lilienfeld et al., 2000). This variability introduces a significant risk of bias and error, which can result in misinterpretations that negatively affect legal outcomes.

One of the primary limitations of using children's drawings as forensic tools is the lack of validity in linking specific drawing characteristics to psychological states or experiences of abuse (Veltman & Browne, 2001). For instance, features such as omission of body parts, exaggerated size of figures, or use of dark colors have been interpreted as indicators of emotional disturbance or trauma. However, research has shown that these features can vary widely based on a child's developmental stage, artistic ability, and cultural background, rather than reflecting specific psychological conditions (Burkitt, 2004).

CONFIDENTIAL

CD001739

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

The subjective nature of interpreting drawings can lead evaluators to project their own biases or preconceived notions onto the child's artwork (Lilienfeld et al., 2000). Additionally, evaluators may give undue weight to drawings as "evidence" of abuse or neglect, despite the lack of empirical support for such interpretations. This can be especially problematic in custody disputes or cases of alleged abuse, where decisions should be based on robust and scientifically validated assessment tools (Veltman & Browne, 2001).

**<u>Formulations and Conclusions:</u>**

I return to the caveats in the front matter of my report. I emphasize the importance of caveats and examining all data from multiple perspectives as well as transparency regarding the use of clinical measures in forensic settings and offering cautionary statements about relying on them.

The report of Dr. Petracek is defective and offers speculative and highly prejudicial opinions because:

There was no attempt to provide neutral information because she did not present information from both sides, nor did she seek it. Nor did she identify in a self-critical fashion why her report had deficiencies.

She conflates the role of forensic expert and treating therapist which is unethical and potentially confusing to the trier of fact. Reporting statements the child(ren) made brings the alleged assertions of the child in "through the back door". Different jurisdictions have different rules about whether this is acceptable hearsay. This is an argument for the attorneys to proffer. Dr. Petracek does not offer the children's disclosures for the trier of fact to opine on. Dr. Petracek makes a "finding," in lieu of the fact finder. This is extremely prejudicial to Mr. Dias, who should have been consulted by Dr. Petracek when treatment started.

This mixing of roles is addressed in the literature but also expressed in the ethical guidelines for forensic practice:

23

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*Guideline 4.02.01: Therapeutic–Forensic Role Conflicts*

*Providing forensic and therapeutic psychological services to the same individual or closely related individuals involves multiple relationships that may impair objectivity and/or cause exploitation or other harm.*

Furthermore Dr. Petracek presents information about domestic violence which is speculative but which she treats as fact.

She provides no guidance or caveats about the self-report she relies on; or the psychological tests she uses which have been criticized by the psychological community.

She does accurately present the potential consequences to the children if what she claims is deemed credible or truthful by the trier of fact but she does not even consider the possibility that the allegations might not be true or might have been exaggerated or allegedly influenced by the mother and her family during a period of no contact with the father.

**Additional Sources of Information:**

Text Messages Supplied By Father

These exhibits were presented to me to bolster father's claims that he believes his wife's family were subverting his relationship with the children; that his wife implored her family to apologize to her husband; that his wife expressed love and devotion to him during a time when he allegedly abused him. I considered this in my opinion but did not give it great weight because evidence like this is considered by the trier of fact in decision making. I do not evaluate evidence except to say that these exhibits are on the surface consistent with father's self-report.

Audio Recordings (DIAS-RESP_0000079; DIAS-RESP_0000081; DIAS-RESP_0000084; DIAS RESP_0004718 DIAS-RESP0004719)

I agree that these recordings are evidence of hostility, anger and inappropriate communication on Mr. Dias' part.

24

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Messages Between the Parties (CD000279; CD000431; CD000486)


These indicate hostility and inappropriate communication from Mr. Dias. I gave them weight in my opinion formation.

Declaration of Laura Petracek (ECF No. 85 – 12)

I add this to my list of criticisms of Dr. Petracek. Experts should not opine on credibility which is the sole purview of the trier of fact. Credibility determination requires extensive training and something known as "calibration," which is a measure of the accuracy someone trained in the evaluation of credibility. Saying the children are "credible" is speculation and does not rest on any empirical foundation.



Photographs of Alleged Injuries of Rula Dias (DIAS-RESP_0000133, DIAS-RESP_0000134, DIAS-RESP_0000135, DIAS-RESP_0000136, DIAS-RESP_0000137, DIAS-RESP_0000138, DIAS-RESP_0000139, DIAS-RESP_0000140, DIAS-RESP_0000141, DIAS-RESP_0000142, DIAS-RESP_0000143, DIAS-RESP_0000144, DIAS-RESP_0000145, DIAS-RESP_0000146, DIAS-RESP_0000147, DIAS-RESP_0000148, DIAS-RESP_0000149, DIAS-RESP_0000150, DIAS-RESP_0000151, DIAS-RESP_0000152)


I received photographs of injuries allegedly sustained by Rula Dias by Mr. Dias. They were forwarded without context (where, when, etc.)

Evaluating photographs is outside the scope of my role as a forensic psychologist. I am not a forensic pathologist. These photographs will undoubtedly be presented as evidence at trial and the proper inferences will be taken by them. Mr. Dias asserts that he did not put any marks on his wife. However, if he did that should be taken into account when determining grave risk Mother's case is focused around Intimate Partner Violence and Domestic Violence. Father presents (to me) a picture of mother's family escalating conflict and trying to control what happens in his family. Father avers that the mother's family insulted him and the children and refused to apologize. There is evidence I was made aware of which portrays father as being angry, hostile and verbally aggressive to Ms. Dias. This cannot and should not be ignored. Despite the fact that Dr. Petracek conflated her role as a therapist and an expert testifying

25

CONFIDENTIAL                                                                      CD001742

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

witness, she accurately pointed out how the research informs us about the dangers to children raised in an environment of coercive control. The question is whether she is able to support her conclusions in an ethical way and in more ways than one ignores the role of the fact finder.  It is my opinion that she did not support her conclusions.  in fact I believe her opinions were formed in a grossly unethical way. My peer review of her report provides a critique of her work product in detail. But generally, she only interviewed one party, accepted everything she was told as the truth, made determinations about credibility, was disingenuous about the quality of tests she used by not talking about their strengths and weaknesses and in my opinion went outside the scope of her role and acted as an advocate more than an evaluator.

In addition, the father asserts that mother withheld the children from any form of contact with the father for five months, ignoring as well the effects that could have on the children's behavior and potential alienation from the father.

As a domestic violence evaluator, I believe that overstepping the scope of the evaluator's role by not proving a balanced appraisal of all potential hypotheses weakens our ability to assist decision makers. As a person who is also aware of psychological relationships between attitudes and behaviors, I find it difficult to ignore that parents who do not see their parents for extended periods of time reinforce notions that the estranged parent is "bad" and that is why they are not seeing them (Mr. Dias). So the attitude "my father is bad") is reinforced by the behavior ("I don't see him (therefore he MUST be bad).").

This brings another potential issue to light. Simply put, these children might never see their father again. This might not even be due to mother's urging them not to. This is not something I have not seen in Dr. Petracek's report. I simply do not know and I will not speculate on alienation. The passage of time alone without any parental indoctrination)often convinces children that they have no need for the estranged parent and in this case there are role models which can (either with or without intent) usurp the father's role in the children's lives. There is the potential to mitigate this and that would be to return the children to Armenia to receive family therapy with the father. This is not successful over zoom by and large.

26

CD001743

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

The front matter of my report educates the trier of fact about confounds that creep into data gathering of all kinds. In the service of critiquing my own work product it was a disadvantage to not be able to interview Rula Dias. She refused to participate and as a result nit having access to Ms. Dias adversely influences my own opinion formation. It is also a disadvantage that I did not have proper access to the children. The time it took to overcome objections to me doing so created difficulties to my opinion generation that could affect the underlying bases of my opinion. I usually record my children's interviews so there can be no doubt as to whether the type of questions I asked were appropriate. Dr. Petracek had twelve sessions to listen to and document what the children said to her. The mother and her family to make an impression on the children. There did not appear to be any effort by Dr. Petracek to use family collaterals to substantiate her opinions, and using those collaterals, from a methodological perspective would have been important.

Even when a psychologist is a partisan expert, they have an obligation to evaluate neutrally and when they evaluate only one party they have an obligation to state how the limitations can affect their opinion formation. I did not and would never evaluate the credibility of Mr. Dias's statements.  That is the sole purview of the fact finder.Avoiding speculation about credibility is in the service of providing neutral testimony as opposed to blind advocacy.

As with all cases of domestic violence expert testimony is a small part of the evidence adduced at trial. I believe in this case the fact finder is the sole determinant of findings of domestic violence.

As a partisan witness I have offered caveats throughout this report so as to give context to how much weight should be given to the data I present.

In terms of grave risk, while the children offered nothing to me which would help me provide an opinion on this, a fact finding using all the data adduced at trial would be the most relevant consideration. By what the children told me it was impossible to rule grave risk in or out. I do not believe that Dr. Petracek's data confirms grave risk because it is so methodologically deficient. Plainly stated it is my opinion that neither my methodology nor Dr. Peracek's

27

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

methodology is robust enough to provide anything more than an "if/then" analysis: If mother is credible in her assertions of violence and abuse there would be a grave risk of their return to Armenia. If father's assertions that he has never been violent and that his temper outbursts were not reflective of who he is as a person, and that mother's allegations were manipulative and opportunistic, there would not be grave risk of return,

Respectfully submitted,

Peter J. Favaro, Ph.D.

References:

APA Guidelines for Forensic Psychology January 2013  American Psychologist

American Psychological Association (2022). Guidelines for Child Custody Evaluations in Family Law Proceedings. Retrieved from https://www.apa.org/ practice/guidelines/child-custody-evaluations.pdf

Burkitt, E. (2004). Drawing conclusions from children's drawings. European Journal of Psychology of Education, 19(2), 107-119.

Collison, K. L., & Lynam, D. R. (2021). Personality disorders as predictors of intimate partner violence: A meta-analysis. Clinical Psychology Review, 102047.

Fury, G., Carlson, E. A., & Sroufe, L. A. (1997). Children's representations of attachment relationships in family drawings. Child Development, 68(6), 1154-1164.

Hopwood, C. J., Kotov, R., Krueger, R. F., Watson, D., Widiger, T. A., Althoff, R. R., Ansell, E. B., Bach, B., Bagby, R. M., Blais, M. A., Bornovalova, M. A., Chmielewski, M., Cicero, D. C., Conway, C., De Clercq, B., De Fruyt, F., Docherty, A. R., Eaton, N. R., ... Zimmermann, J. (2018). The time has come for dimensional personality disorder diagnosis. Personality and Mental Health, 12(1), 82–86.

Lilienfeld, S. O., Wood, J. M., & Garb, H. N. (2000). The scientific status of projective techniques. Psychological Science in the Public Interest, 1(2), 27-66.

28

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Tharinger, D., & Stark, K. (1990). A qualitative versus quantitative approach to evaluating the Draw-A-Person and Kinetic Family Drawing: A study of mood- and anxiety-disordered children. Psychological Assessment: A Journal of Consulting and Clinical Psychology, 2(4), 365-375.

Thomas, G. V., & Jolley, R. P. (1998). Drawing conclusions: A re-examination of empirical and conceptual bases for projective techniques in children's drawings. British Journal of Clinical Psychology, 37(2), 127-139.

29

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Appendix A: Co Parent Intake

This was the intake information provided by Casmiro. He acknowledges the importance of co-parenting but looks upon his experience with his wife over the last eight months negatively . He doe not express himself in a hostile or aggressive manner. It would have been my preference to compare both parent's responses to these items but that opportunity was not afforded to me.

**Casimiro Dias**
Rula Dias
Submission Date
Sep 28, 2024 1:27 PM

1. Date
Sep 28, 2024

2. Filling out this form for
court evaluation

3. Name
Casimiro Dias

4. Date of birth:
Feb 1, 1979

5. What is your email address:
casimirojosedias@gmail.com

6. Co-parent name:
Rula  Dias

7. Your Address:
Ruben Zardaryan Street, 32D, Vakahani Private Condominium
Yerevan, Armenia, 0088

8. What city does the co-parent live in?
Alameda

9. What state does the co-parent live in?
California

10. Highest level of education achieved?
Master

11. Who lives at your home, not including the children you share with the co-parent (for example new spouse, children not from your relationship with the co-parent, other family members.)
Me. Prior to the abduction of my three minor children on 25 April, I lived my wife until 21 April 2024, when she left our house.

12. How long have you lived here?
9 months

13. Do you think you will be living here for the next 6 months?
Yes

14. Number of bedrooms:
3

15. Number of bathrooms:
3

16. What are the names and ages of your child{ren) with the co-parent? (For example: Michael, 6) Please click "add more" and make a separate entry for every child)



, 9
, 8
, 6

17. How far apart in miles do you and the co-parent live from one another (put 0 if you are in the same home).
7600

18. How far apart in minutes do you and the co-parent live from one another (put 0 if you live in the same home)
700

19. What is the best telephone number to reach you at:
(+374) 999-54851

20. Best time(s) to call:
Due to time difference from Armenia to NY, USA, the best time is from 7 am to 4 pm in NY,USA time.

21. Time(s) NOT to call:
Please if urgent, call me any time including after 4 pm in NY time.

22. Which applies to you and the co-parent?
presently married to the co-parent

23. What legal outcome are you seeking?
I would like joint custody

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

24. Who is your attorney (If you do not have one put NA)
Richard Min

25. Who is the co-parent's attorney? (If you do not know put NA)
David Lam

26. If your child has an attorney what is his or her name?
NA

27. Who is the judge who is presiding over your case?
Edward Chen

28. What court are you in? (For example: Nassau County Supreme Court)
UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

29. When is your next court date?
Oct 29, 2024

30. Anything you would like to add or explain (optional)?
I have requested the return of my three minor children to their habitual residence in a Hague
Abduction case in the US District Court of Northern California

31. Which applies to the changes you would like to see to your current access time?
Other

32. Anything you would like to add or explain? (optional)
I would like to return of my three minor children to their habitual residence in Armenia and
establish a cooperative co-parenting plan with their mother, so our children can have access to
both their father and mother.

33. Is there a current temporary order of custody?
No

34. What are the arrangements under the current order? (what are the custody, time sharing and
decision making arrangements)
I am married with my wife and prior to the abduction we lived together with our three minor
children. As married couple we both have custody of the children.

35. Is there a current agreement in place regarding custody? (what are the custody, time sharing
and decision making arrangements)
No

36. What are the arrangements under the current agreement?
My wife has abducted my three minor children, with the support of her brother and her sister,
without my consent or knowledge. For more than five months, I have no contact with my wife

32

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and children. For more than five months, I have no information about my children's safety and wellbeing. Taking into account the prior history of abuse of my children by my wife's brother and father, I have serious concerns about my children's safety and that the threats and abuse towards my children has been sustained, without them being protected by my wife. As I was forcefully isolated from my own children, I feel helpless for not being able to protect them from the threats and abuse potentially sustained by my wife's brother and father.

37. What decisions do you think you should be able to have the final say about?
school/educational decision making
religious decision making
decision about mental health treatment
decisions about aftr school activities
medical decision making

38. Which of these areas would you be willing to permit the co-parent to have final decision making about?
none of these

39. Anything you would like to add or explain?(optional)
I have been a loving and supportive father to my children's development and growth. I feel isolated from them. For my children's best interest, I believe I should continue being an important part of their lives to love and support them, as they develop in a healthy and safe environment.

40. When it comes to making decisions would you be willing to discuss those decisions with the co-parent or other professional?
Yes

41. Anything you would like to add or explain? (optional)
I believe that my children love both their father and their mother. Since the abduction on 25 April 2024, my children have been alienated from me. I have concerns they are also being alienated from their own identity, as the private detective hired to identify the location of my children confirmed that my children are being described by the neighbours as Palestinians. My children are not Palestinians. They are US and Portuguese Citizens. I also feel that I have been subjected to racism by my wife's family for not being Palestinian, but Portuguese. I am very concerned about Parental Alienation and the emotional impact that has in my three amazing children.

42. Does the co-parent have an order of protection against you?
No

43. If yes, is it:
Doesn't apply

44. Was the order of protection issued after a trial or hearing?
Doesn't apply

33

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

45. Please explain the circumstances regarding the Order of Protection including when it expires.
Immediately prior to the abduction of my three minor children, my wife has reported domestic violence against me to the police. The domestic violence was reported by my wife, while I was in a birthday party with my three minor children from 1 am to 8 pm, on 21 April 2024. Following the report of domestic violence, it was issued an Order of Protection that I could not approach my wife for 20 meters. The Order of Protection did not included my children. I have taken care of my children by myself from 21 April to 25 April, when my children were abducted from the International School QSI, Yerevan, by the mother. I have always respected the Order of Protection, and didn't even went to the school play by my daughter N█████ D█, in order to ensure my wife did not felt threaten. My wife has never previously expressed any fear or threats by my presence. The allegation of domestic violence was fully dismissed in the Administrative Court of Appeal of the Republic of Armenia on 8 July 2024, and the Order of Protection was dismissed too. In spite of the Order of Protection and the refusal of any support from the National Authorities as potential victim of domestic violence, my wife has abducted our children from Armenia to California, US. She did not collaborate with the National Authorities to verify the allegations of domestic violence. Instead, she leak the police report of domestic violence, with unverified and unconfirmed allegations, to the media in Armenia, to damage my reputation and the Organization I worked for in Armenia.

46. Do you have an order of protection against the co-parent?
No

47. If you do have an order of protection is it:
Doesn't apply

50. Are there any orders of protection that extend to the child(ren)?
No

51. What are the details of any orders of protection that involve the child(ren)?
There are no order of protection involving my children.

52. Do you currently have supervised visitation?
No

53. Does the co-parent currently have supervised visitation?
No

54. If you or the co-parent currently has supervised visitation explain the details such as who supervises, how often and where.
There is a Court Order that I should have supervised visitation with my children. My wife has submitted 32 conditions for the supervised visitation and these have been delayed.

55. Have you ever been investigated by a child protective agency?
No

34

CD001751

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

56. Is there an ongoing investigation by a child protective agency?
No

57. Has a child protective agency ever determined that you were at fault for placing your child in danger?
No

59. Has the co-parent been found to have placed your child in danger by a child protective agency?
No

61. How time should be divided with the child(ren).
3 / 5

62. Do you have conflicts/disagreememnts about firearms?
No

63. How decisions should be made?
1 / 5

64. If so, please explain:
My children should access to both their father and mother. The children should be loved and supported by the father and the mother.

65. Telephone access
1 / 5

66. How holidays should be shared.
1 / 5

67. How the children should be disciplined.
1 / 5

68. Our overall parenting style.
1 / 5

69. How electronic devices should be managed.
1 / 5

70. How we should support one another in fostering a healthy relationship with the children.
1 / 5

71. The role that other family members play in the child(ren)'s lives.
1 / 5

72. The role that significant others play in the child(ren)'s lives.

35

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1 / 5

73. How finances are handled.
1 / 5

74. The types of food the children should eat.
1 / 5

75. How religious practices are observed.
1 / 5

76. How the child(ren) should be transported.
1 / 5

77. Where the child(ren) should be allowed to travel with each co-parent?
1 / 5

78. If one of the parents should be permitted to move a certain distance away.
1 / 5

79. Whether any of the children need to be seen by a mental health professional?
1 / 5

80. What after school activities should your child(ren) participate in?
1 / 5

81. Whether we should both have access to school, medical and other information related to the children)?
1 / 5

82. What is your most significant disagreement? Who do you feel is most at fault for not being able to resolve it? What efforts have you made to seek a resolution to it?
As a married couple, a father and mother, we had an open dialogue and agree on all matters related to our family activities, children's health and education.
There were three main concerns in our marriage and family with three minor children:
First, there was undue influence by her brother and father in our children's health and education. For example, when my wife and I were discussing if we should vaccinated our children with the Covid19 vaccine, my wife's brother has demanded our children to be vaccinated, if my wife wanted to see her parents in Atlanta. At the same time, my wife's brother has demanded her parents should attend a crowded Christmas dinner, in spite of her parent's concerns with Covid19. We had to cancel our travel to visit my wife's parents for Christmas.
Second, there was undue influence in her brother in our marriage between me and my wife. For example, in front of my, my wife's brother would tell her that she was raising our three minor children by herself, disregarding my role as father and husband. He also stated that my wife should take our children to go live with her brother in Atlanta. My wife would not reply to these

36

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

statement from her brother. I got concerned about the influence of my wife's brother in our marriage.
Third, my wife's brother threaten my children since 2018. Initially, I evaluate her brother's threats towards my children and it was obvious part of a larger pattern of abuse, with emotional impact in my children. Then, I communicate my concerns with these threats with my wife. As I did not felt safe or comfortable, I requested my wife to address these threats with her brother. Then, my wife and I decided to involve her parents to address these threats by her brother. However, the situation escalated, as instead of addressing the threats towards my children, her father has attacked my reaction to the threats, calling my reaction violent and isolated me from the family. Finally, my wife and I decided to jointly address these threats with her parents. However, her father did not allowed her to talk, and I addressed these concerns alone, without my wife support. As my wife was not able to talk because her father's interruptions, I told her father to shut up. While, I thought I was standing up for my wife, she further attacked me for telling her father to shut up.

83. Anything you would like to add or explain?
The threats by her brother and father have escalated since 2018 to 2024. I was put in a very difficult situation. By one side, I fully understand that my wife wanted to see her parents often and have a good relationship with her parents and family. By other side, I was not able to protect my children from her brother and father threats, without being attacked by my wife and mother of our children. I felt the next option was to consider separation. However, I was willing to try to make things work for the best interest of our children. The sustained threats towards my children by my wife's brother and father require both sensitivity and firmness, in order to ensure the safety and wellbeing of my children.

84. When you consider all of what you have rated above do you think your disagreements are very problematic and are not likely to resolve themselves?
No

85. Please check off the issues in this section which you believe are essential to understanding your conflict with the co-parent.
Emotional abuse of the children by the co-parent.
The co-parent is manipulating the children as a means of trying to cut me out of their lives.
The co-parent is trying to replace me as a parent figure .
The co-parent has mental health issues.
The co-parent refuses to share information abput my child(ren) like school information. social events or medical information.
The co-parent refuses to allow me to speak with my child(ren).

86. You may provide more information about any of the items you checked above or if you feel that there are issues in addition to those.
My wife has abducted my children from the International School QSI in Yerevan on 25 April 2024. Since then, I have no contact with my children or my wife for more than five months. I have very strong bonds with my children, and forcing them to have no contact with their father is traumatic. I have serious concerns regarding my children's safety and well-being due to prior

37

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

history of threats towards my children by my wife's brother and father, without her protecting them from those threats.

87. Do you think the co-parent poses a risk of fleeing with the child(ren)?
Yes

88. If your answer to the question above is YES or I AM NOT SURE please say whether you have ever brought the issue of abduction or fleeing to the attention of the court and explain why you feel this way.
I am extremely concerned that my wife will flee with my children to another US State or country. I believe if the Court Order is not favourable to her, she will flee with my children to jurisdictions  that are not signatories of Hague Abduction Convention, including Palestine.

89. Check all that apply:
I work full time

90. What is the name of your employer?
World Health Organizaton

91. Are you self employed or the owner of your business?
No

92. How many hours a week are you employed outside of your home?
less than 10

93. Do you have the option to work from home?
Yes

94. Please provide the details of your ability to work from home and if you CURRENTLY work from home
I usually work from the WHO Office in Yerevan, Armenia, to lead and attend meetings with the Government and International Partners. However, there is a possibility to work from home in a limited number of 5 days per month.

95. Do you travel for work?
Yes

96. If you travel for work what are the details of how often?
I might have to travel for work. However, I work at the country level and it is rare to have to travel to other countries. However, it is a possibility in my work.

97. Are you typically available when the child(ren) leave for school?
Yes

98. Do you currently prepare the children for school?
Yes

38

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

99. Please describe any before school programs or day care that your child(ren) attend.
Prior to the abduction, I will always take my children to school every morning. I will coordinate with my wife to pick up the children from school, depending on hers and mine work commitments.

100. Are you available when the child(ren) return from school?
Yes

101. What time do the children return from school?
4:00 PM

102. Use this box to describe if different children come home at different times?
No, my three minor children studied in the same school, International School QSI in Yerevan. The school is a walking distance from our home in a Private Condominium with private security. They jointly enter school at 8 am and leave at 3.30 or 4 pm.

103. Please explain what other caregivers (family members, nannies, etc.) assist with the care of your children. Who are they? On what days and times?
My wife and I take care of my three minor children. We had the support of a person to clean our house.

104. What time do you get back to your home on most nights?
5:30 PM

106. Do you work weekends?
No

108. Out of 28 possible overnights in a given month how many do you think the co-parent should have with your child(ren)?
14

109. You may provide additional information here:
I would like to discuss this matter with the mother. For the best interest of the children, I believe they should keep sleeping all nights in their room. However, this should further agreed with my wife.

110. Which of these blocks of time should be divided equally between you and the co-parent?
Weekday time
Weekend time
Religious holidays
Summer vacation
School holidays

111. What is your reasoning as to why any of the blocks of time above NOT BE divided equally?

39

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I believe all blocks should be divided equally. However, the best interests of the children should be considered in such division.

112. Do you believe that a child should only have one home (In other words one home they live in and see little of the other parent) during the week?
Yes

113. What logic or reasoning do you use to support the answer to the question above?
For the best interest of our three minor children. I believe they should always sleep in their bedroom with their personal belongings. However, this should be further discussed with co-parent in order to ensure the best interest of the children.

114. Do you object to mid week dinner visits with the co-parent?
No

115. Please explain the answer you provided to the question above.
I believe my children should have contact with the father and mother, for creating a loving and supporting environment. This should be discussed taking into account the best interest of the children.

116. Do you object to midweek overnight visits with the co-parent?
No

117. Please explain the answer you provided to the question above.
I believe my children should have contact with the father and mother, for creating a loving and supporting environment. This should be discussed taking into account the best interest of the children.

118. Please explain, in words the access schedule that you think is MOST APPROPRIATE for your child(ren)?
I would like to establish a cooperative co-parenting plan and have a open line of communication to adjust the plan, taking into account the best interest of my three minor children.

119. Why do you consider this the MOST APPROPRIATE access schedule?
I have no contact with my three minor children for more than five months, since the abduction. I have no contact with my wife since 21 April 2024. Therefore, it is difficult to establish the access schedule, with such uncertainty and lack of contact. I have concerns that my wife will hurt my children or flee the country with my children, if the Court Order is not favourable to her.

120. Over the next 12 months do you think your disagreements with the co-parent will:
Get worse

121. What is your overall impression of the co-parent
3 / 5

122. What one thing could the co-parent do to improve your impression of him or her?

40

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

The co-parent should be able to establish an open dialogue to ensure the best interests of the children. The co-parent abducted my children and unilaterally force my children not to have any contact with their father for more than five months.

123. What one thing could you do to improve the co-parents impression of you?
I am fully involved and committed to my children's daily activities. However, I will have to flexible to ensure the best interest of my children, in a open dialogue and agreement with the co-parent.

124. Have you and the co-parent had counseling together?
No

127. Have you had any individual mental health treatment?
Yes

128. Please provide the names of the treatment provider, their contact information and when they were seen:
After the abduction of my children, I have seek support of a medical doctor and a psychiatrist. I have also seek support of a therapist to process my emotions and establish coping strategies.

129. Are you now taking or have you taken any medication for a mental health issue?
No

131. Please share anything you feel is important about the co-parents past treatment providers, mental health history or medication history:
I was informed by my wife that she was raped in the college dorm by one individual, while her colleagues were listening in the other room. She has not reported the sexual assault to the Police in Austin, Texas. She has also informed me that she was sexually harassed by her second level supervisor, and she did not report the harassment to the Organization or the Police. As a victim of sexual abuse, she was often emotionally unstable.

132. The co-parent is honest.
No

133. The co-parent is dependable.
No

134. The co-parent is focused on the needs of the children.
No

135. The co-parent supports my relationship with the children.
No

136. The co-parent is gentle and not aggressive towards me.
No

41

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

137. The co-parent is gentle and not aggressive towards the children
No

138. On the whole the co-parent is a good parent.
No

139. On the whole the co-parent is a good role model.
No

140. The co-parent shows good judgement.
No

141. I have no worries about the co-parent's use of drugs or alcohol.
No

142. I have no worries about the co-parent's current state of mental health.
No

143. The co-parent places his or her needs above the needs of the child(ren).
Yes

144. The co-parent does permit others to increase the conflict and tension in our co-parenting relationship
Yes

145. I think the co-parent does an adequate job of sharing information relating to the children with me.
No

146. I think the co-parent and I share equal fault in any conflict that exit between us.
No

147. I think it would be best for the co-parent and I to have equal influence in the lives of the child(ren).
Yes

148. I think the co-parent has more good things about them than bad.
No

149. The co-parent offers benefits to the child(ten) that are valuable and different from what I offer.
No

150. I usually worry when the co-parent is alone with the children.
Yes

42

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

151. I wish the co-parent would leave me and the child(ten) alone.
No

CONFIDENTIAL

CD001760

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Appendix B: About My Child

The information submitted through this form reflects Casemiro's beliefs that he is an equal parent who asserts that there is a reciprocal bond of love with his children. While there are expressions of negativity and disappointment there are no hostile or hateful statements

**Casimiro Dias**
Rula Dias
Submission Date
Sep 29, 2024 8:42 AM

1.Date
Sep 29, 2024

2. FORM COMPLETION CODE
5168835747

3. Your name:
Casimiro Dias

4. Your email:
casimirojosedias@gmail.com

5. Co-Parent's name:
Rula  Dias

6. Child's name:
 D

7. Child's Date of Birth:
██████ 2014

8. How old is this child right now?
9 years, 11 months

9. Do you, the child and the co-parent all live under the same roof at present?
No

10. What is the current access schedule (if there is one, if not write None)?
I have three minor children, █ D██, 9 years old, N██ D██, 8 years old and C█████ A███ D██, 6 years old.
I have no access to my children since their abduction on 25 April 2024.
I have no information regarding my children's safety and wellbeing for more than five months now, despite several requests by my Attorney.

11. If there is an access schedule, how was it created?

CONFIDENTIAL

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Court order
Agreement

12. Are you content with the current access schedule?
No

13. Why or why not and if you think it should be changed, how should it be changed?
There is a Court Order for the access to my children. Following the Court Order, my wife has demanded 32 conditions for the access to my children, which resulted in several delays. As my wife has abducted my children from Armenia to California, US, there is a 11 hour time difference between me and my children. The proposed time for access to my children is 3 am Yerevan Time. While, I fully agree that the time should be defined according to the best interest of my children, I have serious concerns that I will not be able to keep access to my children in a regular time, without a Court Order and proper enforcement by the Authorities.

14. Do you believe the co-parent thinks it should be changed?
No

16. Do you think this child is content with the current arrangement?
No

17. How do you know the child is happy or unhappy with the current arrangements?
My children have a very strong bond with me, as their father. My children have been suddenly abducted from school and have been forced to have no contact with their beloved father, for more than five months.
Based on scientific evidence, the children are traumatised by the abduction and parental alienation.
The therapist currently treating my children has been provided with false allegations that my children were subjected to domestic violence by me. Based on the false information provided by my wife, the therapist made an incorrect diagnosis and started a potentially harmful treatment. The therapist diagnosed PTSD to my children. However, the cause is not the false allegation of domestic violence, but the abduction and parental alienation.

I have went through the drawings that my children were making. It is striking how they love and value their family, including father, mother, sister and brother. The drawings also show they love their father.
There are concerning red flags in the drawings made by my children.
First, my oldest daughter has written a note stating "Mommy is not allowed in my bedroom", which might indicated some conflict with her mother.
Second, there are a high number of my children's drawings about an evil woman that tries to hurt my children.

18. What is your understanding of what the child wants and how did you find this out?
My children have a strong bond with me, as their father. I was taking them to school everyday, helping them in their homework, cooking for them and playing with them.
They love me and want to have their father in their lives.

45

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

The abduction and forcing them not to have any contact with their father is very traumatic for them.
Such trauma will required professional support to my children, which should be based in the full information about the situation my children are living, and not exclusively based on false allegations by the mother.
My wife did not only lied to the police, to the court, but also to the therapist, which affect my children's access to adequate health care.

19. Do you think the child's opinion of the access schedule is influenced by the co-parent?
Yes

20. How did you arrive at the conclusion for the question above?
My children are being forced not to have any contact with their father. While I am not aware of what my wife is telling my children about this situation and myself, I believe my children are well aware that they cannot talk to me because their mother does not want them to.

My children were aware that my wife's brother was influencing and manipulating my wife to take our children to go live with him in Atlanta. However, my wife has never expressed any interest or intention to move to the USA, as demanded by her brother.

21. Do you believe this child is capable of making a good decision about how much time he or she wants to spend with each parent?
No

22. Please explain your answer to the question above
My children have 6, 8 and 9 years old, so I don't believe they have the maturity to take such a difficult decision.

I have to support my children to take simple decisions as for example, what they want to dress, they want to eat, they want to do in the weekends and after school. Therefore, I don't believe they will be able to take such difficult decisions, without the support of the father or the  mother.

I have developed some techniques for my oldest daughter, ██ D██, 9 years old, to take decisions. We write togethers different activities that she could do and then she would pick one from the different activities she write down. I have also seek support from therapist to help my daughter be more independent in making her own decisions.

23. Do you think this child's opinion should be what decides what the access schedule should be?
No

24. Please explain your answer to the question above:
I also don't think is fair for the children to carry the burden of such decision, making them feel responsible for a situation they are not responsible at all. This matter should be addressed by the adults, while my children can enjoy their school and daily activities, without worries.The abduction and being forced not to have any contact is the full responsibility of my wife due to

46

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

her unilateral decisions. My children should not carry the burden of my wife's unilateral decisions.

I also don't think it is fair for the children to take such difficult decisions because my wife refuse any contact to discuss the safety and well-being of my children. My wife is making false allegations of domestic violence exclusively to leverage custody of the children, without any consideration for my children's best interest.

25. Does this child go to school?
Yes

26. Who wakes this child up?
Father and mother

27. Who feeds this child breakfast?
Father and mother

28. How does this child get to school most mornings?
Walking with father and mother from home to school everyday.

29. If you the co-parent and the child live in the same home is their conflict in front of the child in the morning before school?
No

30. If this child goes to school what is the name of the school.
International School QSI in Yerevan, Armenia. They are in 6 years old class, 7 years old class and 9 years old class in the International School. They were abducted on 25 April 2024 and the lost the school time until 14 June 2024, with consequences in their educational progress.
I have no information about which class they are currently for the school year 2025/ 2026.

31. What grade is this child in?
6 yoc, 7 yoc and 9 yoc

32. Does this child go to a before school program or after school program? If so what is the name of the program, how often does he or she go, what time does the child go if it is a morning program. what time do they return if it is an after school program, and how is the child transported?
The children have extracurricular activities in the International School QSI in Yerevan. My son does regular physical rehabilitation during the week.

34. Does your child have a guidance counselor?
Yes

35. If your child has a guidance counselor what is the guidance counselor's name?
Tamar Sevadjian, School Counselor

47

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

37. Who are this child's teachers?
 - Mrs V Laitinen
N█████ D█████ - Mrs P Wongsawang
C█████ D█████ - Ms Emily Griffiths

38. What is the name of the principal of this child's school?
Mary Kay Gudkova, Email:marykay-gudkova@yerevan.qsi.org

39. Does your child spend a lot of time with the school nurse? If so, please explain why.
No.

40. Please provide your opinion about this child's educational strengths.
My children love to read books and write their own books. They

41. Please provide your opinion about this child's educational weaknesses.
My children lack social skills. My children preferred to play between themselves. The social skills were not properly developed due to the pandemic with school remote classes for years. I have created regular opportunities for my children to interact with the children of our neighbours and school mates. We went to Portugal for holidays and they would spend most of the time outside in the beach and country side, as well as playing with other children outside.

42. Do you think this child is fulfilling his or her academic potential?
Yes

43. What role does the co-parent play in your child's educational success or failure?
My wife has take the children to school with me, everyday. She helped with the homework and supported the children to read.

44. What role do you play in this child's educational success or failure?
I take my children to school everyday and provide emotional support to them. I help them in their homework and extracurricular activities in a fun way. I support my children to read books and write their own books. I have taken the children to birthday parties with their school mates, so they can create friendship and enjoy those friendships in the school.

45. How does your co-parenting conflict impact your child's school performance?
My wife has abducted my children from school on 25 April 2024, which impacted their performance.
My wife's brother has systematically influenced my wife to take the children to Atlanta to spend time with him during school time, with disregard for their educational progress and development.

46. Do you attend all parent/teacher conferences for this child?
Yes

47. If you do not attend please state why and indicate whether you make alternate arrangements.
I participated in parent conferences, which were mainly informative. I have participated in fun school activities with my children, including theatre plays and sports.

48

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

48. When was the last time you spoke to anyone at school, and what did you discuss.
I spoke with the Principal of the International School QSI in Yerevan, Armenia, on 29 August 2024. We discussed the re-enrollment of my children in the International School, in preparation for the return of my children to their habitual residence.

49. Does this child avoid doing homework and other after school work?
No

50. Does this child have any special educational needs?
No

51. If your child has special needs what are they?
My oldest daughter, ██ D██, 9 years old, has developed OCD in April 2022, and I seek professional support with therapy for OCD in 2022 and 2023. Following threats of being smashed liked a cockroach by my wife's brother, my oldest daughter, during our visit to my wife's parents in April 2022, my daughter has developed thoughts of being dirty as a cockroach. I was concerned about the impact of the threats by my wife brother in my children's health and well-being.
My youngest son does physical rehabilitation regularly to improve movement coordination. My son enjoyed the rehabilitation and he is improving his coordination.

52. Do you and the co-parent disagree as to whether your child has special needs?
No

53. If the answer to the above question is yes, what is your disagreement and what is your opinion on the best way to resolve the disagreement?
My wife and I have an excellent relationship and have an open and constructive dialogue regarding what was best for our children. My wife's brother and father interfere in our joint agreements, critiquing them and making unreasonably demands regarding our children's health and education. For example, her brother demanded that my wife vaccinate our children with covid19 vaccination, if she wanted to see her parents in Christmas 2021.

54. Does this child have an IEP? (Individualized Education Plan)
Yes

55. If this child has a classification what is it?
██ D██ - Success in all orientation skills, classifications included A (high quality), B (success) and P (in progress) in the different skills.
N██ D██ -Success in all orientation skills, classifications included A (high quality), B (success) and P (in progress) in the different skills.
C██ D██ - Success or Exemplary in all orientation skills, classifications included A (high quality), B (success) and P (in progress) in the different skills.

56. Have you attended meetings of the special education committee for this child?
No

49

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

59. Does your child receive tutoring (other than what you do to help academically)?
No

62. How much homework help does this child need?
I and my wife help our children to complete their homework. I try to give them space to complete the homework by themselves and then we work together the exercises they have more difficult, in a fun and engaging way.

63. Do you think the current visitation access schedule interferes with your child's ability to do or complete homework?
Not applicable

64. If the answer to the above question is yes, please explain:
I currently have no access to my own children for more than five months, since they were abducted by my wife, with the support of her brother and sister.

65. Do you and the co-parent communicate effectively about this child's school performance?
Yes

66. What could the co-parent be doing to communicate more effectively about this child's school performance?
Since my children were abducted on 25 April 2024, I have no information regarding my children's school performance, health and safety. I have tried to contact their current school in Alameda, California, but the principal did not replied. I have concerns that my wife has made false allegations of domestic violence against me, which resulted in no contact with the school.

67. What could you be doing to communicate more effectively about this child's school performance?
I highly value the education and personal growth of my children. I have been isolated from my children's lives, including their school performance and fun school activities.

68. Please describe up to two things you have done with this child in the last month that are educational but are unrelated to a school assignment?
Before my children were abducted by my wife, I have helped my youngest son to write a book about himself. I create a safe and stable environment for my children to share their thoughts and emotions after their mother abandoned our house.
I have helped my children play football as a team, instead of playing each other for themselves. They learned the importance of playing as a team of three to win the game with their father. They were very happy with the results they achieved by playing together as a team.

69. Gets this child prepared for school or morning program:
3 / 5

70. Takes responsibility after the child returns from school:
3 / 5

50

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

71. Communicates with the school:
4 / 5

72. Provides information about school related matters to the co-parent:
3 / 5

73. Is an important influence on academic success:
3 / 5

74. Has an understanding of this child's educational needs:
3 / 5

75. Has an active interest in seeing the child succeed academically:
1 / 5

76. Motivates the child to achieve:
1 / 5

77. Is available to assist with school related matters:
3 / 5

78. Has the patience and temperament required to help with school responsibilities:
1 / 5

79. Has the skill to help the child overcome frustration:
1 / 5

80. Puts this child on task when they are avoiding homework:
2 / 5

81. Buys clothes and supplies for school.
1 / 5

82. Willing to attend parent-teacher conferences.
3 / 5

83. More willing to accept advice from educational professionals:
3 / 5

84. Makes sure that the school is provding necessary educational services.
1 / 5

85. Who is your child's primary medical provider (pediatrician)?
Priscilla Morais

51

                                      CD001768

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

86. Do you communicate regularly with all of this child's health care providers?
Yes

87. What is this primary provider's (pediatrician) telephone number?
(876) 969-0083

88. What town does the provider practice in?
Kingston,

89. When was the last date for routine care?
Oct 16, 2023

90. Does this child have any medical conditions, like allergies?
Yes

91. If yes, please describe any special medical needs or conditions:
My oldest daughter, ██ D██, has developed OCD in 2022, during a visit to my wife's parents in Atlanta, where her brother threat to kill and smash my children like cockroaches. He threaten my children despite the fact that my wife has requested him not to threat my children during our visit to her parents.
My youngest son, C████ D██ has diagnosis of mild cerebral palsy. He is followed by a neurologist paediatrician and do regular physical rehabilitation.

92. Do you and the co-parent disagree on medical treatment for this child?
No

93. if yes, what do you disagree on and what is the best solution for that disagreement?
My wife and I have a relationship based on mutual respect and open dialogue. We discuss openly our children's health and education, exclusively with the focus on their best interest. However, my wife's brother and father critique our decisions and make unreasonable demands.

94. What medications is this child on and for what conditions? What doctor prescribed the medicine and what is their specialty?
No medication.

95. Who makes the medical appointments for this child?
Both

96. Do you and the co-parent have conflicts over how doctor's appointments are made?
No, we don't have any conflict regarding our children's health. Since the abduction, I have no information regarding my children's health. While I was fully involved in our children's health, I have been isolated from my children by my wife and her family.

97. Check all that apply:
The co-parent makes appointments without consulting me
The co-parent makes apppointments and will not share information with me

The co-parent will not tell me the names of health care providers

98. What other health care providers does your child see? Include dentists, specialists, therapists, speech and language professionals, etc. and their contact information.

My youngest daughter, N███ Dias, had to go to several times to the dentist in Portugal, during holidays, due to several cavities. My daughter N███ had to extract one decayed tooth. I was more careful to ensure she would brush her teeth after eating sugar. My daughter, N██ D██, had to go back to the dentist in Armenia due to another decayed tooth, but the dentist was able to save the tooth, and was not extracted in spite of the fact it had an abscess. My daughter always tolerate very well the dentist treatments and I was so proud of her. She was happy that she did not lose any more teeth, and would brush her teeth after eating sugar.

99. Is there anything else you would like to share about this child's health care that you feel is important to understanding the needs of this child?

My wife's brother and father has threaten to kill and smash my children, despite I tried unsuccessfully to address these threats and protect my children from those threats. I believe the abduction of my children and parental alienation, being forced not to have any contact with their father is traumatic. I am very concerned about their mental health. I am also very concerned my wife's brother and father threats towards my children have escalated. Since I have been isolated from my own children, I am not able to protect them from those threats and they are now vulnerable for more serious abuse.

I have always take care of my children when there were accidents with my children. My son, C█████ D██, once fall and had a big wound in his head, I took him to the hospital and ensure he was adequately and urgently treated. My son also put a plastic on his nose, I took him immediately to the hospital and spend all night with him in the hospital to be properly treated.

I love my children so much and I have always did everything to ensure they are healthy and safe.

100. Cares about the well being of this child:
5 / 5

101. Has more general knowledge and intelligence about medical and healthcare issues
5 / 5

102. Has in the past made appointments with healthcare providers:
5 / 5

103. More likely to share important health care information:
5 / 5

104. More likely to discuss making appointments with healthcare providers before making appointments:
3 / 5

105. More likely to disagree with healthcare providers for no good reason:
3 / 5

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

106. More likely to be disruptive/cause problems with health care providers:
3 / 5

107. More likely to inform the other parent about health care emergencies:
3 / 5

108. More involved in the healthcare of this child.
3 / 5

109. More willing to share medications and health care equipment with the other parent:
3 / 5

110. Please add anything you wish about medical issues or medical decision making.
My daughter, █ D█, developed OCD in April 2022, during a visit to my wife's parents, when they were threat to be smashed like cockroaches. My daughter developed OCD with thoughts of being dirty like a cockroach. I seek and ensured professional counselling and therapy for her to address the OCD successfully.
My son, C████ D█ was diagnosed with mild cerebral palsy, and he has been followed closely by neurologist pediatrician, and making regular physical rehabilitation to improve his motor coordination.
My daughter, N██ D█, has several decayed teeth, with a tooth extraction. She has been in the dentist for treatment in Portugal and she start brushing her teeth after eating sugar.

111. Please provide a list of what after school/extracurricular activities your child attends and on what days and times:
█ D█, 9 years old:
Track & Field (once a week)
Robotics (once a week)
Sand painting (once a week)
Crafts Club (once a week)
Portuguese Language Classes (twice a week)

N██ D█, 8 years old:
Soccer Club (once a week)
Gymnastics Club (once a week)
Robotics (once a week)
Creative Lab (once a week)
Portuguese Language Classes (twice a week)

C████ A████ D█, 6 years old:
Soccer Club (once a week)
Gymnastics Club (once a week)
Robotics (once a week)
Creative Lab (once a week)
Portuguese Language Classes (twice a week)

54

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

112. Do you agree with your child attending the after school extracurricular events he or she is involved in?
Yes

113. Please add anything you wish on this issue:
Since the abduction of my children on 25 April 2024 from the International School QSI in Yerevan, Armenia, by the mother, I have no contact with my children and no information regarding their school's performance and activities.

114. Has the co-parent ever scheduled an extracurricular activity on your time without consulting you?
No

115. If the answer to the above question is yes, pleae provide details:
After the abduction of my children by the mother, with the influence and support of the brother, I have no contact with my children and no information about school and extracurricular activities. I have unsuccessfully tried to contact the school in California, where I believe they are studying.

116. Do you attend this child's after school activities?
Yes

117. Are you involved as a coach or parent supervisor for any of this child's after school activities?
No

118. Do you think it would be best if the co-parent were prohibited from attending after school activities?
No

119. Have you ever withheld information about after school activities from the co-parent?
No

121. Do you believe you should be given the final say regarding choice of extracurricular activities for this child?
No

122. If you answered yes to the above please explain why:
Since the abduction, I have been alienated from my children's lives. I have no information about their school and extracurricular activities.

123. If there is conflict over extracurricular activities what is your opinion on how to resolve the conflict?
My wife and I should engage our own children in the decision of the extracurricular activities, for them to pursue their main interests. If there is a conflict between my wife and I over extracurricular activities, we should be able to address ourselves, without engaging our children

CONFIDENTIAL                                                                                     CD001772

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

in such damaging conflict. I believe we should always focus on our children's best interests and provide love and support in their extracurricular activities.

125. Please describe your level of religious observance:
I am religious but do not regularly attend services

126. Are you and the co-parent currently disagreeing on what religion your child should be brought up in:
No

127. During the course of your relationship was there any disagreement about religious practice?
No

129. Please (optionally) share any other information you would like regarding disagreements over religion and your opinion on how to resolve that conflict.
My wife's brother and father made racist comments based on other people's religion. They make very offensive racist comments against muslims and migrants, in spite of the fact they were migrants too and they were raised in Palestine and Saudi Arabia, where the Muslim population is 95% and 100%, respectively.
They have also racists comments to US and Portuguese citizens. My wife's brother has married a US citizen and get divorced. My wife's sister has married a US citizen and get divorced twice. My wife's sister previous husband complain to me that he was very upset with the undue interference and influence of my wife's brother in their marriage. I understood the interference of my wife's brother was not only in my marriage but in her other sister's marriage.
I believe there are significant religious and cultural differences which could explain her family dynamic, including the role of her brother with the authority to tell her sisters and parents how to behave and make unreasonably demands to them with influence in their marriages. Also, my wife does not talk and is not allowed to talk. If my wife tries to talk, she is immediately interrupted by the bother and father. This apply if when the brother and father makes threats towards our children, making her not able to protect them from such threats.

130. Do you think that you should be the parent who determines what religion your child should be raised with?
No

131. If the answer to the above question is yes, please state why:
My children were abducted and alienated from their father. The private detective hired to locate my children in California, has reported that my children are not presented as Palestinians. However, my children are US and Portuguese citizens, and the have never been in Palestine due to the unstable situation there.
I have concerns they are alienating my children as Palestinians, as my wife's family are all Palestinians.

132. Fed the child:
5 / 5

56

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

133. Changed diapers:
2 / 5

134. Taught the child how to talk:
3 / 5

135. Taught the child how to walk:
2 / 5

136. Provided emotional security:
2 / 5

137. Provided financial security:
1 / 5

138. Stayed up at night with the child:
2 / 5

139. At this age was this child:
3 / 5

140. At this age was this child:
1 / 5

141. At this age was this child:
1 / 5

142. At this age:
3 / 5

143. Is there anything you would like to add about your influence on this child during the stage of life?
My wife and I have decided to start a big family with three children. We have raised our children without any support from her family. Her family has critiqued our joint decisions and made unreasonable demands, against my children's best interests.
My wife is now alleging that I committed domestic violence towards my children. This is shocking as my wife and her parents have always praised for being an excellent father and husband.
These allegations were only made after the abduction of my children in order to allege "Grave Risk of Harm" and avoid their return to their habitual residence.
My children were always followed by paediatrician and had access to counselling and therapy required, without any limitations. The paediatricians and doctors have never reported any potential sign of domestic violence.
My children have always studied in International School with a very supportive environment. The teachers have never reported any concerns of potential signs of domestic violence. They always reported good school performance.

CONFIDENTIAL

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

146. Taught this child how to be polite:
3 / 5

147. Set boundaries:
2 / 5

148. Taught this child the importance of sharing:
2 / 5

149. Toilet trained this child:
3 / 5

150. Provided healthy food choices for this child :
2 / 5

151. Provided educational activities for this child :
2 / 5

152. Spent quality time with this child :
2 / 5

153. Handled bedtime routines :
3 / 5

154. Took this child to fun places :
2 / 5

155. Taught this child letters and numbers :
3 / 5

156. Helped this child wash/bathe and teaches hygiene :
2 / 5

157. Reads stories:
3 / 5

158. What are/were this child's favorite books?
The Very Hungry Caterpillar" by Eric Carle

159. At this age was this child:
2 / 5

160. At this age was this child:
2 / 5

58

CD001775

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

161. At this age was this child:
2 / 5

162. At this age was this child:
1 / 5

163. At this age was this child:
1 / 5

164. At this age was this child:
2 / 5

165. At this age was this child:
2 / 5

166. At this age was this child:
1 / 5

167. At this age was this child:
1 / 5

168. At this age was this child:
2 / 5

169. Who are/were the most important people in this child's life at this age/stage of development? Include family members/nannies/babysitters:
My wife and me. My cousin has helped to take care of our children in Portugal. My wife's family has never take care of our children. My wife's parents refused to hold my daughter, ██ D██, when she was a baby, despite several requests from my wife. It was a very concerning behaviour, as it looks like they have no emotional connection with our baby, or even felt disgusted by her. Taking into account my wife's father has threat to smash my daughter as a cockroach, I understand now his behaviour to refuse hold my baby.

170. Please share anything you would like to include about this child at this age:
We were very happy and we were living a dream by raising our children in a beautiful island in the Caribbean, where our children could grow healthy and safe.
My wife's family interference was minimal as this time. My wife's started increasingly interfering in our marriage and children, once they were older and become more independent in their daily activities.

171. At this age the co-parent:
3 / 5

172. At this age the co-parent:
3 / 5

59

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

173. At this age the co-parent:
2 / 5

174. At this age the co-parent:
2 / 5

175. At this age the co-parent:
1 / 5

176. At this age the co-parent:
1 / 5

177. At this age the co-parent:
1 / 5

178. At this age the child is/was:
1 / 5

179. At this age the child is/was:
2 / 5

180. At this age the child is/was:
1 / 5

181. At this age the child is/was:
2 / 5

182. At this age the child is/was:
3 / 5

183. At this age the child is/was:
3 / 5

184. At this age the child is/was:
3 / 5

185. Please explain the answer to the question you just answered above:
My children were very happy in a healthy and safe environment. My wife and I were very proud of the behaviour of our children.

186. Who are/were the most important people in this child's life at this age/stage of life and why?
My wife and I. We were both raising our three minor children by ourselves, without any support from my wife's family while we lived in the Caribbean. My wife's family only critique our decisions and make unreasonable demands regarding our marriage and our children's health and education.
My father had died in 2015 and I had only the support of my cousin in Portugal.

60

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

187. Who are/were the most important people in this child's life at this age/stage of life and why?
My wife and I.

188. What were the most important contributions you made to this child at this age/stage of life?
I would take care of my children. I was very involved in my children's lives. I was next to my wife when she delivered the babies and support her during the delivery, so she could feel safe and comfortable during the delivery. My children were breastfeed. However, as my wife had difficult to breastfeed, she will pump the milk and I will give it to my children. I would put them in bed and feed them during the night. would change their diapers, give them bath and play with them. We engaged in outdoor family activities, including going to the swimming pool, which create a strong bond between us and a secure environment for their development and growth.

189. What were the most important contributions the co-parent made to this child at this age/stage of life?
My wife was very important in our children's lives. My children love both the father, the mother, and their sisters/brother. We had an excellent environment for them to grow safely and healthy.

191. During this phase of life:
3 / 5

192. During this phase of life:
2 / 5

193. During this phase of life:
3 / 5

194. During this phase of life:
3 / 5

195. During this phase of life:
2 / 5

196. During this phase of life:
2 / 5

197. During this phase of life:
3 / 5

198. During this phase of life:
3 / 5

199. During this phase of life:
2 / 5

200. During this phase of life:

61

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2 / 5

201. During this phase of life:
2 / 5

202. During this phase of life:
3 / 5

203. During this phase of life:
2 / 5

204. During this phase of life:
3 / 5

205. During this phase of life:
1 / 5

206. During this phase of life:
1 / 5

207. During this phase of life:
1 / 5

208. During this phase of life:
1 / 5

209. What are some experiences you have had with this child that make you think you have a good relationship with this child at this age/stage?
I would spend so much time in the swimming pool with my children. They learned to swim with me, and they will always hold tight to me during our time in the swimming pool. They knew they were safe with their father.
We were always kissing, hugging and playing together.

210. What have you done to encourage a positive relationship with the co-parent with this child at this age/stage?
My wife and I had an excellent relationship with our children. We trust each other to take care of three minor children, without stress or worries.

211. What more could you have done to be a better parent at this age and stage?
I was the only parent working to ensure the financial stability to our children and family. I have always ensure access to all services for their health and education, without any financial constraints.
I am very proud of my parenting and I always try to learn to be a better parent. My children are my Universe and I always want to be a better father.
I was physically and emotionally present with my children, and talk a lot about their emotions.

62

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

212. What more could the co-parent have done to be a better parent at this age and stage?
I would put them in bed and feed them during the night. Before the abduction, I believed my wife always acted on the best interest of our children.

213. What and who are or were the best influences in this child's life at this age and stage?
My wife and I.

214. What and who are or were the worst influences in this child's life at this age and stage?
My wife's brother that threaten to kill and smash my children. This has caused emotional damage to my children. This has also caused emotional damage to me, as I was not able to protect my children. I highlight three main challenges in trying to address my wife's brother influence in our child's life at this stage:
First, Her brother and later her father threaten to kill and smashed my children.
Second, her family refused to address these threats. Instead they focused on my reaction to those threats. attacking me as violent.
Third, my wife start also attacking me for trying to defend my children. This resulted in a challenge to our marriage.

216. During this phase of life:
2 / 5

217. During this phase of life:
2 / 5

218. During this phase of life:
2 / 5

219. During this phase of life:
2 / 5

220. During this phase of life:
3 / 5

221. During this phase of life:
3 / 5

222. During this phase of life:
3 / 5

223. During this phase of life:
1 / 5

224. During this phase of life:
2 / 5

225. During this phase of life:

CONFIDENTIAL

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2 / 5

226. During this phase of life:
3 / 5

227. During this phase of life:
2 / 5

228. During this phase of life:
2 / 5

229. During this phase of life:
3 / 5

230. During this phase of life:
1 / 5

231. During this phase of life:
1 / 5

232. During this phase of life:
1 / 5

233. During this phase of life:
1 / 5

234. What are some experiences you have had with this child that make you think you have a good relationship with this child at this age/stage?
I have a strong bond with my child at this stage of their lives. We play together a lot, including football and jumping in the trampoline. They trust me and that allowed them to try new activities and developed new skills. They knew if their father was there, they were safe and had my full support, including riding a bike or swimming.

235. What have you done to encourage a positive relationship with the co-parent with this child at this age/stage?
My wife and I had a very positive relationship with our children.

236. What more could you have done to be a better parent at this age and stage?
I worked every day from 8 am to 6 pm. I wish I could spend more time with them. As I was the only parent working, my wife was spending more than with my children. My children were always my priority. Before and after work, I was always taking care of them,

237. What more could the co-parent have done to be a better parent at this age and stage?
The mother had an excellent relationship with our children. She could had deal better with the interference of her brother and father in our children's safety and wellbeing.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

238. What and who are or were the best influences in this child's life at this age and stage?
Me and my wife.

239. What and who are or were the worst influences in this child's life at this age and stage?
My wife's brother and father.

240. What else would you like to share about this child's development at this age and stage?
Me and my wife had an excellent relationship with our children. However, the undue influence and the threats of her brother and father have impacted our children's safety and health. I am so sorry about the power and influence of my wife's brother and father to destroy our marriage and our beautiful family, that we built together for 11 years.

291. Please check all that apply:
I am concerned that my child will not be as successful as he or she could be because of the problems that I have with the co-parent.
I am concerned that my child will not be as emotionally adjusted as he or she could be because of problems I have with the co-parent.
I am concerned about not having a relationship at all with this child because the co-parent will not allow it.
I am concerned that my child's needs are not being met by the co-parent.
I am concerned that my child's health and well being are neglected.
I am concerned that my child is being subject to emotional/physical or sexual abuse,
I am concerned that my child is being influenced to replace me as a parent with some other person.
I am concerned that the co-parent actively excludes me from information and events that I should be informed of.
I am concerned that the co-parent is actively trying to escalate the conflict between us.
I am concerned that I will not be able to meet the financial needs of this child.
I am concerned about the co=-parents extended family trying to influence this child against me,
I am concerned about drug and/or alcohol abuse on the part of the co-parent.
I am concerned about the co-parent's use of the court system as a way of separating me from this child.
I am concerned about the co-parent kidnapping this child.
I am concerned that by the end of this process I will never see this child again.
I am concerned that this child does not seem to want to have a relationship with me,
I am concerned about medical needs of this child not being met.
I am concerned about emotional needs of this child not being met.

292. Please describe any other concerns you might have about this child:
I have very concerned that my wife will flee with my children from another US State or country, and I will never be able to locate them ever again. I have been three months trying to locate my own children, with great despair and worries.

293. Would you be willing to supply a detailed list of facts and events (on your own time) which have led you to have concerns about all of the items you described above?
Yes

65

CONFIDENTIAL

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

294. Check this box to confirm that you understand that you have agreed to provide a detailed list of facts and details which support the concerns you have expressed above:
Yes, I understand and will do that.

Appendix C
Interview Notes With the Children

█

Ended after 13 minutes didnt

Intro

Truth versus lie

yes

Green monster

Feelings

happy sad angry scared embarassed

You don't have to answer

Do you know what state you live in?

Where did you live before that?

Who did you live with there?

Was it a nice place to live?

Did you have friends there?

Did you go to school there?

How was school there?

Did you get good grades there?

CONFIDENTIAL                                                             CD001783

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Did you have any pets there?

What kind of pets?

Do you have pets in California?

Do you go to school in California?

Do you have a favorite subject?

What do you do after school?

Do you play any sports?

Do you take music lessons?

WHo else lives in your home in California?

You have a dad, right?

What do you call him?

Where does he live?

Why doesn't he live with you?

When was the last time you saw him?

Do you speak with him on the phone?

Why not?

Do you miss him?

Do you think he loves you?

Do you love him?

What has your dad done that...

And how many times has he done that?

Do you remember when he did that?

CONFIDENTIAL                                          CD001784

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Do you remember when that was?

Do you remember where that happened?

Was he saying anything when he was doing that?

What do You call your mom?

Did ypur mom and dad scream at each other?

Do you think your dad likes your mom?

Why not?

Do you think your mom ;likes your dad?

Why not?

Do you think your uncle likes your dad?

Why not?

Do you think your grandfather likes your dad?

Why not

Do you think your dad likes your uncle?

Do you think your dad likes your grandfather?

Do you think there will ever be a time that you would want to visit with your father?

Why not?

If your dad told you he was sorry for what he did would you forgive him?

Why not?

Right before you came to America do you rememberspending a few days with your father?

Did anything bad happen during those few days?

Did your dad give you anything to eat during those few days?

CONFIDENTIAL                                   CD001785

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Did you drink anything during those few days?

Did you sleep in a bed during those days?

Was he mean during. those few days?

When your mother came back to pick you up to come to America did she tell you anything?

Did dhe tell you that you were going to America?

How did that make you feel?

How would it make you feel if you never visited with him again?

Do you have any questions you would like to ask me?

Ok. Thank you


====================

N█████

Introduction

Ok

Truth versus lies

Yes

monster

Feelings tired happy sad mad scared disgust embarrassed

Just say I do not want to answer

Do you know what state you live in?

Annedas

Where did you live before that?

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Armenia

Who did you live with there?

alfonsemommy pappa 

Was it a nice place to live?

Not really

IDK

Did you have friends there?

No

Did you go to school there?

Yes

How was school there?

idK

Did you get good grades there?

IDK

Did you have any pets there?

No

What kind of pets?

Do you have pets in California?

No

Do you go to school in California?

Yes

IDK (like school)

CONFIDENTIAL

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Do you have a favorite subject?

What do you do after school?

IDK

Do you play any sports?

sometimes

IDK

Do you take music lessons?

No

WHo else lives in your home in California?

Mommy ██ and A████e

You have a dad, right?

Yes but he's not living here

What do you call him?

Where does he live?

Why doesn't he live with you?

Yes. can you tell me not really

When was the last time you saw him?

today on zoom

nice to see him IDK

Do you speak with him on the phone?

Why not?

Do you miss him?

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

IDK

Do you think he loves you?

IDK

on zoom did he say I love you

Do you love him?

IDK

What has your dad done that...

scared or worried?

IDK

And how many times has he done that?

Do you remember when he did that?

Do you remember when that was?

Do you remember where that happened?

Was he saying anything when he was doing that?

What do You call your mom?

mommy

long pause love your mommy

I do love her

Did ypur mom and dad scream at each other?

yes

scream yes

one person

CONFIDENTIAL                                                  CD001789

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Pappa

Screaming about

I don't want to

Do you think your dad likes your mom?

No IDK

Why not?

Do you think your mom ;likes your dad?

IDK

Why not?

Do you think your uncle likes your dad?

IDK I dont think so

Dad to uncle

No

Why not?

Do you think your grandfather likes your dad?

Why not

Do you think your dad likes your uncle?

Do you think your dad likes your grandfather?

Seeda

Do you think there will ever be a time that you would want to visit with your father?

IDK

zoom again?

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

IDK

When you got off zoom today

Why not? How did you feel

IDK

Do anything mean?

hit her, pulled on her hair he screamed at her

remember

how old you were

8 and 7

how many times?

No

How did it make you feel

IDK

If your dad told you he was sorry for what he did would you forgive him?

IDK

Why not?

Right before you came to America do you remember spending a few days with your father?

Did anything bad happen during those few days?

Did your dad give you anything to eat during those few days?

Yes

IDK

Did you drink anything during those few days?

CONFIDENTIAL                                          CD001791

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Did you sleep in a bed during those days?

Was he mean during. those few days?

Mean?

IDK

When your mother came back to pick you up to come to America did she tell you anything?

Did dhe tell you that you were going to America?

I think so

No

How did that make you feel?

How would it make you feel if you never visited with him again?

IDK

Do you have any questions you would like to ask me?

No

Ok. Thank you


====================

Intro

Truth versus lies

Feelings

happy sadangey sad scared worried sleepy

Just say I do not want to answer

Alfonse

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Do you know what state you live in?

Country/IDK State California

Where did you live before that?

Armenia

Who did you live with there?

Papa momm █ and N█

Was it a nice place to live?

IDK

Did you have friends there?

Not really

Did you go to school there?

Yes

How was school there

How come

IDK

Did you get good grades there?

IDK

Did you have any pets there?No

What kind of pets?

Do you have pets in California?

No

Do you go to school in California?

CONFIDENTIAL

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Yes

doesnt like there either

IDJ

Do you have a favorite subject?

What do you do after school?

We do stuff

video games no

Do you play any sports?

No

Do you take music lessons?

No

WHo else lives in your home in California?

Spinning in chair

Aunt N█████ mamma no uncles no grandpa

You have a dad, right?

Yes

What do you call him?

Pappa

Where does he live?

Armenia

Why doesn't he live with you?

long pause he cannot answer

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

When was the last time you saw him?

IDK

Do you speak with him on the phone?

NO

Why not?

No

Do you miss him?

IDK

Do you think he loves you?

IDK

Do you love him?

IDK

Scared

No

What has your dad done that...

And how many times has he done that?

Do you remember when he did that?

Do you remember when that was?

Do you remember where that happened?

Was he saying anything when he was doing that?

What do You call your mom?

Mommy

CONFIDENTIAL

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Did ypur mom and dad scream at each other?

Fought yes why IDK

Do you think your dad likes your mom?

Why not?

Do you think your mom ;likes your dad?

Why not?

Do you think your uncle likes your dad?

IDK

pappa likes mom

Maybe

Why not?

Do you think your grandfather likes your dad?

IDKWhy not

Do you think your dad likes your uncle?

I dont really thinks

Uncle like dad

IDK

Do you think your dad likes your grandfather?

Grandfather

Do you think there will ever be a time that you would want to visit with your father?

Maybe

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Why not?

If your dad told you he was sorry for what he did would you forgive him?

Why not?

Ever see pappa hit om?

Yes

More than once

Think so

cant say when

IDK

Right before you came to America do you rememberspending a few days with your father?

Did anything bad happen during those few days?

Idk

Did your dad give you anything to eat during those few days?

Did you drink anything during those few days?

Did you sleep in a bed during those days?

Was he mean during. those few days?

Dad mean

I don't know what hw did but he did do it

I do know

what do you mean

feel bad

CONFIDENTIAL                                                                                CD001797

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

yes

What?

When your mother came back to pick you up to come to America did she tell you anything?

Did dhe tell you that you were going to America?

How did that make you feel?

How would it make you feel if you never visited with him again?

Do you have any questions you would like to ask me?

Armenia just to visit

Ok. Thank you

No


====================

CONFIDENTIAL                                              CD001798

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Vitae of

# Peter Joseph Favaro, Ph.D.

Psychologist

NYC and Long Island Offices
Main Office: 617 Port Washington Boulevard * Port Washington, NY 11050
Phone (516) 883-5747 * Fax (516) 883-5869

## Education

Ph.D. School-Clinical Psychology, Hofstra University, September 1983.

M.A. Psychology, Hofstra University, May 1980.

B.A. Liberal Arts, Psychology/Biology, Hofstra University, May 1979.

Certificates/Licenses Held:
    New York State Psychologist, Licensed February 1985

Certified Mediator

## Clinical Psychology

May 1991 – Present
Forensic psychology expert/custody evaluator. Responsible for evaluating mental health and parenting competencies in civil and criminal cases. Court appointed in over 4000 cases in the following jurisdictions: Nassau County, Suffolk County, Richmond County, New York County, Kings County, Bronx County, Queens County, Rockland County, Westchester County. Appointments have been in the Supreme, Family and District

1

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Courts.   Specific areas of qualification have been child and adolescent psychology, the methodology and evaluation of child custody cases, child sex abuse, drug and alcohol abuse.

Court related services by court appointment include supervised visitation, therapeutic visitation, parenting education, parenting coordination.

Producer of the following SmartParenting Tools for Professionals:
*Interviewing Techniques for Judges and Law Guardians*
*Parent's Resources Questionnaire* – a comprehensive survey addressing important factors for initial information gathering for custody evaluation and conflict resolution. Used to determine each parent's knowledge of their children and their parenting skills.
*Parenting Resources Questionnaire Custody Evaluation Task Inventory* – also used for custody evaluation and conflict resolution, this multi-task booklet assesses each parent's problem solving abilities, their attitudes about their children and their skills as a parent.
*Conflict Resolution Workbook* – exercises and tools to be used in mediation setting or program.
*Supervised Visitation Checklist Record* – uses a standardized format to be used throughout the supervised visitation process, including checklist and narrative responses.

*Mastering Calm Six Critical Paths to Managing Anger* – this book is available as a stand-alone book, is a one-on-one program in my office and available on-line as a self-paced program.   Both the in-person program and the on-line program require that each student successfully demonstrate knowledge of coping skills, communication techniques and conflict resolution skills taught in the Mastering Calm Program. Students must pass a final examination at 80 percent or higher to earn a certificate.
*Anger: Plain and Simple Program* - this book is available as a stand-alone book and available on-line as a self-paced program. This course typically takes approximately seven hours to complete and students must demonstrate knowledge of coping skills, communication techniques and conflict resolution skills taught in the Anger: Plain and Simple Program. Students must pass a final examination at 80 percent or higher to earn a certificate.
*Anger Answers* – this book was initially developed for the Fort Bend County, Texas

2

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Juvenile Department of Probation.   It is a thirty day anger management program that is available in book form and on-line as a self-paced program. Students are required to keep a journal as well as demonstrate knowledge of coping skills, communication techniques and conflict resolution skills taught in the Anger Answers Program. Students must pass a final examination at 80 percent or higher to earn a certificate.

March 1985 – Present
Private practice, concentrating on diagnosis, assessment and treatment of children and adolescents.

September 1979 – September 1983
Hofstra University Psychological Evaluation Research Center. Psychotherapist: Assessment, diagnosis and treatment of emotional and learning disorders, individual and group therapy.

August 1981 – August 1982
State University of New York at Farmingdale (clinical internship). Psychotherapist: Assessment, diagnosis and treatment of emotional and learning disorders, individual and group therapy.

<u>Consulting</u>

1999 – 2005
Blisstribution, Brooklyn, NY
Mental health liaison to help employees find appropriate psychological services. In-service training on issues of customer service and public relations.

April 1992 – 1993
Executive Director, Discovery Enrichment Program, Inc. Founder of organization dedicated to teaching children confidence building, self-esteem, leadership and social skills through science and nature activities. Responsible for all phases of program

3

CD001801

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

development, staff training, creative concepts.

March 1991 – 1995
Consultant to Kloster Cruiselines Ltd.   Responsible for training of all children's program staff, youth coordinators and supervisors for two fleets (14 ships) of cruise ships. Designed and implemented intensive 40 hour workshop on child management, team building, children and teen recreation programming, activity design, and risk and liability management.

October 1991 – 1995
Consultant to SkiWee Ski School, a franchise business owned and operated by Times Mirror Group. Responsible for clinicing staffs at over 80 winter resorts on the care and management of children in resort settings.

October 1991 – 1995
Consultant to Professional Ski Instructors Association. Guest speaker at yearly symposium on children and skiing. Responsible for clinics given to 300 professional ski instructors on the care and management of children in resort settings.

Academic / Teaching

1985 – 1987
Member, Advisory Board for Institute for Continuing Education in Psychology.

1983 – 1993
Hofstra University: Departments of Psychology, Graduate Education, Computer Science. Rank: Adjunct Assistant Professor.

Courses:
  Statistics for Behavioral Sciences          Sleep and Dreaming
  Research Methods                            Advanced Seminar
  Introductory Psychology                     History of Psychology

4

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| Child Development | Adolescent Psychology |
| Human Sexual Behavior | Clinical Psychology |
| Computers in Elementary Education | Intro to Computers |
| Computers in Secondary Education | Expert System Design & Development |

## School Psychology / Special Education

October 1981 – May 1982
Port Washington School District. Consulting School Psychologist: Developed behavior program for a group of thirty emotionally handicapped and learning disabled elementary school children.

September 1982 – February 1983
William Floyd Union Free School District. School Psychologist: Assessment and diagnosis of learning problems, individual education plans, group counseling, supervision of social workers.

November 1985 – January 1986
North Bellmore Union Free School District. Consulting School Psychologist: Provided counseling, social skills training, parenting training to students and parents in special education grades 4 through 6.

## Computers and Electronic Media

October 1992
Iota Technologies, Oyster Bay, New York
Vice President, Behavioral Technologies.   Became project leader for multimedia artificial intelligence and virtual reality projects which included interactive games, behavioral immunology health programs, and telepresence applications.

May 1992
Seahawk Deep Ocean Technology, Tampa, Florida

5

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Became responsible for development of all interactive and multimedia exhibits for Seahawk Shipwreck and Treasure Museum.

June 1990
Became a distributor/developer for Psion, Inc. a handheld computer company. Developed a number of applications including word processor for the handicapped, speech synthesizer and talking board for severely speech impaired, pocket databases and a sports performance analyzer.

March 1989
Designed and implemented Child's Play educational software for Holt, Rinehart and Winston. Child's Play is a textbook ancillary that teaches child development concepts intuitively by emulating the Socratic teaching method via computer software.

January 1985 – January 1987
Educational and Entertainment Software Designer for Activision, Inc. Mountainview, California. Designed Alter Ego TM, an award-winning, fantasy role-playing adventure about psychology and life.   Considered to be one of the first virtual reality games.

November 1985
Received approval for Small Business Innovative Research grant to develop an expert system designed to assist in psychiatric diagnosis, assessment and report writing.

September 1985 – June 1989
North Bellmore Union Free School District. Consultant: Designed and implemented district-wide microcomputer literacy program for teachers and administrators. Developed custom special education software, expert system design for individual education plan management, and development of audio-visual aids for the instruction of word processing.

November 1984 – December 1984
Board of Cooperative Education Services (South Westchester)
In-service training, district-wide evaluation of computer needs.

6

CONFIDENTIAL                                                                                 CD001804

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

April 1984 – April 1985
Altro Human Services, Inc. Consultant: Designed and developed software for rehabilitation and education program for chronic psychotic population. System: Apple MacIntosh.

January 1984 – January 1985
Prentice-Hall, Inc. Consultant: Book and software evaluation and review.   Systems: Apple, Commodore 64, IBM-PC, PC Jr.

March 1982 – November 1983
Softside Publications, Milford, New Hampshire. Education Editor:   Manuscript review, feature writing, software development. Developed consumer entertainment software including computerized relaxation trainer, adventure games, cooperative games, music software, board games and art software for children.
Systems:   Apple IIe, Atari, TRS-80, IBM PC.


<u>Educational Video</u>


June 1988 – May 1989
Consultant to Pinnacle Associates, Inc. Beverly Hills, California
Played a key role in the development of a videotape series designed to teach social skills, critical thinking and social values.   Wrote scripts for 13 shows on a variety of topics including responsibility, self-control and positive thinking.   Managed seventy children on the movie set during filming.

7

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

<u>Audio / Video / On-Line / Publications</u>

*Navigating the Civility High Road Strategic Advice for Managing Difficult Co-Parents and Adversarial Relationships*   - 2024 Fulton Books
This textbook and workbook is designed to help parents deal with, manage and avoid conflict during or after a divorce.

*Staying in Love Secret Recipes For Making Love Last* – 2022 Fulton Books
After spending almost 40 years watching relationships fall apart and helping people find new beginnings, this book is about reconnection, rebuilding and creating recipes for success.

*Iffy about 50-50: How to Better Apportion Parental Custody Arrangements,* New York State Bar Association Journal, August 1, 2021

*Smart Parenting During and After Divorce* – November 2008
This book presents non-adversarial methods, information, strategies, and resources on visitation, communication, conflict resolution, anger management, scheduling of holidays and visitation, decision-making, the effects of divorce on children at different ages, the influence of a parent's social life on children, and negotiating under both good and bad circumstances.    McGraw Hill 222p

*Anger Management – Six Critical Steps to a Calmer Life* – September 2005
Details the roles anger and conflict play in day-to-day interactions at home, at work and in social environments using real0life examples.   The first section describes the psychology and behavior of predatory people, the other teaches you how to deal with situations where remaining "cool under pressure" can be a vital survival tactic.
Career Press 288p

*Anger: Plain and Simple*   Spring 2004
Self-published anger management guide and manual for in-house use at SmartParenting, distribution over the Internet, one-on-one classes and on-line self-paced program.   Students must pass a final examination at 80 percent or higher to earn a certificate. 47 p

8

 CD001806

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*Anger Answers*    Spring 2004
This self-published book was initially developed for the Fort Bend County Texas
Juvenile Department of Probation. It is a thirty day anger management program that is
available in book form and on-line as a self-paced program.   Students must pass a final
examination at 80 percent or higher to earn a certificate. 64 p

*Mastering Calm* Winter 2002
Self-published anger management guide and manual for in-house use at
SmartParenting, distribution over the Internet, one-on-one classes and on-line self-
paced program. Students must pass a final examination at 80 percent or higher to earn
a certificate. 322 p

*101 Ways To Make A Difficult Divorce Easier On The Children*    Fall 1998

*Every Child Succeeds Given Enough Time*    Fall 1998   A self-paced structured
learning program designed to teach the basic skills of parenting and child management,
includes workbook and audio tape or CD.

*The Good Behavior Coupon and Guidebook*    Spring 1996
A Good Behavior Incentive Program for parents and teachers

PBS Pilot:   *SmartParenting: Success in School*   Fall 1995
Host of a 30 minute show co-produced by PBS station WEDU in Tampa, Florida.
Worked with 4 sets of parents and co-host on the issues of separation anxiety, coping
with peer pressure, forming good study habits and communicating about sex, drugs and
alcohol.

Book:   *SmartParenting: An Easy Approach to Raising Happy, Well-Adjusted Kids*,
Contemporary Books   Spring 1995

Book:   *The Parent's Answer book: Over 101 Solutions to Everyday Parenting
Problems*,
Contemporary Books   Spring 1995

9

                                                                    CD001807

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Book:   *The Divorced Parent's Guide to Managing Custody and Visitation*,
R and E Publications   Spring 1995

Book:   *Can I Have Your Attention, Please? A Guide For Parents With Hyperactive and ADD Children,* R and E Publications   Spring 1995

Book:   *Think Before You Act!* R and E Publications   Spring 1995

AudioCassette Series: *SmartParenting: An Easy Approach to Raising Happy, Well-Adjusted Kids* (6 1-hour cassettes plus workbook), Nightingale-Conant   Fall 1994

Regular Feature Writer since Spring 1990: American Academy of Pediatrics' Healthy Kids. Circulation approximately 2 million. Article topics have included discipline, school achievement, learning disabilities, coping and socialization.

Book:   *Already Been Chewed: A Guide For Anyone Who Works With Kids and Doesn't Want To Be Bitten By Them*, Times Mirror Publications 1989

Book:   *Understanding Child Development* (Consulting Authorship), Holt , Rinehart and Winston 1988

Book:   *Educator's Guide to Microcomputers and Learning,*   Prentice-Hall, College Textbook Division, 1986

Consumer Magazine Article: "The Secret World of Imaginary Friends," Child, December 1987

Consumer Magazine Article: "Take Me Home Before I Die: Sending Your Children To Summer Camp," Child,   May 1988

Monthly Column in a Consumer Magazine: *Family Computing,*   a Scholastic Publication (circulation 400,000) – Microcomputer puzzle series as of March 1984. Contributing Editor as of July 1984.

10

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Consumer Magazine Article: *Creative Computing* – April 1983. "My Five Year Old Knows Basic."
Book Chapter:   *Using Computers in the Classroom: an Idea Resource for Teachers* (Chapter Title: "Software for Developing Cognitive Skills"), World Book Publishers, 1984

Consumer Magazine Article Series: *Softside*, Milford, New Hampshire
Issue #35   -   "Games for Cooperation and Growth: An Alternative for Game Designers"
Issue #39   -   "Secrets of Software Design (Part 1)
Issue #40   -   "Speaking Easy: Speech Synthesis for Microcomputers"
Issue #43   -   "Taught to the Tune of a Silicon Chip"
Issue #44   -   "Secrets of Software Design (Part 2)
Issue #46 – "How Video Games Affect Players"

<u>Presentations, Partial</u>

<u>Nassau and Suffolk County Supreme Court Judges Conference</u>          January 2024
Touro Law Center
Invited Speaker, Substance Abuse in Custody Cases

<u>UN Women</u>
<u>The Foundation for Gender Equality</u>
Spotlight Speaker, "Fighting Cyber Sexual Abuse"                        May 2016

<u>New York State Family Court Judicial Training Seminar</u>               March 2016
Invited Speaker, March 30 and March 31, 2016
Topics: "Lincoln Hearings" and "Ways to Address Visitation Refusal"

11

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Nassau County Matrimonial Bar Association                November 2015
Invited Speaker
"The Myth of Supervised Visitation"


New York State Bar Association                           October 2015
Invited Speaker, Family Law Section
"The Mental Health Expert/Forensic"


American Academy of Matrimonial Lawyers, New York Chapter    December 2013
Invited Speaker, "Child Centricity vs. Due Process: The Conflict
Between *Parens Patriae* and Parents' Rights


New York State Matrimonial Judicial Training Seminar        March 2013
Invited Speaker


New York State Bar Association, Annual Meeting              January 2011
Committee on Children and the Law's Continuing Education Program
Invited Speaker


New York State Matrimonial Judicial Training Seminar        May 2009
Invited Speaker


Nassau County Matrimonial Bar Association                   March 2009
Invited Speaker


12


CONFIDENTIAL                                    CD001810

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

<u>St. John's Law School</u>                                                                 2007
Invited Speaker, Matrimonial and Family Law
Justice Lawrence Brennan, Nassau County Family Court
Once yearly since 1999


<u>2004 Family Law Seminar</u>, Corpus Christi, Texas                    March 2004
Seminar Speaker "Cross Examination of Mental Health Experts"
And "Co-Parenting in the New Millennium"


<u>Suffolk County Matrimonial Bar Association</u>                       November 2004
Invited Speaker


<u>Nassau County Colombian Lawyers Association</u>                      April 2003
Keynote Speaker


<u>Nassau County Matrimonial Bar Association</u>                         March 2003
Invited Speaker


<u>Nassau County Supreme Court Matrimonial Judges Conference</u>   February 2003
Invited Speaker


<u>Integrated Domestic Violence Task Force</u>                             May 2002
Justice Alan Oshrin, Suffolk County District Administrative Judge


<u>Nassau County Supreme Court Matrimonial Judges Conference</u>   December 2001
Invited Speaker


13

CONFIDENTIAL                                                                      CD001811

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Nassau County Supreme Court Matrimonial Judges Conference     March 2001
Invited Speaker

Statewide Meeting of Parenting Education Programs     December 2000
Justice Evelyn Fraeze, Albany NY

Nassau County Bar Association     October 1998
Invited Speaker, Topic: Personality Testing

Nassau County Supreme Court Matrimonial Judges Conference     September 1998
Invited Speaker

Appellate Division, 2nd Judicial Department     May 1998
Invited Speaker, "Interviewing Techniques for Law Guardians"

National Parenting Conference, Walt Disney World, FL     August 1997
Invited Speaker "Making a Difficult Divorce Easier on Your Children"

Suffolk County Law Guardian Panel     March 1997
Invited Speaker, Presentation Topic:
"Critical Path for Determining Forced Visitation"

Nassau County Bar Association     March 1997
Invited Speaker, Presentation Topic:
"Validation of Sexual Abuse Allegations"

14

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

<u>Port Washington Schools</u>, Sousa Middle School                                      March 1997
Invited Panel Member, "Knowing When Athletics Are Right For Your Child"


<u>International Network for Children & Families</u>, San Diego, CA      November 1996
Keynote Speaker: "Are Our Children Growing Up Too Fast? How
The Media Influences Our Children" and "Understanding Your Child's
Temperament (And Your Own)"


<u>Pasco Pediatric Foundation Event</u>, Pasco County, FL                 September 1996
Keynote Speaker: "Maximizing Your Child's Potential in School"


<u>Nassau County Family Law Committee</u>                                      September 1996
Invited Speaker, "Critical Path for Determining Forced Visitation"


<u>Parent Institute Days</u>, Chicago, IL                                               March 1996
Keynote Speaker: "Are Our Children Growing Up Too Fast?"


<u>Nassau County Bar Association</u>                                                   April 1996
Invited Speaker:   "Supervised Visitation Issues"


<u>American Orthopsychiatric Association Meeting</u>                          April 1985
Invited Speaker:   "Thinking About Computers In Early Education:
An Act of Treason?"


<u>Harvard University</u>, Small Computers in Mental Health Conference         June 1984
Invited Speaker "Designing Software from Theory, not Vice Versa"


15

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

<u>Columbia University</u>, Conference on Educational Microcomputing       November 1983
Invited Speaker:" Using Cognitive Strategies in Educational Software Design"


## Media Appearances /Partial


<u>Montel Williams Show</u>, On-Air Psychologist, Expert              1999 – 2008
Average five to six new shows per season, repeated through season


<u>The Morning Show with Mike and Juliet, On-Air Psychologist, Expert</u>      2007 - 2010


<u>WHUR</u>, Washington DC. One hour live radio show including call-ins      April 2004


Additional Television Appearances
20/20, CBS Morning Show, Home Matters, News12 Long Island


## Community Service / Honors


Advisor, Parent Resource Center, Port Washington, NY Frequent lecturer on behavior, education and school achievement.   Operated community hotline three days per week to answer questions about child development and behavior.

Chairperson, Advisory Board, Center for Parents and Children, North Shore University Hospital, Glen Cove, NY   Frequent group leader and lecturer on infant and child development and behavior. Coordinated lecture series with other professionals in the community.

16

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Recipient, Community Service Award, Lions Club, February 1991

Recipient, Community Service Award, Thomas Gulotta, Nassau County Executive, September 1990

Recipient, Community Service Award, Center for Parents and Children, June 1990

Recipient, Community Service Award, Parent Resource Center, September 1990

<u>Membership</u>

Chairperson and Founding President,
Parenting Coordinators of New York (PCNY)                    2007 - 2009

17