GIBSON, DUNN & CRUTCHER LLP
THAD A. DAVIS, SBN 220503
    tdavis@gibsondunn.com
DANIELLE HESSE, SBN 318321
    dhesse@gibsondunn.com
ROMMY FLORES CONKLIN, SBN 298770
    rfloresconklin@gibsondunn.com
WILLIAM FELDMAN, SBN 339008
    wfeldman@gibsondunn.com
AARON J. CHEUNG, SBN 346307
    acheung@gibsondunn.com
NICOLE WADDICK, SBN 352997
    nwaddick@gibsondunn.com

One Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

333 South Grand Avenue
Suite 4600
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

*Attorneys for Respondent*
*RULA NABIL KHOURY CAVACO DIAS*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In the Matter of I.D., N.D., and C.D.<br><br>CASIMIRO JOSE CANHA CAVACO DIAS,<br><br>    Petitioner,<br><br>    v.<br><br>RULA NABIL KHOURY CAVACO DIAS,<br><br>    Respondent. | CASE NO. 3:24-cv-04471-EMC<br><br>**RESPONDENT RULA NABIL KHOURY CAVACO DIAS' PRETRIAL BRIEF** |

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................................ 1

II.     BACKGROUND .......................................................................................................... 2

III.    ARGUMENT ............................................................................................................... 4

        A.      Legal Standard: Habitual Residence ............................................................... 4

        B.      Armenia is Not the Children's Country of "Habitual Residence" ............................. 5

                1.      Neither Petitioner nor Respondent intended to make Armenia their
                        permanent home ........................................................................................ 5

                2.      The Children were never integrated into a social or family environment
                        in Armenia ................................................................................................ 7

                3.      The totality of circumstances proves Armenia was never the Children's
                        habitual residence .................................................................................... 7

        C.      Legal Standard: Grave Risk of Exposure to Harm ....................................... 9

        D.      The Children Face Grave Risk of Harm if Returned to Armenia ............................. 10

        E.      Ameliorative Measures are Insufficient in Armenia and Need Not be Considered ... 12

IV.     CONCLUSION ........................................................................................................... 12

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acosta v. Acosta*,
  725 F.3d 868 (8th Cir. 2013) ........................................................................................11, 12

*Alzu v. Huff*,
  2024 WL 3165485 (W.D. Mi. June 24, 2024) ...................................................1, 4, 7, 8

*Braude v. Zierler*,
  2022 WL 3018175 (S.D.N.Y. July 29, 2022), *aff'd* 2023 WL 3012269 (2d Cir.
  Apr. 20, 2023) .........................................................................................................12

*Colchester v. Lazaro*,
  16 F.4th 712 (9th Cir. 2021) ...................................................................................9, 10

*Davies v. Davies*,
  717 Fed. Appx. 43 (2d Cir. 2017) ...........................................................................9, 10

*Delgado v. Marquez*,
  2024 WL 517874 (N.D. Cal. Feb. 9, 2024) ........................................................9, 10, 12

*Douglas v. Douglas*,
  2021 WL 4286555 (6th Cir. Sept. 21, 2021) ............................................................4

*Ermini v. Vittori*,
  758 F.3d 153 (2d Cir. 2014) ......................................................................................9

*Farr v. Kendrick*,
  824 F. App'x 480 (9th Cir. 2020) .............................................................................5, 6

*Gitter v. Gitter*,
  396 F.3d 124 (2d Cir. 2005) ......................................................................................4

*Golan v. Saada*,
  596 U.S. 666 (2022) .........................................................................................3, 9, 12

*Gomez v. Fuenmayor*,
  812 F.3d (11th Cir. 2016) ....................................................................................10, 11

*Holder v. Holder*,
  392 F.3d 1009 (9th Cir. 2004) ...................................................................................8

*Jacquety v. Baptista*,
  538 F. Supp. 3d 325 (S.D.N.Y. 2021) .....................................................................12

*Kenny v. Davis*,
  2022 WL 501625 (9th Cir. Feb. 18, 2022) ...............................................................8

*Monasky v. Taglieri*,
  589 U.S. 68 (2020) ...........................................................................................1, 2, 4, 5, 6, 7

Gibson, Dunn &
Crutcher LLP

ii

**TABLE OF AUTHORITIES**
**(Cont'd)**

Page(s)

*Morrison v. Chang*,
   2024 WL 1765675 (W.D. Wash. Apr. 24, 2024) ...................................................................8

*Murphy v. Sloan*,
   764 F.3d 1144 (9th Cir. 2014) ...........................................................................................4

*Nisbet v. Bridger*,
   2023 WL 6998081 (D. Or. Oct. 24, 2023) ...............................................................1, 4, 8

*Papakosmas v. Papakosmas*,
   483 F.3d 617 (9th Cir. 2007) .............................................................................................9

*Smith v. Smith*,
   976 F.3d 558 (5th Cir. 2020) .................................................................................5, 6, 8

*Staggers v. Timmerman*,
   2024 WL 3948448 (S.D. Iowa Aug. 27, 2024) ...................................................................5

*Walsh v. Walsh*,
   221 F.3d 204 (1st Cir. 2000) ............................................................................................10

*Watts v. Watts*,
   935 F.3d 1138 (10th Cir. 2019) ...............................................................................1, 4, 7

**Other Authorities**

Dr. Jacquelyn Campbell's "Danger Assessment." ...............................................................11

Hague Convention Art. 13(b) .......................................................................................2, 9

22 U.S.C. §§ 9001-11 ............................................................................................................1

RESPONDENT RULA NABIL KHOURY CAVACO DIAS' TRIAL BRIEF
CASE NO. 3:24-CV-04471-EMC

Gibson, Dunn &
Crutcher LLP

## I.    INTRODUCTION

The three minor children of Petitioner Casimiro Jose Canha Cavaco Dias and Respondent Rula Nabil Khoury Cavaco Dias—I.D. (nine years), N.D. (seven years), and C.D. (six years), (together "the Children") —should not be returned to Armenia under the 1980 Hague Convention for two reasons.

**First**, Petitioner cannot make the *prima facie* case under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-11, that the removal of the Children was wrongful because they did *not* habitually reside in Armenia when Respondent fled with the Children. *See, e.g.*, *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) ("[T]he Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides.") (internal citations omitted). The record in this case is clear and establishes that Armenia was a temporary, transitory stopgap in the family's life, was *not* the Children's country of habitual residence, and was not intended to be a permanent home by either Respondent *or* Petitioner. Petitioner may argue that Armenia was the only home the Children had in the world at the time of removal—but where you go to sleep in four different temporary rentals for 17 weeks total while trying to get any other potential job in any other part of the world does not constitute a habitual residence.[1] Likewise Petitioner's temporary employment contract, declarations of Portugal as his legal residence, his own desperate attempts to leave Armenia as soon as possible (indeed, before even arriving), and his forcing of Respondent to leave the last rental there evidence instead a chaotic, transitory existence. The Children's habitual residence is simply not Armenia, so Petitioner cannot prevail and the inquiry respectfully should end there.

**Second**, even if Armenia were the Children's country of habitual residence (and it was not) when they were removed, the Children would face exposure to a "grave risk" if returned to Armenia. *See Monasky*, 589 U.S. at 72. ("[A] child's return is not in order if the return would place her at a 'grave risk' of harm or otherwise in 'an intolerable situation.'") (citing Hague Convention Art. 13(b)). As detailed below, Petitioner's physical, psychological, and verbal abuse of Respondent and the Children

---

[1] Under ICARA, Respondent does *not* have to establish where the Children have habitual residence; *Petitioner* must show that their habitual residence was Armenia to prove his *prima facie* case. *Nisbet v. Bridger*, at *6 2023 WL 6998081 (D. Or. Oct. 24, 2023); *see also Watts v. Watts*, 935 F.3d 1138, 1143 (10th Cir. 2019); *Alzu v. Huff*, 2024 WL 3165485, at * 5 (W.D. Mi. June 24, 2024).

would expose them to grave harm if returned. Critically, this is not a story where Respondent's claims are new to Petitioner, nor are they claims lacking evidence. Petitioner's abuse of Respondent and the Children is well-documented: in text messages, telephone calls, and as witnessed by third parties spanning *years*. Petitioner's abuse of Respondent in front of the Children, and to the Children themselves, escalated in nature so much that on April 21, 2024, Respondent was hospitalized after a multi-day assault, when he damaged her chest and eyes in the presence of the Children. After that horrific assault, Petitioner threw Respondent out of the family's rental. Petitioner cannot be trusted to keep his rage and violence in check around Respondent, the Children, the Children's family, or anyone else. He is a self-described "extremely violent" man who we should take at his word. The Children would be at grave risk of exposure to harm should they be returned to him in Armenia or anywhere else.

## II.    BACKGROUND

This is not a close case. Petitioner cannot meet his initial burden to prove that Respondent removed the children from their habitual residence. All three Children are American and Portuguese citizens, with C.D. also holding Bajan citizenship. FoF ¶¶ 11, 14, 17. Petitioner is a Portuguese citizen and owns at least five separate homes in Portugal, files taxes in Portugal pursuant to World Health Organization ("WHO") regulations on country of residence choices, and owns no real estate anywhere else in the world. FoF ¶¶ 2, 64. Respondent is a U.S. citizen and was raised primarily in the U.S. FoF ¶4-6. Her parents and siblings are settled in Georgia and California. FoF ¶ 5.

In contrast, neither Petitioner, Respondent, nor their Children are Armenian citizens. None have any family there. None have any close friends there. None speak or read Armenian. None own property there. They lived in Armenia from December 27, 2023 to April 25, 2024—staying at four different temporary places during their brief stay in the country: at an AirBnB for one week, another short term rental for a few more, and two rented houses for the last two and a half months. FoF ¶ 51. During their short time in Armenia, the Children went to an American-style school that taught classes in English and took Spanish classes. FoF ¶ 67. Petitioner's appointment in Armenia began on November 22, 2023, and will expire on November 21, 2024, with no guarantee of renewal. FoF ¶¶ 40–43. During the relevant 17 weeks in Armenia, Petitioner applied for at least five different positions across the world,

including in Angola, Brazil, Geneva, Denmark, and Portugal. FoF ¶ 48. He had applied for many before even arriving in Armenia. FoF ¶ 47; *see also* FoF ¶¶ 31, 33. He interviewed for the Geneva position on February 16, 2024, and the Portugal position on March 26, 2024—the latter less than a month before his wife fled his violence with the Children. FoF ¶ 48. In 17 weeks, the family made no meaningful social ties and no connections to Armenia. FoF ¶ 60–69.

Simply put, Petitioner cannot establish by a preponderance of the evidence that the Children's "habitual residence" was Armenia at the time of their removal. This failure ends the Court's inquiry and the Petition for return must be denied. Nevertheless, even if the Children's habitual residence were Armenia (and it is not) Respondent can show by clear and convincing evidence (including Petitioner's own recorded and written words) that the Children are at grave risk of exposure to harm if returned to Armenia. *Golan v. Saada*, 599 U.S. 666, 672 (2022). Petitioner had always been verbally abusive and controlling with Respondent, (for example, exerting full control over the family's finances, communications, and keeping his property ownership in Portugal secret), over the course of several years. FoF ¶¶ 77–165; *see also* FoF ¶¶ 189–197. But concurrent with relentless professional setbacks while he was working in Jamaica, FoF ¶¶ 29–30, 77–165. Petitioner's abuse took a dangerous turn for the worse. In 2022, he began physically abusing Respondent, often in the presence, and to the detriment of, the Children. FoF ¶¶ 96–101, 109–110. The Children were so scared of their father's outbursts that they became withdrawn and isolated. FoF 214. I.D. began to show evidence of obsessive-compulsive disorder ("OCD") and was treated for it by a therapist in Jamaica. FoF ¶ 110, 202–207, 219(c).

When Petitioner was offered the position in Armenia, Respondent hoped that the move would serve as the family's escape hatch from abuse while Petitioner saw it as his escape route from relentless professional failures. *See* FoF ¶¶ 29–34, 47–50. Respondent believed that now that they were leaving the place that was so full of setbacks for her husband, his anger and outbursts would subside and they could escape his wrath. *See* FoF ¶ 132. But Petitioner's rage only worsened. During the short stint in Armenia, Petitioner routinely beat Respondent in the presence of the Children, confining her (and them) to "dark rooms" (i.e., small, windowless rooms in the home with no egress except the door that Petitioner locked from the outside), FoF ¶¶ 99, 103, 107-108, 204, slapping Respondent, FoF ¶¶ 101, 218(a), and verbally and psychologically assaulting her by phone, by text, and in person, FoF ¶¶ 132-

159. Critically, Petitioner's abuse is not supported simply by Respondent's word or the Children's therapist's word (both of which would be more than enough to establish grave risk); it is supported amply by the record—Petitioner sent horrific text messages stating he would kill her and her family, he raged in recorded phone calls to Respondent's family that he would "kill them all" and that they were "subhuman" "cockroaches." FoF ¶¶ 86, 106, 148(d), (h), (j)-(l). Respondent did all she could to mollify him—every exchange is jarring in her attempts to cool her husband down and talk him off the ledge—but none worked. FoF ¶¶ 104, 109, 138.

### III.    ARGUMENT

**A.    <u>Legal Standard: Habitual Residence</u>**

A parent petitioning for the return of a child under the Hague Convention may invoke the protection of the Convention *only if* the child is a "habitual resident" of the country from which he or she was removed. *Monasky*, 589 U.S. at 72. Petitioner bears the burden of proof to prove by a preponderance of the evidence that the child was the habitual resident of a country and has been wrongfully removed to or retained in a different country. *Gitter v. Gitter*, 396 F.3d 124, 131 (2d Cir. 2005). Thus, "[d]etermination of 'habitual residence' is perhaps the most important inquiry under the Convention." *Murphy v. Sloan*, 764 F.3d 1144, 1150 (9th Cir. 2014) (internal quotation marks omitted). Critically, "a child's residence in a particular country can only be considered 'habitual' when 'her residence there is more than transitory' and requires "some degree of integration by the child in a social and family environment." *Douglas v. Douglas*, 2021 WL 4286555, at *4 (6th Cir. Sept. 21, 2021), quoting *Monasky*, 589 U.S. at 76. Importantly, the Convention ***does not*** require that a respondent prove that the Children may have some other habitual residence. *See Watts v. Watts*, 935 F.3d 1138, 1147–48 (10th Cir. 2019) ("[t]he Convention does not require a district court to determine where a child habitually resides [ ] [i]nstead, the Convention requires a district court to determine whether the child habitually resides in the location that the petitioner claims"); *see also Nisbet v. Bridger*, 2023 WL 6998081, at *6 (D. Or. Oct. 24, 2023) (holding that children who moved repeatedly between two countries "lacked a habitual residence altogether"); *Alzu v. Huff*, 2024 WL 3165485 (W.D. Mi. June 24, 2024) (holding that the Hague Convention does not require every child to have a habitual residence).

According to the Supreme Court, habitual residence is determined by "the totality of the circumstances specific to the case." *Monasky*, 589 U.S. at 71. The "totality of circumstances" rubric includes: (1) a "change in geography combined with the passage of an appreciable period of time"; (2) where the children have lived throughout their lives; (3) the length of time that Children have lived in a country; (4) whether the parties viewed their time in a country as temporary; (5) the citizenship and immigration status of the Children and parents; (6) whether the Children speak the language of the country; (7) whether the children have acclimated; and (8) the purposes and intentions of the parents. *Id.* at 68, 78 n.3; *see, e.g.*, *Farr v. Kendrick*, 824 F. App'x 480, 482–83 (9th Cir. 2020) (affirming finding that Mexico was not children's habitual residence where testimony supported that the move was "temporary" for only three to five years, the family were on temporary visas, the children were American citizens, and parties maintained American bank accounts); *Smith v. Smith*, 976 F.3d 558, 560, 563 (5th Cir. 2020) (affirming finding that the petitioner had not established children's "habitual residence" as Argentina even when family had moved their belongings there, lived there for two years, and initiated divorce proceedings there, when the children attended American schools, the family remained American citizens, and their jobs contained provisions for "home leave" in the U.S.); *Staggers v. Timmerman*, 2024 WL 3948448, at *3 (S.D. Iowa Aug. 27, 2024) (holding Mexico was not the child's habitual residence where parents had signed a three-year lease in Mexico, but the child had lived there for only nine months, the child had only begun to learn Spanish, was there on a temporary visa, and where parents had paid taxes only in the U.S.).

## B. Armenia is Not the Children's Country of "Habitual Residence"

It is quite clear in this case that Armenia was not, and could not have been, the Children's habitual residence at the time of removal.

### 1. *Neither Petitioner nor Respondent intended to make Armenia their permanent home*

*First*, Petitioner has repeatedly represented to this Court that his position with the WHO is for "5 years" or "until 2028." *See* Comp., ECF No. 1, at 3; Mot. for Access, ECF 66, at 2; Mot. to Continue Trial, ECF 116, at 3. FoF ¶¶ 41-43. *This is false*. Petitioner's contract with the WHO is "fixed term," which the WHO describes as a "time limited appointment of one year or more." FoF ¶3, 40-42. Petitioner's fixed term began November 22, 2023 and ends November 21, 2024. FoF ¶ 40-42. To date,

Petitioner's appointment has not been renewed. FoF ¶ 43. *Second*, Petitioner was trying to leave Armenia even before he arrived. FoF ¶ 47. In the 17 short weeks that Respondent and the Children were in the country, Petitioner applied to no less than nine separate jobs—none in Armenia. FoF ¶ 48. On November 30, 2023, after being in his new position for mere days, Petitioner forwarded Respondent a job opening in Brazil. FoF ¶ 47. In December 2023, Petitioner applied for a new position in Denmark. FoF ¶ 47. In January 2024, he applied for positions in Angola and Switzerland. FoF ¶ 48. In March 2024, he applied and conducted extensive interview preparations a position outside of the WHO in Portugal. FoF ¶ 48. Respondent noted to a friend back in Jamaica on February 6, 2024, that Armenia "fe[lt] temporary." FoF ¶ 49.

    *Second*, the Children have lived all over the world and were born in various countries—I.D. in Copenhagen, N.D. in Portugal, and C.D. in Barbados. FoF ¶¶ 10, 13, 16, 19-27. The longest the family lived anywhere at all was Jamaica—where they resided from 2019 through the end of 2023. FoF ¶¶ 27, 45. Even during the time that the family lived in Jamaica, Petitioner applied to more or pursued dozens of different positions throughout the world, including in Switzerland, Thailand, Indonesia, the U.S., Portugal, and Brazil. FoF ¶¶ 31, 33, 47-48. Even *if* Petitioner's position at the WHO was set for more than one year (it is not), this is not sufficient to establish a "habitual residence" for the Children. *See Farr*, 824 F. App'x at 481–82 (upholding district court ruling finding no habitual residence in Mexico where parents did not have a "shared, settled intent" to do so); *Smith*, 2019 WL 13201172, at *4 (finding no habitual residence in Argentina after the family lived there for two years and where the parties "always spoke of the move as temporary").

    While not dispositive, the shared intent of the caregiving parents are "relevant considerations" under *Monasky*. *Monasky*, 589 U.S. at 78. Here, as part of the totality of circumstances, and taken together with all the other evidence, the shared intent of the parents weighs heavily against a finding that Armenia was the Children's habitual residence. *See Monasky*, 589 U.S. at 71 (A "child's habitual residence depends not on any one fact, but on the totality of the circumstances specific to the case."). Here, Petitioner and Respondent did not "choose" Armenia as the family's habitual residence; Petitioner applied to or pursued dozens of positions during his last 18 months in Jamaica—Armenia was not an affirmative choice, but rather his only option (and one which he was desperate to change

immediately, without regard to where), FoF ¶¶ 32, 34-35, to continue to maintain the benefits available specifically to WHO employees working overseas temporarily. *See Alzu*, 2024 WL 3165485 at * 5 (holding that habitual residence was not established where Petitioner's residency options were limited due to a prior deportation). In fact, the parents did have a shared intent—to leave Armenia as soon as they could. *See* FoF ¶¶ 47-50. Petitioner has provided no proof that he will or even can remain in (non-EU) Armenia if his appointment is not renewed.

> **2.**      ***The Children were never integrated into a social or family environment in Armenia***

It is telling that Petitioner's evidence of the Children's alleged integration in Armenia is so thin. *See, e.g.*, Exs. 2 (Children's identity cards); Ex. 20 (Children's school records); Ex. 18 (school invoice); Ex. 44 (school payment confirmation); Ex. 46 (lease agreement expiring February 2025). Petitioner's purported evidence shows instead how little the Children acclimated to any aspect of life in Armenia. The Children went to an American-style school that taught in English and took Spanish classes (rather than Armenian) due to its resemblance to Portuguese. FoF ¶ 67. Petitioner points to the Children's Armenian identity cards—which are not "resident cards" as described by Petitioner but instead merely offer the holder "immunities and privileges as provided for the *employee . . .* of the international organization[]"—and one picture of them playing with a soccer ball bearing the Armenian flag. Ex. 35 at 5. There are no pictures of the Children with their extended family (all in the U.S. or Portugal), no pictures of the Children with long-time friends (there are none), and no indication whatsoever that the Children or the family believed that Armenia was anything but temporary for them. Neither Petitioner nor Respondent got Armenian drivers' licenses, purchased or leased a car in Armenia, looked to purchase property in Armenia, or took any steps to integrate into Armenian culture at *all*. There is *no* evidence of acclimation by the Children *or* their parents to their new environment.

> **3.**      ***The totality of circumstances proves Armenia was never the Children's habitual residence***

While the circumstances outlined by *Monasky* and other courts analyzing habitual residence support a finding that Armenia was not habitual residence of the Children, as noted above, Respondent is ***not required to show that the Children had some other habitual residence***. *See Watts*, 935 F.3d at 1147–48 ("[t]he Convention does not require a district court to determine where a child habitually

resides"); *see also Nisbet* 2023 WL 6998081 at *6 (same); *Alzu v. Huff*, 2024 WL 3165485, at *5 (same). Respondent and Children are all American citizens; Petitioner and Children are all Portuguese citizens. Petitioner and Respondent each filed taxes in their respective home countries, as required by the WHO. FoF ¶¶ 2, 4, 11, 14, 17, 64-65. Moreover, Petitioner has not pursued any attempts to secure Armenian citizenship or permanent status as a transient worker for an international organization. *See* FoF at ¶ 45.

The Ninth Circuit holds that the inquiry related to establishing habitual residence should be "guided by common sense." *See Kenny v. Davis*, 2022 WL 501625, at *1 (9th Cir. Feb. 18, 2022). Common sense should guide us here as well. There is simply no support for Petitioner's contention that Armenia is the Children's habitual residence: they were not acclimated to Armenia; they did not establish friendships; they went to an English-only school with other children of diplomats and international workers; they did not speak Armenian; and, critically, they have no claim to Armenian citizenship or any other immigration status outside of their father's fixed-term employment. *See* FoF ¶¶ 11, 14, 17, 60-69. Their ties are far stronger to the United States (or even Portugal), but Armenia simply is not it. *See id.*; FoF ¶¶ 71-73.

The Ninth Circuit also held that, to determine habitual residence, important facts are those "indicating that the parents have made their home in a particular place" and the child's experience showing that she was "firmly rooted in their new surroundings" because "[i]f a child does not have a factual connection to a State and knows nothing of it socially, culturally, and linguistically, there will be little benefit in sending him there." *Holder v. Holder*, 392 F.3d 1009, 1019, 1023 (9th Cir. 2004) (internal citation omitted). Based on the evidence, Petitioner cannot even establish that the Children were even somewhat "rooted" to Armenia's language *or* customs—never mind so firmly rooted as to be habitually resident there. *See Morrison v. Chang*, 2024 WL 1765675, at *8 (W.D. Wash. Apr. 24, 2024) (holding that Mexico was not the child's habitual residence even though the petitioner was born there because the family had "sought an international lifestyle"). *Smith v. Smith* is instructive; there, the Fifth Circuit found that the *Smith* children were not habitually resident in Argentina where, like here, the petitioner held a position in an international organization in Argentina, his employment was "at will," he sought benefits related to "home leave" in the U.S., and where he owned property in the

Gibson, Dunn & Crutcher LLP

U.S. *Smith*, 976 F.3d 560. The *Smith* petitioner's ties to Argentina were strong (unlike here); Petitioner could have sought citizenship in Argentina, and the family lived there for over two years. *Id.* Here, Petitioner's only tie to Armenia is his "fixed-term" position with an international organization that has moved him to at least four different countries in the last 10 years alone; his bank accounts are in Portugal and the U.S.; he took "home leave" to Portugal; he owns property in Portugal; he claimed benefits available *only to WHO employees* temporarily stationed away from home. FoF ¶¶ 2-3, 19-28, 42-45, 60; Ex. 44,106-108, 432; *see Papakosmas v. Papakosmas*, 483 F.3d 617, 627 (9th Cir. 2007) ("when a child's time in a country can be characterized as being 'in a permanent state of flux,' their relative attachment to that country must be considered weaker").

Petitioner cannot establish by a preponderance of the evidence that the Children's habitual residence was Armenia. Thus, his Petition must, as a matter of law, be denied.

## C.    Legal Standard: Grave Risk of Exposure to Harm

"[T]he Convention provides that return to a country of habitual residence is not required if '[t]here is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.'" *Golan*, 596 U.S. at 670–71 (quoting Art. 13(b), *id.*, at 10). "Th[e] 'grave risk' defense thus reflects the proposition that the remedy of return is inappropriate when the abductor is a primary caretaker who is seeking to protect herself and the children from the other parent's violence." *Colchester v. Lazaro*, 16 F.4th 712, 717 (9th Cir. 2021) (internal quotation marks omitted). Courts find grave risk when the risk is exposure to "physical or psychological abuse, serious neglect, and domestic violence in the home." *Golan*, 596 U.S. at 680.

Respondent need not establish that the Children themselves have been abused—importantly, witnessing abuse is sufficient to give rise to "grave risk." *See id.* ("[D]omestic violence in the home may also constitute an obvious grave risk to the child's safety that could not readily be ameliorated."); *Colchester*, 16 F.4th at 717–18 (quoting *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014)) ("[a] respondent parent can establish a grave risk of harm from abuse 'where the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question'"); *Delgado v. Marquez*, 2024 WL 517874, at *10 (N.D. Cal. Feb. 9, 2024) ( "Domestic violence committed by one parent against the other may also establish a grave risk of harm to the child, particularly when the

violence occurs in the presence of the child[.]"); *Davies v. Davies*, 717 Fed. Appx. 43, 48 (2d Cir. 2017) (upholding denial of petition because "[e]vidence of prior spousal abuse, though not directed at the child, can support the grave risk of harm defense, as could a showing of the child's exposure to such abuse" and where the district court's finding was supported by the documentary evidence).

### D.    **The Children Face Grave Risk of Harm if Returned to Armenia**

Where, as here, a petitioner's violence towards his family is well-documented, courts routinely find grave risk. In *Delgado*, the court found that the child faced exposure to a grave risk of harm if returned to Mexico because the petitioner had physically abused the respondent, called her names like "whore," threatened to kill her and to kill her extended family, assaulted her in front of the child, and physically restrained her and the child. *Delgado*, 2024 WL 517874, at *5–7. These facts collectively showed a grave risk of *at least* psychological harm to the child if returned to Mexico. *Id.* at *11.

The risk to the Children is even greater here. Petitioner repeatedly abused Respondent in front of the Children before and after the move to Armenia. FoF ¶¶ 85, 88, 99-101, 138, 141, 147-48, 214-19.. They witnessed numerous incidents of hitting, slapping, verbally assaulting (by phone and in person) that culminated in Respondent being beaten so badly that she was hospitalized. FoF ¶¶ ¶¶ 96–101, 132-165, 214-19. Petitioner's own expert notes that the two Children he evaluated relayed that Petitioner was mean and had hit their mother and pulled her hair in their presence. FoF ¶¶ 137, 218. As in *Delgado*, curse words and foul names directed at Respondent and her family were common. *See* FoF ¶¶ 99-131, 138-14-154, 159. And the Children here were clearly impacted by the abuse. I.D. was aware of the pattern of physical abuse against her mother, warning her mother at one point that "[Petitioner] will beat you for this." FoF ¶106, 201, 218-19. *See Colchester*, 16 F.4th at 718 (holding that spousal violence establishes grave risk when it occurs in the presence of the child). The Children routinely witnessed, and were themselves subject to, Petitioner's constant physical abuse and fits of rage. FoF ¶¶ 96–110, 132-159, 218-19.

Even setting the Children's awareness to the side, "credible social science literature establishes that serial spousal abusers are also likely to be child abusers." *Colchester*, 16 F.4th at 718 (citing *Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000)). In *Gomez v. Fuenmayor*, for example, the Eleventh Circuit explained that threats made against a parent may foreshadow a risk of harm to the child because "it

10

requires no stretch of the imagination to conclude that serious, violent domestic abuse repeatedly directed at a parent can easily be turned against a child" or to foresee "the powerful effect that a pattern of serious violence directed at a parent may have on [a] child[ ]." 812 F.3d at 1005, 1114 (11th Cir. 2016). Here, Petitioner's abuse already extended to the Children; he put them in "dark rooms" as a form of solitary confinement and slapped them with open hands on multiple occasions. FoF ¶¶ 99, 103-108, 134, 204, 218. It will escalate. The evidence of Petitioner's physical abuse in this case is exceptional. There are police reports, hospital reports, photographs of Respondent's injuries, and contemporaneous text messages and phone recordings. FoF ¶¶ 78-164, 174-179. Petitioner's own words are decisive: in text messages—many of which Petitioner *deliberately spoliated well-into this litigation*, *see* FoF ¶¶ 159, 189, 196—Petitioner repeatedly described himself as "extremely violent," repeatedly told Respondent that she would "pay" for slights Petitioner perceived, and repeatedly threatened to harm Respondent and her family, FoF ¶¶ 112-131, 138-154, 159, 180. And in multiple audio recordings, he has threatened the death of Respondent's entire family. FoF ¶¶ 90, 138. *See Acosta v. Acosta*, 725 F.3d 868, 875–76 (8th Cir. 2013) (finding grave risk when petitioner had a "violent temper and inability to cope with the prospect of losing custody of [his] children" and had "made multiple threats to kill [respondent] and her family"). This evidence leaves no doubt. Petitioner  has repeatedly abused Respondent and the Children, and his threats of escalating  are not mere bluster.

Petitioner's physical violence is horrific, but his emotional and psychological abuse is further cause for alarm. Petitioner's text messages and recorded phone calls to Respondent and her family lay bare additional instances of psychological and emotional violence in Petitioner's ***own voice*** and Respondent's constant (unsuccessful) attempts to allay Petitioner's anger. FoF ¶¶ 100, 112-131, 138-154, 180. Petitioner has wished rape upon Respondent, used racist slurs against her and her family, and threatened to "cut off" the legs of Respondent's father. FoF ¶¶ 130, 138, 196(n), (q). He also took an innocuous comment in 2018 from Respondent's brother—the *one time* use of the word "cockroach" to describe only N.D.'s sleeping position in a stroller —and weaponized it for ***over six years***, constantly telling the Children that Respondent and her family believe they are "cockroaches."[2] All of this has

---

[2] Respondent continues to be disturbingly obsessed with his revised view of this one incident, citing it throughout his responses to Dr. Favaro's questions. Ex. 112 at 9, 11, 50, 53, 55, 60.

RESPONDENT RULA NABIL KHOURY CAVACO DIAS' TRIAL BRIEF
CASE NO. 3:24-CV-04471-EMC

Gibson, Dunn & Crutcher LLP

caused the Children clear psychological trauma, and returning them to Armenia would expose them to further harm. *See Acosta*, 725 F.3d at 875–76 ; *see also Braude v. Zierler*, 2022 WL 3018175, at *8 (S.D.N.Y. July 29, 2022), *aff'd* 2023 WL 3012269 (2d Cir. Apr. 20, 2023) (finding grave risk where petitioner had "concerning history of angry and manipulative behavior"); *Delgado*, 2024 WL 517874, at *11 (distinguishing "isolated incidents of abuse aimed at someone other than [the child]" from "a pattern of physical and emotional abuse of [the child's] mother, in [the child's] presence" and finding it likely that the child would be exposed to harm).

**E.     Ameliorative Measures are Insufficient in Armenia and Need Not be Considered**

There are no measures in Armenia sufficient to protect the children from grave risk of further physical and psychological harm due to the severity of abuse perpetrated by Petitioner. This Court need not consider this issue at all due to the serious nature of Petitioner's abuse. *See Golan*, 596 U.S. at 682 ("[t]he court may [] find the grave risk so unequivocal, or the potential harm so severe, that ameliorative measures would be inappropriate" because it "could not readily be ameliorated"). The evidence of Petitioner's physical and psychological abuse of the Respondent and Children is clear and unambiguous. Thus, the facts of this case, *see infra*, render any potential ameliorative measures inadequate. *See Jacquety v. Baptista*, 538 F. Supp. 3d 325, 381 (S.D.N.Y. 2021) ("[T]here are no potential undertakings that would sufficiently ameliorate the grave risk of psychological harm to E.J. for the same reason that there are no potential Moroccan legal remedies or services that would do so: returning to Morocco will trigger E.J.'s PTSD."). The same applies here—the current state of the law and support infrastructure in Armenia is inadequate to protect three American-Portuguese children that cannot even speak the language from Petitioner's documented and long history of physical, psychological, and verbal abuse.

**IV.     CONCLUSION**

Because the Children's habitual residence is not Armenia, the petition should be denied. Alternatively, the petition should be denied because Respondent can show by clear and convincing evidence that the Petitioner's physical, psychological, and verbal abuse would expose the Children to grave risk of harm if returned to Armenia.

Gibson, Dunn & Crutcher LLP

DATED: October 9, 2024                       Respectfully submitted,

                                             GIBSON, DUNN & CRUTCHER LLP

                                             By: */s/ Thad A. Davis*
                                                  Thad A. Davis, Bar No. 220503

                                             *Attorneys for Respondent RULA NABIL*
                                             *KHOURY CAVACO DIAS*

RESPONDENT RULA NABIL KHOURY CAVACO DIAS' TRIAL BRIEF
CASE NO. 3:24-CV-04471-EMC