GIBSON, DUNN & CRUTCHER LLP
THAD A. DAVIS, SBN 220503
    tdavis@gibsondunn.com
DANIELLE HESSE, SBN 318321
    dhesse@gibsondunn.com
ROMMY FLORES CONKLIN, SBN 298770
    rfloresconklin@gibsondunn.com
WILLIAM FELDMAN, SBN 339008
    wfeldman@gibsondunn.com
AARON J. CHEUNG, SBN 346307
    acheung@gibsondunn.com
NICOLE WADDICK, SBN 352997
    nwaddick@gibsondunn.com

One Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

333 South Grand Avenue
Suite 4600
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

*Attorneys for Respondent*
*RULA NABIL KHOURY CAVACO DIAS*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In the Matter of I.D., N.D., and C.D. | CASE NO. 3:24-cv-04471-EMC |
| CASIMIRO JOSE CANHA CAVACO DIAS, | **RESPONDENT RULA NABIL KHOURY CAVACO DIAS' EXPEDITED MOTION FOR EVIDENTIARY PRESUMPTIONS AND PRODUCTION OF ARMENIAN COUNSEL/EXPERT MATERIALS** |
| Petitioner, | |
| v. | |
| RULA NABIL KHOURY CAVACO DIAS, | |
| Respondent. | |

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................................ 1

II.   BACKGROUND ............................................................................................................. 1

III.  ARGUMENT .................................................................................................................. 2

    A.    Petitioner's False Pleading Regarding Length of Employment .................................. 2

    B.    Petitioner's Spoliation of Unrecoverable Evidence ...................................................... 8

    C.    Ms. Ashkhen Dashyan—Petitioner's "Expert" is Revealed as Also is
    Petitioner's Attorney ................................................................................................... 13

IV.   CONCLUSION ............................................................................................................. 19

Gibson, Dunn &
Crutcher LLP

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Abrego Abrego v. Dow Chem. Co.*,
443 F.3d 676 (9th Cir. 2006).................................................................................7

*America Unites for Kids v. Rousseau*,
985 F.3d 1075 (9th Cir. 2021)..............................................................................6

*Apple Inc. v. Samsung Electronics Co., Ltd.*,
881 F. Supp. 2d 1132 (N.D. Cal 2012) ...............................................................9

*Aschcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................7

*Aspex Eyewear Inc. v. E'Lite Optik, Inc.*,
276 F. Supp. 2d 1084 (D. Nev. 2003)...............................................13, 16, 17

*In re Bairnco Corp. Sec. Litig.*,
148 F.R.D. 91 (S.D.N.Y.1993) ............................................................................17

*First Fin. Sec., Inc. v. Jones*,
2017 U.S. Dist. LEXIS 128194 (N.D. Cal. Aug. 11, 2017)......................14, 15

*Friction Div. Products v. E.I. Du Pont De Nemours*,
117 F.R.D. 535 (D.Del.1987)..............................................................................17

*Glaukos Corp. v. Ivantis, Inc.*,
2020 WL 10501850 (C.D. Cal. June 17, 2020) ................................................10

*Golan v. Saada*,
596 U.S. 666 (2022)............................................................................................12

*Handgards, Inc. v. Johnson & Johnson*,
413 F. Supp. 926 (N.D. Cal. 1976) ...............................................................16, 17

*Herrick Co., Inc. v. Vetta Sports, Inc.*,
1998 WL 637468 (S.D.N.Y. Sept. 17, 1998)......................................13, 14, 18, 19

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018).................................................................................7

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005)..............................................................................7

*Monasky v. Taglieri*,
589 U.S. 68 (2020)...........................................................................................5, 7

*Multiform Dessicants, Inc. v. Stanhope Prods. Co., Inc.*,
930 F. Supp. 45 (W.D.N.Y. 1996) ......................................................................17

Gibson, Dunn & Crutcher LLP

ii

*Murphy v. Sloan*,
  764 F.3d 1144 (9th Cir. 2014)..................................................................................5

*In re Napster, Inc. Copyright Litig.*,
  462 F. Supp. 2d 1060 (N.D. Cal. 2006) ...................................................................12

*Oppenheimer Fund., Inc. v. Sanders*,
  437 U.S. 340 (1978).................................................................................................14

*Union Pac. Railroad Co. v. Loran Maintenance of Way, Inc.*,
  2006 WL 8459287 (D. Utah Feb. 1, 2006) ...............................................................16

*In re Witt*,
  2010 Bankr. LEXIS 2685 (E.D.N.C. Aug. 10, 2010) ...........................................16, 17

**Other Authorities**

Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* §
  IV.14. (6th ed. 2017) ...............................................................................................14

**Rules**

Fed. R. Civ. P. 11 .................................................................................................3, 6, 7

Fed. R. Civ. P. 11(b) ................................................................................................3, 4

Fed. R. Civ. P. 11(c)(1) ...............................................................................................3

Fed. R. Civ. P. 11(c)(4) ...............................................................................................4

Fed. R. Civ. P. 12(b)(6) ............................................................................................6, 7

Fed. R. Civ. P. 37(e) ....................................................................................................9

Fed. R. Civ. P. 37(e)(2) ..............................................................................................12

Gibson, Dunn & Crutcher LLP

iii

# I.     INTRODUCTION

Respondent respectfully, and reluctantly, moves this Court after extensive meet confer efforts and attempts at compromise in the expedited lead up to trial in this matter. There are three key issues where Respondent requests an expedited briefing and hearing: (1) Petitioner's now admittedly false Petition, sworn under oath, and repeated false pleadings, that his contract with the World Health Organization ("WHO") was alternatively "scheduled to last 5 years" or "from December 2023 to December 2028" but for which no such contract exists; (2) Petitioner's admitted intentional spoliation of highly salient evidence, which has now been confirmed to not be remediable; and (3) a dispute over expert materials, where it was discovered Petitioner's Armenian "expert" is actually his paid lawyer and advocate in Armenia, which the report did not disclose, and about which Respondent has proposed discovery. All three issues are now at an impasse, despite the best efforts of Respondent at compromise.

# II.     BACKGROUND

Respondent and her counsel have repeatedly raised concerns to Petitioner's Counsel regarding the issues raised in this motion. *First*, Petitioner has made repeated, now admittedly false pleadings to this Court regarding whether his position in Armenia, when the Children moved there, was *temporary* for one-year, fixed-term or "scheduled to last" five years until 2028 (including under penalty of perjury in his "Verified" Complaint). This issue is highly relevant—if not at the heart of—Petitioner's claims that Armenia was the Children's habitual residence *because he and Respondent allegedly intended to stay there for five years*. *See* ECF No. 1. *Second*, Petitioner has intentionally deleted hundreds of text messages relevant to the claims in this case. He has admitted doing this as well. Despite Respondent's efforts since September 11, 2024 to obtain information about these deleted messages, Petitioner has still failed to provide any concrete information regarding the nature of this spoliation. *Third*, Petitioner has presented his personal Armenian counsel to this Court as an "expert" on alleged ameliorative measures in Armenian domestic violence law. Petitioner's personal attorney did not disclose this conflict in her reports, and Petitioner has refused to produce relevant communications between the two based on claimed attorney-client privilege.

Respondent and her counsel have made themselves available to Petitioner through extensive meet and confer efforts and have attempted in good faith to resolve the parties' issues and compromise

without burdening the Court. Even with these efforts, the situation continues to worsen, and critical open items remain unresolved with trial less than three weeks away. Although Petitioner has finally provided some discovery related to his employment (but not all), including additional documents *today* (which he continues to insist is not relevant), Petitioner has yet to receive other important documents, including Petitioner's declaration with respect to Petitioner's spoliation of hundreds of text messages sent from Petitioner to Respondent, the Children, and Respondent's family.

Despite these concerns, and mindful of the Court's guidance, Respondent remained open to finding a solution. On October 10, 2024 at 10:11 a.m. PT, Respondent's Counsel emailed Petitioner's Counsel with the following proposal:

> 1) [Petitioner agrees to] a rebuttable presumption that Petitioner's employment in Armenia is temporary and does not support a habitual residence finding as to Armenia… [2] Petitioner agrees to] a rebuttable presumption that the "grave risk" defense has been established and the destroyed evidence supports that presumption… [and 3)] Petitioner provides a privilege log of communications or work product shared between Petitioner and [Petitioner's] Armenian law expert (and [Petitioner's Armenian] counsel) by Saturday, October 12 in English [to facilitate a further meet and confer on this issue].

Ex. A at 2–3. Petitioner's counsel rejected Respondent's proposal regarding rebuttable presumption the next morning on October 11, 2024 at 7:40 a.m. PT and ignored the proposal regarding a privilege log. Ex. A at 1. Petitioner's counsel now argues that Petitioner's contract for employment is "expected" to be renewed (which is not relevant for the falsehood that it was never set to be for five years at the start); that spoliated evidence simply cannot be recovered; and that his Armenian law expert citing to the very proceedings where that same expert *represents* Petitioner does not waive privilege nor bring their communications into the realm of relevance.

### III.     ARGUMENT

#### A.     Petitioner's False Pleading Regarding Length of Employment

Throughout the pendency of this case, Petitioner stated multiple times, including under penalty of perjury, that his position at the WHO in Armenia, which started in November 2023, was supposedly set for a five-year term, to run until 2028, and that the family signed a lease in Armenia renewable for five years. This is now by his counsel's own admission, simply false. Petitioner has repeated this false statement to this Court at least *five* separate times, and as late as October 1, 2024, when he sought an

extension to the trial dates. S*ee* ECF No. 116, at 3.  This assertion prominently features at the outset of all of Petitioner's substantive pleadings to this Court.  The contract Petitioner produced in discovery clearly states that his position with the WHO is for a "fixed-term," one-year contract that is set to terminate on November 21, 2024. Per WHO Guidelines, "fixed-term" assignments carry "no right to extension or conversion of the appointment" and "expire at the end of the term." WHO Guideline No. 1040.1 (Ex. 12[1] at 2). Petitioner's counsel has confirmed that the current contract term is set to expire and has not been renewed. While Petitioner's counsel now states that Petitioner "expects" renewal to occur, counsel admitted that no five-year contract scheduled to last until 2028 exists. Knowing the representations to this Court were false, Petitioner's Counsel agreed to notice and amend the pleadings after extensive negotiation; yet still has not done so. Additionally, in its latest pleading before the Court (ECF No. 123), Petitioner continues to mislead this Court.[2]

Federal Rules of Procedure 11(b) states that "[b]y presenting to the court a pleading, written motion, or other paper. . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, a pleading, written motion, or other paper. . . [that] certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" the paper "is not being presented for any improper purpose. . ."; "**the factual contentions have evidentiary support** or, if specifically so identified, ***will likely have evidentiary support after a reasonable opportunity for further investigation*** or discovery"; and "the denials of **factual contentions are warranted on the evidence** or, if specifically so identified, are reasonably based on belief or a lack of information." Fed. R. Civ. P. 11(b) (emphasis added). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). A sanction imposed under Rule 11 "must be

---

[1] Exhibits identified by number refer to those Exhibits submitted to the Court by the Parties on October 9, 2024, as part of their pretrial briefings.

[2] In Petitioner's Trial Brief, filed October 9, 2024, Petitioner continues to assert that the "expectation was that his assignment in Armenia was to last five years" and "the parties discussed staying in Armenia for up to five years." ECF No. 123, at 3. Petitioner cites no evidence for these assertions, and continues to fail to provide any supporting evidence to Respondent for these claims.

limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4).

Here, Petitioner has violated Rule 11(b) by falsely claiming, in various pleadings, written motions, or papers, that Petitioner's WHO job position in Armenia was "scheduled to last 5 years" for five years and/or "until 2028." Specifically, in pleadings before this Court Petitioner, by and through his Counsel, has stated the following regarding his employment:

- "Mr. Dias' assignment to Armenia was scheduled to last from 2023 to 2028." (6/24/24) ECF No. 1, at ¶ 16.
- "Mr. Dias was offered a position in Armenia, scheduled to last from December 2023 to 2028, and the family moved there on December 27, 2023 from Jamaica and entered into a lease of one year with renewal up to five years . . ."[3] (8/12/24) ECF No. 52, at 2.
- "I was assigned to Yerevan, Armenia, from December 27, 2023, through to 2028." 9/21/24 Petitioner's Reponses and Objections to Respondent's Special Interrogatories (Ex. 735 at 4)
- "Petitioner was offered a position in Armenia, scheduled to last five (5) years, from December 2023 through 2028. The family moved to Yerevan, Armenia on December 27, 2023, from Jamaica and entered into a lease of one (1) year with renewal up to five (5) years..." 9/6/24 ECF No. 73, at 3.
- "Petitioner was offered a fixed-term contract in Armenia on November 20, 2023, scheduled to last five (5) years, from December 2023 through 2028." (10/1/24) ECF No. 116, at 3.

Petitioner and his Counsel have been on notice since Respondent's Answer two months ago that the factual contention by Petitioner was false. *See* 8/9/24 Respondent's Answers and Affirmative Defenses, ECF No. 57, at 7 ("Respondent further states that Petitioner's assignment to Armenia was only for one (1) year, and Respondent [] reasonably believes that Petitioner's assignment to Armenia ***was designated as temporary by his employer*** . . . Petitioner was not told where his next assignment would be.") (emphasis added). On September 11, during the course of discovery, Respondent again sought the support for these allegations and requested from Petitioner "All DOCUMENTS that relate to YOUR contention that YOU and/or YOUR CHILDREN maintained or intended to maintain habitual residence in Armenia, including any and all past or present employment contracts in Armenia." Ex. B at 5. Petitioner produced only the single, one-year contract that shows Petitioner's assignment in Armenia, as of November 22, 2023 is set to expire on November 21, 2024, Respondent's counsel has

---

[3] A renewable, 5-year lease is also misleading. We note that the lease produced by Petitioner allows for renewal, but there is no mention of "5 years" there either and the lease specifically states the term is to February 4, 2025. *See* Ex. 6 at 6.

repeatedly sought from Petitioner the documents supporting the contention—present throughout the pleadings—that Petitioner's employment, upon arriving in Armenia, would run until 2028 and/or for 5 years. *See* Ex. C at 2–4. Finally, on October 4, Petitioner's Counsel admitted that no such evidentiary support existed for this contention, but that Petitioner had not yet received notice that he was *not* being renewed. *Id.* To date, Petitioner has provided no evidence that he ever had an employment contract beyond November 21, 2024.  Of key importance here is—***whether the contract is renewed matters less***; Petitioner's claim was that it was set to last five years ***at the outset*** which is the critically false contention provided to this Court (and under oath) on at least five occasions to support Petitioner's claim of habitual residence because it allegedly showed that it was his and Respondent's intent to live in Armenia for five years.

This fact of temporariness of the Armenia position *at the outset* is critical in the proceedings, as a parent petitioning for the return of a child under the Hague Convention may invoke the protection of the Convention only if the child is a "habitual resident" of the country from which he or she was removed. *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020). The "[d]etermination of 'habitual residence' is perhaps the most important inquiry under the Convention," and requires assessing whether a stay in a certain country is permanent or temporary. *Murphy v. Sloan*, 764 F.3d 1144, 1150 (9th Cir. 2014) (internal quotation marks omitted). Whether Petitioner's job was for five years ***upon the start of the position*** (and whether he will have one there as of November 21, 2024) or was at the outset for just one year is of the utmost importance to this inquiry. Petitioner's primary argument for "habitual residence" is that the family "planned" to stay there because of his alleged five-year term job and because he had worked for the WHO for fifteen years. This is simply false.[4]

Likewise, should Petitioner's contract not be renewed (and as of this writing, it has not) he has no legal status in Armenia; this case would be mooted and subject to immediate dismissal because he would have to leave Armenia. Petitioner has not shown that he has any ties to Armenia other than his

---

[4] Petitioner has revised this contention in his Findings of Fact (ECF No. 123, at ¶ 5), but we believe it continues to mislead the Court: "This role is considered longer-term and given that the Petitioner has served with the World Health Organization for 15 years – often having his previous appointments or renewals follow the conclusion of one-year fixed-term contracts – **the expectation was that his assignment in Armenia was to last several years.** To that end, the parties discussed staying in Armenia for up to five years." (emphasis added). Again, Petitioner provides no evidentiary support for this. And the documents simply do not bear this out, and flatly contradict the false pleadings.

Gibson, Dunn &
Crutcher LLP

temporary job—he does not have family there; he does not own property there; he is not a citizen there; and he does not speak the language. His Armenia identification card specifically notes his rights and privileges are based on his status as a temporary worker for the WHO.

Additionally, it was not until *long after* the close of discovery, and on the same day the parties filed their trial briefs, that Petitioner finally produced documents showing that he applied to at least eight different positions since accepting his job in Armenia all in countries *other than Armenia*, including during the critical 17-week time period between December 27, 2023 and April 25, 2024, and again on May 11, 2024.[5] Petitioner's Counsel continues to claim that they do not see the relevance of Petitioner's job applications in relation to his claims regarding habitual residence. But whether he was seeking to immediately find other employment outside of Armenia, including because it was a temporary job *from the start*, is directly relevant to these claims. Petitioner's job and job searches go to the heart of his habitual residence arguments and to argue otherwise is belied by the fact that *every* substantive pleading the Petitioner put in front of this Court <u>led</u> with this now admittedly false assertion regarding the length of his employment contract to support his claim that Armenia was the Children's habitual residence because that factual assertion goes to the heart of the claim he makes. *See* ECF No. 1, at ¶ 16; ECF No. 52, at 2; ECF No. 73, at 3; ECF No. 116, at 3.

Respondent seeks evidentiary sanctions under Rule 11 of the Federal Rules of Civil Procedure and the Court's inherent powers, *America Unites for Kids v. Rousseau*, 985 F.3d 1075, 1088 (9th Cir. 2021), for Petitioner's intentional and knowingly false statements under penalty of perjury in Petitioner's various papers, and the prejudice this has caused and continues to cause Respondent in her trial preparations. Petitioner's false claims create concerns that Petitioner will continue to dissemble, prevaricate, and offer false contentions at trial. Petitioner's false and misleading statements to the Court have caused Respondent to expend attorneys' fees as well as other expenses.

Notably, had Petitioner not made this false allegation, Respondent could have moved to dismiss his Petition for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the threshold question of habitual residence. "The tenet that a court must accept as true all of the

---

[5] Petitioner's Counsel also feigns ignorance regarding the relevance of these job applications. This incredulousness belies the facial relevance of whether Petitioner intended to stay in Armenia—an issue that, as noted above, Petitioner's Counsel found relevant enough to falsely raise to this Court in multiple pleadings.

allegations contained in a complaint is inapplicable to legal conclusions. ***Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice***." *Aschcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (emphasis added). The crux of Petitioner's "habitual residence" claim is that Petitioner's WHO job position in Armenia was "scheduled to last" for five years and/or "until 2028." Without this fact, Petitioner provides no support and merely asserts conclusory, "[t]hreadbare recitals" that the Children's alleged "habitual residence" is in Armenia. *See id.*

Because of Petitioner's false pleading regarding the length of his WHO position in Armenia in his Complaint and other papers, Petitioner's contract, which clearly states that this position is for a "fixed-term," one-year contract that is set to terminate on November 21, 2024, should be incorporated by reference. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) ("[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself. The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken— or doom—their claims"). This rule was created to "[p]revent[] plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." *Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681–82 (9th Cir. 2006). Here, Petitioner has not only omitted facts that weaken his claims—he falsely asserted on at least five occasions as to the length of his term in Armenia *from the start*. Although the Complaint did not "allege or describe the contents of" the one-year contract, incorporation is proper "because the claim necessarily depend[s] on [the contract.]" *Khoja,* 899 F.3d at 1002*; see also Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) (affirming the incorporation of materials that the complaint did not reference at all). Here, Petitioner's primary claim is that the Children were habitually resident in Armenia *due to his long-term job*. Critically, simply being in Armenia is not enough to reach habitual residence, and Petitioner (and his counsel) know that. *Monasky, 589 U.S. at 76 (*"A child 'resides' where she lives. . . ***Her residence in a particular country can be deemed "habitual," however, only when her residence there is more than transitory***." (emphasis added)).

Now Respondent will have to consume trial time combatting those false contentions, further prejudicing Respondent who has already been forced to discover and attempt to remedy the false

7

Gibson, Dunn &
Crutcher LLP

pleadings at the eleventh hour. As such, Respondent seeks sanctions pursuant to Federal Rules of Civil Procedure, Rule 11 and the Court's inherent powers, requesting a rebuttable presumption that Petitioner's employment in Armenia *upon the position starting* was temporary and set to expire on November 21, 2024, which does not support a habitual residence finding as to Armenia. Petitioner through counsel has rejected this compromise. *See* Exs. A, C.

**B.      Petitioner's Spoliation of Unrecoverable Evidence**

Throughout the course of this litigation, Petitioner has deleted hundreds of text messages to Respondent and her family in a clear and repeated act of spoliation. *See* Ex. 206; Ex. 31, *passim*. Notwithstanding Respondent's diligent preservation and efforts at recovery, nearly all of this evidence is now lost forever.[6] Under the circumstances as outlined below, a severe sanction is warranted including a presumption that the spoliated evidence supports Respondent's "grave risk" defense, and fees and costs associated with the time spent remedying Petitioner's misconduct in this litigation.

Heeding this Court's October 1, 2024 Order, ECF No. 114, Respondent has made repeated efforts to address the spoliation issue with Petitioner's Counsel without involving the Court. These efforts include:

- On September 11, 2024, two days after current counsel filed Notices of Appearance in this litigation, Respondent requested in her Special Interrogatories that Petitioner "Describe in detail any Communications with Respondent that [Petitioner has] deleted or destroyed since January 1, 2024. Ex. 735 at 18. On September 21, 2024, Petitioner responded, "I have deleted WhatsApp messages since January 1, 2024 but I do not remember what they were in detail. They generally concerned requesting updates on the health and safety of the children and my shock and disbelief of the Respondent's actions." *Id.* at 19.
- On September 12, 2024, concerned about previous and ongoing spoliation, Respondent sent Petitioner a Preservation Request, detailing Petitioner's spoliation concerns and request to ensure subsequent messages be preserved. Exs. D, E.
- On September 26, 2024, Respondent requested via email that Petitioner "confirm which text messages were deleted after Petitioner reasonably anticipated litigation, and what, if any efforts are ongoing to retrieve those messages." Respondent advised Petitioner that in the absence of efforts or confirmation, Respondent would "plan to seek an adverse inference from the Court, given the extent and breadth of deleted messages." Ex. F at 5–6. On September 29, 2024, Petitioner responded to this request and informed Respondent that Petitioner was "attempting to recover those messages." *Id.* at 4. On

---

[6] Petitioner's Counsel has represented that Petitioner has recently made unsuccessful efforts to recover the spoliated evidence as well, but has failed to provide a documentation of those efforts despite promises to do so.

September 29, 2024, Respondent again requested specific information regarding the deleted messages. *Id.* at 3–4.

- On October 1, 2024, with no further updates on the deletions, Respondent again expressed concern over Petitioner's spoliation. To assess the extent of spoliation, Respondent asked Petitioner to provide a declaration detailing the reasoning for and timing of message deletions and efforts to recover those messages. Ex. F at 1–2. On October 4, 2024, Petitioner stated that they were "working on responses" and "would have something" over the weekend. *Id.* at 1.

- On October 7, 2024, during the Parties' meet and confer, Respondent again requested an update on the deleted messages. Petitioner responded that they would have a conclusion by the next day, October 8, 2024.

- On October 8, 2024, during the Parties' meet and confer, Petitioner informed Respondent that they believed they had recovered the deleted messages and an update would be coming.

- On October 9, 2024, during the Parties' meet and confer at Respondent's request, Petitioner informed Respondent that they had *not* in fact recovered the deleted messages, and a declaration was forthcoming.

- On October 10, 2024, still awaiting Petitioner's promised declaration, Respondent proposed a set of presumptions with respect to the deleted messages. Ex. A at 2-3. On October 11, 2024, Petitioner noted that he would discuss internally and revert. *Id.* at 1.

- On October 11, 2024, Respondent, still awaiting information originally requested in her September 11, 2024 Interrogatories and the declaration requested on October 1, 2024, Respondent informed Petitioner that she would move before the Court on this issue, among others. Ex. A at 1.

Despite these and other efforts over the course of nearly a month, Respondent has yet to receive *any* specific information regarding the content of Petitioner's deleted messages nor the timing and reasoning for the deletions.

Rule 37(e) applies when electronically stored information ("ESI") that "should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). To determine whether spoliation occurred, courts consider the following elements: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Apple Inc. v. Samsung Electronics Co., Ltd.*, 881 F. Supp. 2d 1132, 1138 (N.D. Cal 2012) (internal quotation marks omitted). Petitioner's conduct easily constitutes gross spoliation, and severe sanctions are warranted.

Gibson, Dunn & Crutcher LLP

*First*, Petitioner had control over the evidence and many, if not all, of these deletions occurred well *after* he had an obligation to preserve them. At the latest, Petitioner's preservation obligations kicked in on May 14, 2024, the date Petitioner filed his Hague Petition with the United States Department of State. Ex. 399. Of course, unless Petitioner prepared this form the day he filed it, his obligations kicked in even earlier.[7] *See Glaukos Corp. v. Ivantis, Inc.*, 2020 WL 10501850, at *1 (C.D. Cal. June 17, 2020) ("The obligation to preserve relevant evidence attaches when litigation is 'pending or reasonably foreseeable.'").

Although the nature of Petitioner's spoliation makes the exact timing of all of Petitioner's misconduct impossible to reconstruct, Respondent's diligent preservation provides key data points that confirm extensive deletion occurred well into litigation. For example, on August 7, 2024—nearly three months *after* Petitioner first filed his Hague Petition, Ex. 399—Petitioner sent Respondent a violent tirade of text messages. Respondent was able to screenshot some of these messages before Petitioner's deletion, which said, concatenated, "**Just imagine for one second[.] Now imagine for 105 days[.] I believe in the Almighty God and in his Justice[.] The shitshow will be over[.] FOREVER[.] Your family shitshow will be over forever[.] For me and my children[.] Enjoy my pain[.] If you cannot imagine my pain for not knowing nothing about my children[.] I hope one day you feel it[.] Like I feel for 105 days[.] You just care about your [sic] and your brother[.]**" Ex. 217. Petitioner subsequently deleted at least 19 of those messages, leaving only "Now imagine for 105 days" and "The shitshow will be over." Ex. 31 at 19.

And this is just one example. To provide details regarding just one stretch of time (and just as to texts between Petitioner and Respondent, which ignores deletions made between Petitioner and Respondent's family), Petitioner deleted: one message he sent on June 8, 2024, seven messages he sent on June 14, 2024, one message on June 15, 2024, three messages on June 16, 2024, one message on June 19, 2024, one message on June 20, 2024, six messages on June 22, 2024, two messages on July 2, 2024, eleven messages on July 4, 2024, one message on July 6, 2024, three messages on July 7, 2024, two messages on July 8, 2024, three messages on July 9, 2024, two messages on July 10, 2024,

---

[7] Another relevant data point, unknown to Respondent, is when Petitioner first retained counsel. Lead Counsel for Petitioner in this litigation, for example, filed the initial "verified" complaint in June 2024. *See* ECF No. 1.

Gibson, Dunn & Crutcher LLP

two messages on July 11, 2024, fourteen messages from July 12, 2024. Ex. 31 1–11. This list is non-exhaustive, and Petitioner has deleted <u>over 200</u> messages that he sent to Respondent between June 6, 2024 and September 12, 2024, *see* Ex. 31 *passim*—a number that excludes the messages he went back in time to delete and that excludes Petitioner's deletions of texts with people other than Respondent. *See, e.g.*, Ex. 237. Noteworthy during all of this is that Petitioner has been represented by counsel—and at least the same lead counsel as represents him today—throughout this litigation.[8]

*Second*, Petitioner deleted the messages with a culpable state of mind in the hopes of deleting unfavorable evidence. A small sample of Petitioner's deleted text messages have since been recovered. In the representative examples below, Respondent has provided the screenshots of the text messages before and after Petitioner's deletion for reference. These screenshots show that the messages deleted were violent and incriminating, rather than benign.

- **April 21, 2024:** Petitioner texted Respondent: "Of course. You want to talk behind my back that my kids are cockroaches and I am violent and bully[.] **I am extremely violent when you try to fuck with my family bitch** [.] **Extremely violent**[.]" Ex. 233 & 238. *See also* Respondent Findings of Fact, ECF No. 124-1, ¶ 159. Petitioner deleted these text messages. *See* Ex. 237; Ex. 335 at 1240-41.
- **August 7, 2024:** As discussed above, Petitioner texted Respondent: "Just imagine for one second[.] Now imagine for 105 days[.] I believe in the Almighty God and in his Justice[.] **The shitshow will be over[.] FOREVER[.] Your family shitshow will be over forever[.]** For me and my children[.] **Enjoy my pain**[.] If you cannot imagine my pain for not knowing nothing about my children[.] I hope one day you feel it[.] Like I feel for 105 days[.] You just care about your [sic] and your brother[.]" Ex. 217. Petitioner subsequently deleted at least 19 of those messages, leaving only "Now imagine for 105 days" and "The shitshow will be over." Ex. 31 at 19.

As further evidence of Petitioner's culpable state of mind, and compounding the conduct here, Petitioner has since grossly misrepresented his spoliating conduct in discovery responses submitted through Petitioner's Counsel. On September 11, 2024, Respondent asked Petitioner in an Interrogatory to "[d]escribe in detail any COMMUNICATIONS with RESPONDENT that YOU have deleted or destroyed since January 1, 2024." Ex. 735 at 18. Petitioner responded, "I have deleted WhatsApp messages since January 1, 2024 but I do not remember what they were in detail. They generally

---

[8] Petitioner's Counsel has indicated that Petitioner will provide a declaration regarding the spoliated evidence. As of the filing of this brief, that declaration has not been sent to Respondent.

Gibson, Dunn &
Crutcher LLP

concerned requesting updates on the health and safety of the children and my shock and disbelief of the Respondent's actions." *Id.* at 19. This is patently false. Although nearly all of Petitioner's deleted text messages appear to be lost forever, the little evidence Respondent could save shows that far from "generally concern[ing]" his children, Petitioner's deleted text messages *related to his violent conduct and temperament, and involved threats against Respondent or her family*—highly relevant and probative of the grave risk he poses to others including the Children. And further, Petitioner's claim that he deleted messages "since January 1, 2024" is a transparent attempt to elide that he has, in fact, *extensively* deleted text messages *throughout this litigation*. *See supra* at 11-12 (non-exhaustively summarizing deletions from June 6, 2024 through July 12, 2024).

*Finally*, Petitioner's spoliated evidence is highly relevant to the claims at issue; as noted, it provides further proof of Petitioner's relentless abuse of Respondent and the Children. This text evidence is directly relevant to whether "[t]here is a grave risk that . . . return would expose the child[ren] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation." *Golan v. Saada*, 596 U.S. 666, 670–71 (2022).

In the face of this cut-and-dry spoliation, the only question remaining for the Court is what sanction to impose. Under Rule 37(e)(2), the court may issue the following sanctions "upon finding that the party acted with the intent to deprive another party of the information's use in the litigation": (1) a presumption "that the lost information was unfavorable to the party;" (2) a jury instruction "that it may or must presume the information was unfavorable to the party;" or (3) a dismissal or default judgment. *Id.* District courts may employ a variety of different sanctions in response to the spoliation of evidence, including monetary sanctions, evidentiary sanctions, and default judgment. *See In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1066, 1078 (N.D. Cal. 2006).

Respectfully, this Court's sanction should reflect the gravity and context of Petitioner's misconduct. A few points warrant particular consideration. First, Petitioner, represented by counsel, has spoliated many hundreds of text messages in a case dealing with the safety and well-being of a mother and her three young children—the stakes are extremely high. Respondent's case has been severely prejudiced by this destroyed evidence, the extent of that evidence will never be known, and the only partial amelioration has been through Respondent's quick efforts, despite Petitioner's

12

intentional efforts to obfuscate and avoid accountability. Second, Petitioner's actions have wasted Respondent's time and resources on discovery to root out this spoliation. Given the incredibly tight timelines of this case, the prejudice from this wasted time is great. Third, Petitioner's spoliation should be viewed in light of his conduct—apparently condoned by Petitioner's Counsel—throughout this litigation. As noted above, Petitioner perjured himself in his "Verified" Complaint, made patently false representations in additional pleadings filed with the Court, and misrepresented his spoliation in discovery responses. These add up to a pattern and practice of grave misconduct aimed to undermine the truth-seeking function of this Court and Respondent's case. Respondent accordingly seeks sanctions of: (1) a rebuttable presumption that all deleted materials establish a finding of "grave risk" to the Respondent and her Children, (2) a presumption that the missing materials show "grave risk," and (3) an order that Respondent may add exhibits from any restored materials (though there appear to be none) which Petitioner is not entitled to use, but to rebut the "grave risk" finding. Respondent also seeks fees and costs associated with the time spent remedying Petitioner's misconduct in this litigation.

## C.    Ms. Ashkhen Dashyan—Petitioner's "Expert" is Revealed as Also is Petitioner's Attorney

The Court should compel the production of documents from Petition's attorney and expert, Ms. Dashyan relating to the Armenian restraining order and subsequent appeals before the Administrative Court and the Administrative Court of Appeal ("Armenian Proceedings").[9] Though not disclosed in her report, Ms. Dashyan represented and continues to represent Petitioner in the Armenian Proceedings. *See* Exs. 207 at 3, 433 at 1. Those Armenian Proceedings are relevant to this case because they concern the violence inflicted by Petitioner on Respondent in Armenia that contributed to her decision to flee for the safety of herself and her children. Additionally, Ms. Dashyan opined on the Armenian Proceedings in her expert report. Ex. 87 at ¶¶ 54–57. Again, Ms. Dashyan did not disclose in her expert report her representation of Petitioner. *See* Exs. 87, 89. When "litigation counsel" is designated as an "expert witness," that party must produce their "file on the subject matter of the asserted [issue]." *Aspex Eyewear Inc. v. E'Lite Optik, Inc.*, 276 F. Supp. 2d 1084, 1095–96 (D. Nev. 2003); *see also Herrick*

---

[9] Respondent raised this issue on October 5 over email, and the parties subsequently met and conferred on October 7 and 9. The parties discussed in writing these issues through October 11. *See* Ex. A at 1. Respondent explained that Petitioner's objections, as described in this Section, are unsupported by the law. *See id.* at 7–8.

*Co., Inc. v. Vetta Sports, Inc.*, 1998 WL 637468, at *1 (S.D.N.Y. Sept. 17, 1998) ("[I]t is well established that a party waives the attorney-client and work product privileges whenever it puts an attorney's opinion into issue, by calling the attorney as an expert witness or otherwise."); Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* § IV.14. (6th ed. 2017) ("If an attorney is designated as a witness, any factual work product may thereby be waived. Opinion work product is waived only when the attorney is designated as an 'expert' witness.").

**RFPs.** The documents sought are directly requested by Respondent's Request for Production of Documents, Ex. B, including:

- "All COMMUNICATIONS between YOU and each and every witness identified in YOUR initial disclosures dated September 5, 2024." Ex. B at 4. Petitioner's initial disclosure includes Ms. Dashyan. Ex. G at 3.
- "All DOCUMENTS and COMMUNICATIONS that relate to or reference the physical health, mental health, or YOUR relationship with YOUR CHILDREN from January 1, 2019 to the present, including but not limited to COMMUNICATIONS with individuals connected to YOUR CHILDREN'S school." Ex. B at 4.
- "All DOCUMENTS and COMMUNICATIONS that relate to or reference the physical health, mental health, or YOUR treatment in any way of RESPONDENT from January 1, 2019 to the present, including but not limited to the list of rules YOU required RESPONDENT to write out to govern her own behavior." Ex. B at 4.
- "All DOCUMENTS and COMMUNICATIONS that relate to or reference any investigation, inquiry, or warning related to YOU or YOUR conduct that is or has ever been conducted by any governmental or nongovernmental entity." Ex. B at 4.
- "All DOCUMENTS and COMMUNICATIONS that relate to YOUR contention that YOU actually exercised custody rights over YOUR CHILDREN in April 2024." Ex. B at 5.

The documents may also be responsive to Requests Nos. 7, 8, and 9. *See* Ex. B at 4–5. Respondent's RFPs sought documents from Petitioner's "agent or employee." *Id.* at 1, ¶ 5. Petitioner has not objected on the basis that the documents requested are not covered by Respondent's RFPs.

**Relevance.** Parties may obtain discovery regarding any "nonprivileged matter that is relevant to any party's claim or defense." *First Fin. Sec., Inc. v. Jones*, 2017 U.S. Dist. LEXIS 128194, at *4 (N.D. Cal. Aug. 11, 2017). A relevant matter is "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Id.* (quoting *Oppenheimer Fund., Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

The documents sought are directly relevant to this litigation. First, they are independently relevant because they concern the April 19–21, 2024 physical abuse that hospitalized Petitioner and

14

led to her attempts to flee from Armenia. *See* ECF No. 124 at ¶¶ 155–173 (Respondent's Findings of Fact); ECF No. 123 at ¶¶ 12–15 (Petitioner's Findings of Fact). Second, the documents are relevant because Ms. Dashyan opined on the Armenian Proceedings as part of her expert report on ameliorative measures. *See* Ex. 87 at ¶¶ 54–57. Despite now asserting that the Armenian proceedings, in Petitioner's estimation, are not relevant to escape discovery, Petitioner has not agreed to amend Ms. Dashyan's expert report to remove the supposed non-relevant opinion and refused to agree to refrain from raising the Armenian Proceedings at trial.[10] *See* Ex. A. This is unsurprising, as the Armenian proceeding "could bear on[] any issue that is or may be in [this] case." *First Fin.*, 2017 U.S. Dist. LEXIS 128194, at *4. Third, to the extent that Ms. Dashyan advised Petitioner on matters related to ameliorative measures, including the import of the events and abuse, what rights Petitioner or Respondent had and the likelihood that an Armenian court would issue orders restricting Petitioner's conduct would be relevant, as Ms. Dashyan opined on ameliorative measures. Ex. 87 at ¶¶ 27–48. For instance, such documents may contradict information contained in Ms. Dashyan's report and be used for impeachment at trial. Fourth, documents relating to Ms. Dashyan's ***concurrent*** representation of Petitioner in related Armenian proceedings is likely to weigh on the credibility and bias of Ms. Dashyan's expert report and testimony. *See, e.g.*, Ex. 64 at 3. Respondent should be able to question Ms. Dashyan on the scope of his attorney-client relationship, including about how much Petitioner has paid Ms. Dashyan in the Armenian litigation and whether Petitioner has retained Ms. Dashyan for future litigation should the Children be returned to Armenia.

**Burden.** Petitioner has not objected to producing Ms. Dashyan's documents based on burden. Nor would Petitioner be able to as the documents requested likely cover only a period of seven months. Petitioner has only produced approximately 250 documents in this litigation and producing additional documents from a single custodian—Petitioner's counsel/expert—would not be unduly burdensome.

---

[10] On October 7, Respondent offered a compromise. Ex. A at 9–10. In lieu of producing documents, Petitioner waives the right to contend that the Armenian litigation, including any findings by the court there, are unrelated to the instant litigation. *Id.* If Ms. Dashyan testifies on or Petitioner cites to the Armenian Proceeding, Respondent would be permitted to move to strike or for sanctions. *Id.* This would be without prejudice to Respondent citing the proceedings or any incident in Armenia for her defense, unrebutted. *Id.* Respondent would be permitted to use such materials to impeach Ms. Dashyan, including by inquiring about Ms. Dashyan's prior and/or concurrent representations and relationship. *Id.* On October 9, Respondent offered a compromise. In lieu of producing documents, the parties would agree to strike the expert report as it pertains to the Armenian Proceeding. Ex. A at 5–6. If Ms. Dashyan nonetheless testified on the Armenian Proceedings, there would be a presumption that the privileged materials confirm the expert's bias. *Id.* at 6.

Gibson, Dunn & Crutcher LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Privilege.** Petitioner asserts that the requested documents are covered by the attorney-client privilege and attorney work product doctrine. Petitioner has not submitted a privilege log of such documents even though those documents were requested by Respondent's RFPs and the RFPs requested a privilege log for all withheld documents. Ms. Dashyan was listed as having information in Petitioner's initial disclosures, so any withheld information should have been logged. *See* Ex. G at 3. On October 10, Respondent reiterated her request for a privilege log. *See* Ex. A at 2–3. To the extent Petitioner asserts any privilege claims, they have been waived because Petitioner submitted the expert report of Ms. Dashyan and intends to call Ms. Dashyan as an expert witness.[11] *See* Ex. H at 3.

Waiver of the attorney-client privilege and the work product doctrine is routinely found when a party calls his own attorney as an expert witness and that attorney has represented that party on issues at dispute and similar issues. This rule—taught in textbooks—has been a fundamental part of preventing abuse of the attorney-client privilege for decades. For instance, in *Handgards, Inc. v. Johnson & Johnson*, the Northern District of California found that "[s]ince the lawyers who managed and supervised the former litigation . . . are being called as witnesses to express their opinions as to the merits of the prior suits and [other issues] . . . , [the] plaintiff has a particularized and compelling need for the production of the relevant work product of these attorneys." 413 F. Supp. 926, 931 (N.D. Cal. 1976). Likewise, in *Aspex Eyewear,* the court ordered the production of an attorney's entire "file on the subject matter of the asserted [issue]" because when a party "designated its former litigation counsel as an expert witness," that party has waived privilege. 276 F. Supp. 2d at 1094–96; *see also Union Pac. R.R. Co. v. Loran Maint. of Way, Inc.*, 2006 WL 8459287, at *6 (D. Utah Feb. 1, 2006) ("When an attorney in a prior matter serves as an expert witness in new litigation, privileges are found to be waived. This is another way of saying that the attorney's prior communications and work product are at issue."). Illustratively, in *In re Witt*, the court found that privilege was not waived to the extent that the attorney testifies as a lay witness and offers "only factual testimony." 2010 Bankr. LEXIS 2685, at *5–6 (E.D.N.C. Aug. 10, 2010). But the court ruled that "[i]f it becomes apparent that [the attorney]

---

[11] On October 10, Respondent reiterated its request for a privilege log, offered to exchange a written list of potential topics to be logged, and subsequently meet and confer about any specific documents. Ex. A at 2-3. Petitioner is considering the request. *Id.* at 2. As a clarification, the proposal for a privilege log is not an offer of further negotiations concerning the documents requested by this Motion as Petitioner has refused to produce documents, but to help Petitioner comply with its privilege log obligations. Petitioner has made clear that he will not produce documents from his Armenian expert.

Gibson, Dunn &
Crutcher LLP

will testify as an expert, [then] the court will order all documents containing opinion work-product to be disclosed." *Id.[12]*

Petitioner has picked an untenable position. Petitioner designated Ms. Dashyan as an expert testifying witness. Ms. Dashyan opined on ameliorative measures in Armenia and cited the actual Armenian Proceedings here in the expert report. Ms. Dashyan *represented* and *concurrently represents* Petitioner in the Armenian Proceedings, the events leading to, basis for, and outcome of which is at dispute in this case, and was included in Petitioner's initial disclosure. *See supra*, at 14–17; ECF No. 124 at ¶¶ 225, 227 (Respondent's Findings of Fact); ECF No. 123 at ¶¶ 15–16; 19 (Petitioner's Findings of Fact). Respondent has a "particularized and compelling need" for the requested privileged information because it is necessary to evaluate (1) what privileged information Ms. Dashyan had knowledge of and whether she relied on that information in her report; (2) whether such privileged information influenced her report and how, including an assessment by the Court on whether her knowledge only is sufficient to influence her report; and (3) whether the privileged information contradicts what Ms. Dashyan opined on, (4) whether Ms. Dashyan is biased because she was or is being paid by Petitioner for a related proceeding, and (5) whether Ms. Dashyan or Petitioner made any promises about continued representation or outcome if the Children were returned to Armenia. Petitioner, by submitting Ms. Dashyan as an expert witness, has waived the attorney-client privilege and the attorney work product doctrine over the requested documents. *See Aspex Eyewear*, 276 F. Supp. 2d at 1094–96; *Handsgard*, 413 F. Supp. at 931–33; *Witt*, 2010 Bankr. LEXIS 2685, at *5–6.

Petitioner argues that Ms. Dashyan's expert report relies on information that requires no disclosure of the attorney-client privilege. However, a party is not required to take the opposing party's word and is permitted wide latitude in discovery and permitted to fully explore that information, including investigations into documents protected by privileges. *See Multiform Dessicants, Inc. v. Stanhope Prods. Co., Inc.*, 930 F. Supp. 45, 47 (W.D.N.Y. 1996) (granting motion to compel discovery from the plaintiff's attorney who was retained as an expert even though he submitted an affidavit stating he will not "rely upon or consider privileged communications of any sort"). Indeed, even if the law

---

[12] *C.f. In re Bairnco Corp. Sec. Litig.*, 148 F.R.D. 91, 100 (S.D.N.Y. 1993) ("To permit [defendant] to offer the fact of counsel's conclusions where such conclusions serve [defendant's] purposes without permitting plaintiffs access to all the communications between counsel and [defendant] would prejudice plaintiffs in the prosecution of their action.").

Gibson, Dunn & Crutcher LLP

required taking Petitioner's word as true, privilege would still be waived. In *Herrick*, the defendant law firm submitted its own attorney as an expert. 1998 WL 637468, at *2. The attorney represented that he did not consider any of the documents listed on a privilege log in forming his opinion of the case, and the defendant argued that a privilege waiver should only extend to "documents considered by that disclosed testifying expert witness in forming the opinions he or she intends to express in trial of the case." *Id.* The plaintiff argued that the waiver extends to other materials, including "other instances in which the attorney advised the party on similar matters." *Id.* The court, adopting the plaintiff's position, found that by designating its attorney as an expert trial witness, the defendant "opened the door to such discovery, which covers documents other than those directly considered by [the attorney] in forming his opinion." *Id.* at *3. By choosing to use the defendant's attorney to "bolster its case," the law firm "has turned the prior advice it received from [its attorney] into [a] 'matter, not privilege, which is relevant to the subject matter involved in the pending action' . . . and "discoverable." *Id.* Just as the court in *Herrick* compelled the law firm to produce documents on the "general subject matter" of the report, the court should do so here. *See id.* at *4.

Furthermore, Ms. Dashyan's expert report contains no *citations* to supporting materials in the portions of her report that opine on the Armenian Proceeding, undermining Petitioner's representation that she supposedly did not rely on privileged information or work product. *See* Ex. 87 at ¶¶ 54–57. Thus, at best, it is speculative whether Ms. Dashyan did not rely on her prior knowledge gained from her continuing representation of Petitioner. Indeed, Ms. Dashyan's concurrent representation and the information she received may have, in other ways, such as by taking into consideration privileged facts and legal opinions, influenced her report and testimony. Respondent should be able to challenge Ms. Dashyan's expert report and testimony, including any biases, with her own legal analyses on the Armenian Proceedings, including about any advice she may have provided as part of her retention in the Armenian Proceedings, to Petitioner concerning the likelihood of his chances to prevail if the Children are returned to Armenia—including weaknesses in the Armenian domestic violence, ineffective police response, or, hypothetically, the role of bribery in the Armenian legal process. *See Herrick*, 1998 WL 637468, at *2 ("Prior inconsistent opinions by [the attorney expert provided to the defendant] on the same subject matter would be highly relevant material."). Moreover, Petitioner's

18

Gibson, Dunn &
Crutcher LLP

argument does not address the issue of any potential biases, including biases that the Court may find based on how much Petitioner already paid Ms. Dashyan, whether Ms. Dashyan and Petitioner intend on or made any promises about representation in the Armenian Proceedings should the Children be returned to Armenia, and the extent of their attorney-client relationship. *See id.* at *3 (Federal Rules of Evidence "assume that the cross-examiner has the advance knowledge which is essential for effective cross-examination.").

## IV.  CONCLUSION AND REQUESTED RELIEF

Respondent's Motion respectfully should be granted for the foregoing reasons. Respondent has attempted to compromise, in a setting where terminating sanctions and other Court administrative actions could be readily justified. She is just seeking her day in Court and trying to overcome the litigation conduct of Petitioner and his counsel.

Respondent respectfully requests that this Court grants Respondent's motion for a rebuttable presumption that (1) Petitioner's employment in Armenia *upon the position starting* was temporary and set to expire on November 21, 2024, which does not support a habitual residence finding as to Armenia; and (2) all deleted materials establish a finding of "grave risk" to the Respondent and her Children.   Respondent also respectfully requests that this Court order that: (1) there shall be a presumption that the missing materials show "grave risk"; (2) Respondent may add exhibits from any restored materials and Petitioner is not entitled to use the restored materials but to rebut the "grave risk" finding; and (3) Petitioner produce documents from Petition's attorney and expert, Ms. Dashyan relating to the Armenian restraining order and subsequent appeals before the Administrative Court and the Administrative Court of Appeal ("Armenian Proceedings").  Any attorney-client privilege and work product attaching to Ms. Ashkhen Dashyan's representation of Petitioner in the Armenian Proceedings has been waived because Petitioner designated Ms. Dashyan as a testifying expert.

Gibson, Dunn & Crutcher LLP

1

2

3   DATED: October 11, 2024                    Respectfully submitted,

4                                              GIBSON, DUNN & CRUTCHER LLP

5                                              By: */s/ Thad A. Davis*

6                                                  Thad A. Davis, Bar No. 220503

7                                              *Attorneys for Respondent RULA NABIL*

8                                              *KHOURY CAVACO DIAS*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28