Pages 1 - 23

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

CASIMIRO JOSE CANHA CAVACO DIAS,  )
                                  )
            Plaintiff,            )
                                  )
   vs.                            ) No. C 24-04471 EMC
                                  )
RULA NABIL KHOURY CAVACO DIAS     )
                                  ) San Francisco, California
            Defendant             ) Friday
                                  ) October 4, 2024
_____  ) 1:30 p.m.

**TRANSCRIPT OF ZOOM VIDEO CONFERENCE**

**APPEARANCES**:

For Plaintiff:          GREEN, KAMINER, MIN & ROCKMORE, LLP
                        420 Lexington Avenue
                        Suite 2821
                        New York, New York 10170
                    BY: **RICHARD MIN, ESQ.**

                        DELACEY, RIEBEL, SHINDELL, LLP
                        180 Montgomery Street
                        Suite 1900
                        San Francisco, California 94104
                    BY: **KELLY SHINDELL DELACEY, ESQ.**


For Defendant:          GIBSON, DUNN & CRUTCHER, LLP
                        555 Mission Street
                        Suite 3000
                        San Francisco, California 94105
                    BY: **THAD ALAN DAVIS, ESQ.**


         (APPEARANCES CONTINUED ON FOLLOWING PAGE)


*Reported By:*  **Debra L. Pas, CSR 11916, CRR, RMR, RPR**
            Official Reporter - US District Court
            Computerized Transcription By Eclipse

1    **APPEARANCES:   (CONTINUED)**

2    **For Defendant:**            GIBSON, DUNN & CRUTCHER, LLP
                                  333 South Grand Avenue
3                                 Suite 4600
                                  Los Angeles, California 90071
4                         **BY:    ROMMY L. FLORES CONKLIN, ESQ.**

5                                  —   —   —

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Friday - October 4, 2024**                    **1:28 p.m..m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo |
| 4 | **THE CLERK:** This Court is now in session. The |
| 5 | Honorable Edward M. Chen presiding. |
| 6 | The Court is calling the case Dias versus Dias, et al, |
| 7 | Case Number 24-4471. |
| 8 | Counsel, please state your appearance for the record |
| 9 | beginning with the petitioner. |
| 10 | **MR. MIN:** Richard Min, Green, Kaminir, Min and |
| 11 | Rockmore, on behalf of petitioner Casimiro Dias. Good |
| 12 | afternoon, Your Honor. |
| 13 | **THE COURT:** Good afternoon, Mr. Min. |
| 14 | **MS. DeLACEY:** Kelly Shindell DeLacey on behalf of |
| 15 | petitioner, Casimiro Dias. My apologies for my voice. |
| 16 | **THE COURT:** All right. I can tell you're under the |
| 17 | weather a little bit there. |
| 18 | **MS. DeLACEY:** Sorry about that. |
| 19 | **MR. DAVIS:** Thad Davis from Gibson Dunn for |
| 20 | respondent. Good afternoon, Your Honor. |
| 21 | **THE COURT:** Good afternoon, Mr. Davis. |
| 22 | **MS. FLORES:** Hi. Rommy Flores from Gibson Dunn also |
| 23 | for respondent Rula Dias. |
| 24 | **THE COURT:** All right. Thank you, Ms. Flores. |
| 25 | So we have an interesting situation where the parties' |

```
 1   positions have been, I believe, inverted by 180 degrees.  And
 2   it's easy to invoke estoppel, I guess, but let me hear the
 3   merits.
 4       So I don't know whether Mr. Min or Mr. DeLacey -- it seems
 5   like there's nothing surprising or new that's arisen in this
 6   case.  If anything, the case is narrowed somewhat by the
 7   withdrawal of the mature children issue and now the production
 8   of documents.
 9       So I know there are several hundred documents, but some of
10   which you already had.  It didn't seem like a huge number of
11   documents and the nature of the grave risk defense has been
12   sort of known from day one, so what's -- what's the problem
13   here?
14           MR. MIN:  Yeah.  Your Honor, I mean, I think, yes,
15   some of the issues have narrowed; but as counsel for respondent
16   noted, September 10th we agreed to move forward with trial.
17       September 11th was the first time we received detailed
18   allegations of the abuse that respondent has alleged had been
19   going on for years; not simply the allegations from April 2024,
20   which we had reason to believe which were denied and dismissed
21   as a result of the proceedings in Armenia, but there were
22   allegations going back several years with respect to the
23   children in which -- with respect to Mrs. Dias.
24       Your Honor, I'm going to apologize.  I'm recovering from
25   pneumonia, so --
```

```
 1            THE COURT:  Goodness.
 2            MR. MIN:  -- if I'm coughing, I apologize.  I'll try
 3    to mute myself with some coughs.
 4         Truthfully, the underlying issue is really just the
 5    gravity, severity, the extent of these allegations, which, yes,
 6    we were made aware that there was going to be grave risk
 7    allegations, but the -- again, the gravity of these allegations
 8    were somewhat of a surprise to us.
 9         We received the expert report on September 23rd.  Our
10    expert is obviously scheduled to interview the children or
11    evaluate the children tomorrow and issue a rebuttal report
12    Sunday.
13         I mean, the fact of the matter is simply we would like
14    some more time to feel like we can adequately prepare.  You
15    know, I know counsel responded and doesn't believe that the
16    mediation, like, has any bearing and, you know, generally we
17    would agree; but we also believe that efforts to focus on
18    mediation could be very fruitful in this matter.  Not to say we
19    can't walk and chew gum at the same time, but, you know,
20    considering how much we have to do over the next several weeks.
21         I mean, there were 621, I think, exhibits that were
22    proposed.  We've spent the last couple days
23    meeting-and-conferring.  It's been whittled down to 524 from
24    respondent's side.
25         This is just a significant amount.  I've done many of
```

1  these cases, as Mr. Davis seems to allude to in his papers.  I

2  mean, I've never had a case where there was 500-plus exhibits

3  proposed by respondent or on the other side.

4      So this is just an inordinate amount of work that we feel

5  we have to prepare over the next couple weeks.  Could we do it?

6  Sure.  We will do it if that's what the Court requests, but,

7  you know, from our vantage point -- and this is petitioner's

8  case -- we did want to expedite.  We believe that, you know,

9  this would be adequate amount of time.  You know, upon further

10  reflection and gathering more information, we believe that we

11  can benefit from some additional time.  That's essentially the

12  essence.

13      **THE COURT:**  Let me ask you to respond, since you

14  didn't have a chance to file a reply brief, to the alternative

15  suggestion of bifurcation; that we take the habitual residence

16  issue first.  That seems to be a threshold issue.

17      **MR. MIN:**  Sure.  I mean -- and I understand the logic

18  of that.  I mean, I do believe that the habitual residence

19  issue to some extent is a little bit of a red herring in this

20  case because ultimately, I mean, our case theory is that, you

21  know, in April 2024 the children had one home in the entire

22  world, which was in Armenia.

23      So this idea that there could be another habitual

24  residence where the children never -- did not reside seems

25  almost impossible to us.

1          The only alternate theory that could exist on habitual

2    residence is that the children had no habitual residence, which

3    is something that the U.S. Supreme Court in *Meenakshi* has

4    disfavored as an outcome.

5          So, I mean, certainly that is legally a possibility, that

6    the children have no habitual residence, but ultimately our

7    contention is in April 2024, when the children were abducted,

8    Armenia was their home.  Their sole home in the entire world.

9    Whether or not they were planning to be there for a year, five

10   years, ten years in Armenia, the point is at that moment in

11   time that was their only home.

12         And so the idea of bifurcating to some extent makes sense

13   if we thought there was some sort of chance that -- or

14   realistic chance or likelihood that the habitual residence

15   outcome would, you know, ultimately end this case.  We just

16   don't believe that that's a strong likelihood at all and to

17   that extent, we think that it wouldn't make sense to have two

18   separate trials.  It seems to make sense to have one trial

19   because also as part of the habitual residence argument I

20   presume that respondent will make allegations as to the state

21   of the marriage, which is a factor in habitual residence

22   determination.  So that would overlap to some extent with the

23   grave risk allegations.

24         So I'm not sure that there's a clear -- clean and clear

25   bifurcation that can result from that.

 1          As an alternative, we are open to that.  I mean, we're not

 2     saying, no.  That just doesn't seem to be our preference, and

 3     we don't think it makes sense for the Court, but --

 4          THE COURT:  Yeah.  Let me explore with you, this --

 5     because the question that I asked is really kind of an overlap

 6     question, and how much judicial inefficiency would result from

 7     bifurcation.  Because I don't want to have -- call witnesses,

 8     you know, multiple times and this sort of thing.

 9          But the state of marriage -- explain to me why that's --

10     how that comes into play and how that overlaps on both phases

11     of the case.

12          MR. MIN:  Sure.  Because there is case law that if

13     there's dysfunction or problems in the marriage when a move is

14     made, that can go into shared intentions of the parties; right?

15     Agreements of the parties, intentions of the parties, and we

16     know to what extent those intentions should control.

17          Because, of course, if there's issues in the marriage,

18     then that might, you know, impact in terms of what intentions

19     the parties really had, right, or give contour or context to

20     what those intentions were.

21          I also think, as Your Honor stated, I mean, there are

22     going to be witnesses who are going to testify to both issues,

23     habitual residence and grave risk issues, which means that

24     they're going to have to be called multiple times.

25          THE COURT:  Who would those witnesses be that will be

 1  called multiple times?

 2          **MR. MIN:**  I mean, my understanding -- I mean,

 3  there -- I mean, I think -- if I go through respondent's

 4  Witness List, I assume that some of the family members are

 5  going to be called for multiple purposes.  I believe they were

 6  listed for multiple purposes.  I'd have to just double check on

 7  that.

 8      We have witnesses that are friends of Mr. Dias, who are

 9  going to talk about their intentions, but also then talk about

10  their observations of the marriage, about him as a father.

11  That will go to the grave risk issue as well.

12          **THE COURT:**  All right.  Let me hear respondent's

13  response, just on the judicial economy aspect of bifurcation.

14      I'm hearing that there may not -- there may be some

15  judicial inefficiencies and inconveniences here.

16          **MR. DAVIS:**  Okay, Your Honor.  I'll reserve remarks

17  on the other -- respectfully on the other issues.

18          **THE COURT:**  Yeah, yeah.

19          **MR. DAVIS:**  I think there's some things we would need

20  to correct in fairness.

21      I hope it's obvious from the tone of our brief, we heard

22  the Court, we put a compromise out.  We tried to move things

23  along.

24          But on the overlap, first of all, habitual residence is a

25  gating issue.  If they cannot prove -- the petitioner cannot

1    prove that it's Armenia -- it doesn't matter where else it

2    might be or if it's nowhere.  If they cannot prove it was

3    Armenia, the case is over.  Respondent wins.

4        To that effect, it's far from a red herring.  We have just

5    learned in documents produced yesterday and today that

6    respondent's employment status there is -- runs out in a few

7    weeks, has not been renewed.  The representations to the Court

8    about his employment status had been inaccurate.  They are

9    going to be amended and fixed.

10       So we had -- if he's not employed there, then nobody is in

11   Armenia.  So at that point it's not Armenia.

12       So it's a -- it's a separate threshold issue.  It's a very

13   objective set of facts.  I think the main overlap would be

14   petitioner and respondent.  So we're not complaining about the

15   timing of learning the true facts about his employment status.

16       It goes to -- and the reason those are the two main

17   witnesses is it goes to the state of mind and intent.  It has

18   to be both spouses.  And we -- we have produced evidence and

19   received evidence that shows that it was always temporary in

20   Armenia.  Before petitioner even got to Armenia, he was looking

21   for jobs elsewhere, in Copenhagen and other countries; anywhere

22   but Armenia, Portugal.  As soon as he landed on the ground,

23   petitioner started doing other job interviews.

24       And just to touch a bit on the 500 documents.  A lot of

25   what we've had to produce, Your Honor, has been things which

 1    should have been produced to us by petitioner.  They were in

 2    his custody and control; about his employment status, his text

 3    messages, all the evidence of abuse.  Those were not produced.

 4    We produced them.

 5        So it's a little -- I mean, 500 documents, I think, in the

 6    scheme of things in this day and age is not a whole lot, but it

 7    certainly -- a lot of it was already in the custody and control

 8    and known to petitioner.

 9        But back to my efficiency question.  These new friends in

10    Armenia that we may hear from, a few minutes by Zoom I assume,

11    I don't know that they can speak to the fact that respondent

12    put terms in their temporary -- they lived in three temporary

13    houses in 16 weeks, and our client put into the lease that it

14    could be stopped at any time, the lease, with no penalty.  And

15    there's just a lot of objective facts that are just documents

16    of respondent and petitioner.

17        In terms of petitioner's counsel trying to inject overlap

18    issues, I think the only sort of evidence of the abuse that we

19    would think that would overlap would be relevant to -- to

20    habitual residence would be that petitioner threw respondent

21    out of the house; said leave, don't ever come back or terrible

22    things were going to happen.  That only goes to the fact that

23    he didn't view her as intending to stay.

24        So I think this is a simple, crisp, you know, day and a

25    half, two days, mainly based on documents, including his

1  employment contract that we finally got to the bottom of.  And

2  it's not a five-year term.  It terminates in a few weeks unless

3  it's renewed.

4      So this -- and then in terms of judicial efficiency, Your

5  Honor, if the case ends, then we -- we're spared other trial

6  days.

7          **THE COURT:**  Right.  But your point about his spouse

8  being thrown out of the house and the state of sort of

9  disrepair of the marriage, I mean, that is -- there is some

10  overlap.  Once you kind of get into that, you're starting to

11  get into maybe not the full 9 yards, but several yards.  So

12  there is some overlap.

13          **MR. DAVIS:**  I'd say it's about a half a yard, Your

14  Honor.

15      I didn't think that -- the bulk of it is -- it's sort of

16  -- their sort of movement history, his employment applications.

17  These are all just black and white exhibits; their lease, his

18  employment contract.  The various things that suggest he

19  probably will not be employed soon because he has rampantly

20  violated WHO, W-H-O, conduct regulations.

21      But that's -- you know, this is his -- what I will say, it

22  doesn't involve experts, doesn't involve the Armenian experts

23  about whether it's a safe place for people suffering domestic

24  violence.  It does not involve the psychologist or Dr. Favaro,

25  all the expert cases put off, and a lot of -- and, frankly, the

1   family, I -- our client's family, I don't see them testifying.

2       I mean, it's in black and white that the family moved all

3   the time and never meant to stay there, including petitioner,

4   so --

5           THE COURT:  Tell me what your -- how many witnesses

6   you would call for -- if we were to bifurcate, who would you

7   call?

8           MR. DAVIS:  I would probably just call respondent and

9   petitioner.

10          THE COURT:  Okay.  And what about you, Mr. Min?

11          MR. MIN:  We would likely call, obviously, the

12  parties and maybe one or two other witnesses, friends who

13  would -- had communications with them in terms of their

14  intentions.

15          THE COURT:  Well, I mean, there makes -- I'm usually

16  not favorable to bifurcation because it seems to end up in

17  the -- having more inefficiencies than efficiencies, but I can

18  see some merit to it.

19      I understand petitioner's argument that their position is

20  there's no merit to it, so you're not going to save any time

21  anyway, but I can't prejudge that.

22      My concern is sort of the inefficiencies of having to kind

23  of re-go over the same evidence or having people appear

24  multiple times.  That's certainly within -- give you a little

25  more time on the -- the Dr. Favaro's report, on sort of the --

 1   that goes to the grave risk issue, I think.  Give you a little

 2   more time and then, you know, back and forth.

 3       On the other hand, I also -- you know, I did set this

 4   date.  I did set -- I cleared this.

 5       The other thing I should tell you is that I don't have any

 6   availability because of my schedule until, it would probably be

 7   mid December when I could do either Phase 2 or this case.  And

 8   then we're talking about a six-week delay, and I'm concerned

 9   given -- you know, ironically it's normally in the other

10   direction.  It's the petitioner's concern, but it might --

11   given the -- the statutory policy of trying to expedite.

12       So I should tell you that up front.  I can't just do --

13   you know, it's not four weeks.  It's going to be -- it would be

14   December, I think it's like the 15th is the next clearing I

15   have where I've got a couple days available.

16           **MR. DAVIS:**  If I could be heard first?

17           **THE COURT:**  Yeah.

18           **MR. DAVIS:**  By mid December, I know myself and the

19   lead colleague on this, are -- have other commitments already.

20   That's -- and I guess that goes to, we're ready to try the

21   whole case.  We made ourselves ready.  We cleared our

22   calendars.  We've incurred hard costs.

23       And, again, it's not just who is taking which position

24   today.  The statutory scheme, as you noted, Your Honor, as

25   Mr. Min argued successfully in August, favors expedition.  I

 1  think a delay to that degree, it will probably end up being

 2  even later.

 3      It's just -- there's just a lot of inefficiencies and

 4  prejudice to respondent and we're very -- and I think if we

 5  could get started -- in terms of mediation, I think we all know

 6  mediation tends to be more successful if there's a little bit

 7  -- if trial is imminent, and I think it's always a conversation

 8  between counsel before mediation, certainly after, to continue

 9  the conversation.

10      I don't -- maybe I don't share Mr. Min's skepticism.  I

11  have great confidence in his and our ability to do two things

12  at once.  So, but if we could proceed, Your Honor, I -- anyway,

13  I respectfully thank you.

14          **THE COURT:**  Okay.

15          **MR. DAVIS:**  One other note -- sorry, Mr. Min, I

16  apologize.

17      Given it may be in bifurcation that there be a friend of

18  respondents that would need to be called to rebut whatever

19  Mr. Min's new friends might say, but I -- if you forced us, we

20  would -- you know, we could -- we'll try it with those two

21  witnesses and the documents.

22      So, sorry.  Apologies.

23          **THE COURT:**  All right.

24          **MR. MIN:**  Yes, Your Honor.  Apologies.

25      We understand and we acknowledge I think the first thing

1   Your Honor said, which is sort of everyone's position is

2   inverted 180 degrees, and it's completely true.

3        Again, I think we go back to the fact that it is typically

4   petitioner that's pushing this case, and it's petitioner's case

5   that he brought; right?  And it's his rights there really, you

6   know, what's being adjudicated to a large extent here.

7        So, you know, at the end of the day, I mean, it's

8   petitioner that was asking for the expeditious resolution and

9   it's petitioner now asking for additional time.

10       We are fine and we are prepared to work with counsel, with

11  the Court, and with respondent's witnesses so that it's all

12  convenient and available for them.  And if that's December,

13  it's December.  If it's January, it's January.

14       And we've talked internally and our client understands

15  that if we're asking for a continuance, that we have to be

16  accommodating to the Court, to respondent's counsel's schedule

17  and to their witness schedule, and we fully understand that.

18       We are not raising any arguments that this case is not

19  expedited, and there's plenty of cases that have not resolved.

20  And this was -- has been discussed in, you know, the time

21  frame, and we weren't even working in the six-week time frame

22  to begin with.  And so another six weeks, another two months,

23  you know, in the grand scheme of things in order to put forward

24  the best case possible, and certainly to that extent, I mean,

25  no one is going to be prejudiced by having more time to prepare

```
 1   for trial.  It's not going to harm anyone's case.

 2        If anything, allow both parties a little bit better chance

 3   to put on the best case possible.  We are willing to be

 4   completely flexible for everyone else.

 5        MS. FLORES:  Your Honor, my apologies, but petitioner

 6   does not get to dictate the timing of the matter.  And our

 7   client actually, you know, is subject to an obligation based on

 8   the timing of this case.  She has essentially put her life on

 9   hold so that she can defend against petitioner's accusations

10   against her.

11        So to the extent that her due process rights as a

12   defendant in this case are implicated, she should be able to be

13   heard in court as soon as possible.  We set a schedule.

14   Mr. Min, who has been on the case since June 24th, agreed to

15   it, and now saying he needs more time.  We've been on the case

16   for less than a month and we're ready to go.

17        MR. MIN:  Your Honor, one additional thing I'd like

18   to add, because Mr. Davis before talked about our client's job

19   status and his contract, which we respectfully disagree with

20   his representation and interpretation of that, but putting that

21   aside.

22        I mean, even using Mr. Davis's representation of the

23   contract, in a few weeks, you know, he says the contract

24   expires.  Well, in a few weeks, you know, we'll know then, you

25   know, by November, December certainly, is he continuing to be
```

1  employed by the WHO.  And that certainly would be a relevant,

2  you know, factor and development if Mr. Davis is right that our

3  client is no longer employed by the WHO, which we, again,

4  contest.

5      But if that's what Mr. Davis is representing then, in a

6  few weeks his contract expires and he's no longer working for

7  the WHO and, therefore, has no connection to Armenia, that

8  certainly would be a very important development in this case.

9          **MR. DAVIS:**  If I could respond, Your Honor.

10         **THE COURT:**  Okay.  Briefly, and then I have a

11 question.  Go ahead, Mr. Davis.

12         **MR. DAVIS:**  Again, as Ms. Conklin noted, respondent

13 is -- and the defendant share here.  She has rights too.  She's

14 been accused of abduction and so forth.

15     Again, it's a statutory scheme.  I think the -- an

16 opportunity to be heard, that's what the statutory scheme

17 speaks of.  It doesn't speak about your -- the best case

18 possible.

19     In terms of not anyone being prejudiced, again, we -- our

20 entire team cleared out our professional lives, set everything

21 aside based and in reliance on Mr. Min's agreement to

22 everything.

23     And his client -- Your Honor, the cliche is his client

24 knew what he did last summer.  He knew what he had done.  He

25 knew the texts he would send.  He knew the audios that he had

```
 1   left for people.  He knew how he behaved.
 2       And the Armenian proceeding has not been -- I mean, it's
 3   still on appeal.  If it's -- if it was dismissed at all after
 4   successfully being restrained, it was because of procedural
 5   issues.  But that's neither here nor there.
 6       It certainly put him on notice that his conduct and all
 7   and so forth would be an issue.  So it's just -- anyway, I
 8   apologize.
 9            THE COURT:  Let me ask you:  What do you anticipate
10   in terms of the pretrial filings that your -- whether it's --
11   whether it's as had been ordered or -- on the 7th or it's a
12   later date, what are we talking about in terms of -- what are
13   the issues that are going to be -- that need to be resolved
14   pretrial?
15            MR. DAVIS:  For the full trial, Your Honor?
16            THE COURT:  Yeah.
17            MR. DAVIS:  Okay.  Our meet-and-confer efforts on
18   Motions in Limine, or at least our anticipating
19   meeting-and-conferring will lead to success.  I think there's
20   not going to be any from either side.
21       I would have reserved on that, but I think a bench trial
22   and just understanding your standing order and so forth at
23   least, I think, none.
24       No -- we've been exchanging objections and Exhibit Lists
25   and Witness Lists and so on.  There may be some hearsay
```

| | |
|---|---|
| 1 | objections that we received from petitioner's counsel.  I fully |
| 2 | intend we will work those out. |
| 3 | And I think given the procedural rules and the residual |
| 4 | hearsay exception and so on, that's solvable. |
| 5 | So I don't see any evidentiary motions from respondent |
| 6 | certainly.  My colleagues can correct me if I'm getting -- if |
| 7 | I'm too far afield. |
| 8 | **MS. FLORES:**  That is correct. |
| 9 | **MR. DAVIS:**  Yes.  So I think motions, just a pretrial |
| 10 | brief and -- and we see, we do the tech check and -- but if I'm |
| 11 | missing anything, Ms. Conklin will correct me. |
| 12 | **MS. FLORES:**  Nope. |
| 13 | **THE COURT:**  All right.  On your side, Mr. Min, |
| 14 | Ms. DeLacey? |
| 15 | **MR. MIN:**  Yes.  I mean, generally we agree.  We -- I |
| 16 | know -- I don't think I was on it, but last week there was a |
| 17 | meeting and confer, my colleague, and the expectation is that |
| 18 | there would be no Motions in Limine.  Obviously, Monday we have |
| 19 | the joint pretrial -- pretrial conference statement, the |
| 20 | pretrial brief, and then the proposed findings, conclusions of |
| 21 | law, which we all expect to all file on Monday. |
| 22 | Yeah.  I mean, otherwise I don't disagree with Mr. Davis. |
| 23 | **THE COURT:**  Okay.  All right.  So here is what we're |
| 24 | going to do. |
| 25 | I'm going to deny the motion to continue the trial.  I'm |

1    not going to bifurcate.  I think we should go forward.

2         I understand that, you know, there's a fair amount of work

3    to do, but in my view there should be nothing completely

4    surprising.

5         There is a sort of policy and statutory interest in

6    adjudicating this, not only because of the rights of both

7    parties involved, including the respondent, but also the

8    children.  I think the longer things go on -- if there's going

9    to be, for instance, an order bringing them back, I don't think

10   it's to their advantage to have their current state prolonged.

11   And so there are a lot of reasons why I think the -- the treaty

12   and statutory log favors expeditious adjudication.

13        And we have moved -- I've moved my schedule around

14   substantially to accommodate this case.  And I just can't move

15   it for four weeks.  Sounds like can't move it to six or eight

16   weeks.  Because I've got another criminal case scheduled for

17   early January, now we're talking about sort of late January,

18   and that really is putting things out for a long time.

19        So I'm going to deny the motion to continue.  What I will

20   do is I can move the pretrial conference back a day, to the

21   17th.  I can move some of these disclosure dates, such as the

22   rebuttal report and the pretrial filings, back by a couple

23   days.  So, you know, Dr. Favaro has a little more breathing

24   space.  He can file, for instance, by the 8th, and then your

25   pretrial filings by the 9th.  And that should give him time to

1   do the examinations and then put together his report in a

2   meaningful way, give you all a little extra time to file.

3        I can hear the matter on the 17th at 9:00 o'clock, but we

4   would keep the same trial date.

5             **MR. MIN:**  Okay.

6             **THE COURT:**  This way you get a little more breathing

7   space, but, you know.

8             **MR. MIN:**  Thank you, Your Honor.

9        Your Honor, can I clarify one thing --

10            **THE COURT:**  Yeah.

11            **MR. MIN:**  -- on the pretrial conference.

12       I -- because I didn't see it, I don't think, in the

13  minutes order and then one of the scheduling orders made a

14  statement about lead trial counsel.  I had noted that I would

15  be in Florida testifying on another case at the pretrial

16  conference.

17       The last conference I believe you said it was okay for

18  Ms. DeLacey, even though I'm lead trial counsel, to be handling

19  the pretrial conference.  Is that still okay?

20            **THE COURT:**  Sure.  Yes.

21            **MR. MIN:**  All right.  I mean, I would be able to

22  appear via Zoom to the extent I'm able.

23            **THE COURT:**  Yes.  We'll hybrid so you can appear.

24            **MR. MIN:**  Okay.  Thank you.  I just wanted to

25  clarify.  Appreciate that.

```
 1        And I appreciate the new deadlines, Your Honor, and your
 2   consideration of this motion.
 3            THE COURT:  All right.  Well, this is important.  So
 4   let me -- we'll get out a minute order, some minutes, Vicky,
 5   with -- confirming these dates; but, hopefully, that will give
 6   you at least a little bit of breathing space, but I think it's
 7   important that we proceed.
 8        I'm also hopeful that perhaps mediation will bear some
 9   fruit.  So, obviously, I'm encouraging you all to give that a
10   real chance.  So you all are very experienced, so I'm sure it's
11   in good hands in that regard.
12            MR. MIN:  Thank you, Your Honor.
13            THE COURT:  Okay.  See you at the pretrial
14   conference.
15            MR. DAVIS:  Thank you, Your Honor.
16            THE CLERK:  This hearing is concluded.
17        (Proceedings adjourned.)
18
19
20
21
22
23
24
25
```

## **CERTIFICATE OF OFFICIAL REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, October 23, 2024